# COMPOSITE

# EXHIBIT A



# MIAMI-DADE COUNTY CLERK OF THE COURTS
## HARVEY RUVIN

Contact Us    My Account    🛒

---

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

---

◀◀ BACK

**ISLAND WIFI LIMITED LLC VS AT&T MOBILITY NATIONAL ACCOUNTS LLC.**

| | | | |
|---|---|---|---|
| Local Case Number: | 2020-017369-CA-01 | Filing Date: | 08/14/2020 |
| State Case Number: | 132020CA017369000001 | Judicial Section: | CA24 |
| Consolidated Case No.: | N/A | Case Type: | Injunctive Relief |
| Case Status: | OPEN | | |

## 👥 Parties
Total Of Parties: 2 ➖

| Party Description | Party Name | Attorney Information | Other Attorney(S) |
|---|---|---|---|
| Plaintiff | ISLAND WIFI LIMITED LLC | B#: (Bar Number)1002238<br>N: (Attorney Name)Drummond, Kevin, ESQ | |
| Defendant | AT&T MOBILITY NATIONAL ACCOUNTS LLC. | B#: (Bar Number)100566<br>N: (Attorney Name)Martinez-Cid Jordi | |

## 🔧 Hearing Details
Total Of Hearings: 1 ➖

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 09/03/2020 | 10:30AM | SPECSETS | Special Sets | |

## 📡 Dockets
Total Of Dockets: 20 ➖

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| ○ | 18 | 09/07/2020 | | Emergency Motion | Event | **FOR INJUNCTIVE RELIEF RELIEF AGAINST DEFENDANT AT&T MOBILITY NATIONAL ACCOUNTS LLC** |
| 📄 | 17 | 09/04/2020 | | Order: | Event | **ON PLAINTIFF'S EMERGENCY MOTION FOR ENTRY OF TEMPROARY [SIC] INJUNCTION** |
| 📄 | 16 | 09/03/2020 | | Amended Motion | Event | **FOR INJUNCTION** |
| | | 09/03/2020 | | Special Sets | Hearing | **STATUS CONFERENCE** |
| 📄 | 15 | 09/02/2020 | | Notice of Appearance | Event | Parties: Martinez-Cid Jordi; AT&T MOBILITY NATIONAL ACCOUNTS LLC. |
| 📄 | 14 | 09/01/2020 | | Notice of Hrg Special Appt | Event | **09-03-20 @ 10:30 AM** |
| 📄 | 13 | 08/28/2020 | | Service Returned | Event | |
| 📄 | 12 | 08/28/2020 | | Amended | Event | |

1/3

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 11 | 08/28/2020 | | Emergency Motion | Event | |
| | | 08/27/2020 | | 20 Day Summons Issued | Service | |
| 📄 | 10 | 08/27/2020 | | ESummons 20 Day Issued | Event | Parties: AT&T MOBILITY NATIONAL ACCOUNTS LLC. |
| | 9 | 08/25/2020 | | Receipt: | Event | **RECEIPT#:2650067 AMT PAID:$10.00 NAME:DRUMMOND, KEVIN, ESQ 1645 PALM BEACH LAKES BLVD STE 1200 WEST PALM BEACH FL 33401 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:E-FILING ACH** |
| 📄 | 8 | 08/20/2020 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 7 | 08/20/2020 | | Amended Complaint | Event | |
| | 6 | 08/18/2020 | | Receipt: | Event | **RECEIPT#:2560075 AMT PAID:$401.00 NAME:DRUMMOND, KEVIN, ESQ 1645 PALM BEACH LAKES BLVD STE 1200 WEST PALM BEACH FL 33401 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:E-FILING ACH** |
| 📄 | 5 | 08/17/2020 | | Notice of Service of Process | Event | |
| 📄 | 4 | 08/14/2020 | | Notice: | Event | **TO DEFENDANT OF: PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANT AT&T MOBILITY SERVICES LLC.** |
| 📄 | 3 | 08/14/2020 | | Motion: | Event | **PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANT AT&T MOBILITY SERVICES LLC** |
| 📄 | 2 | 08/14/2020 | | Complaint | Event | |
| 📄 | 1 | 08/14/2020 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Login

Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



## HARVEY RUVIN

Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2020 Clerk of the Courts. All rights reserved.



**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting <u>data</u> pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I.      CASE STYLE**

<div align="center">

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>  COUNTY, FLORIDA

</div>

Case No.:_____
Judge: _____

<u>ISLAND WIFI LIMITED LLC</u>
 Plaintiff
            vs.
<u>AT&T MOBILITY NATIONAL ACCOUNTS LLC.</u>
Defendant

---

**II.     AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim rounded to the nearest dollar $<u>165,759</u>

**III.    TYPE OF CASE**     (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

| | |
|---|---|
| ☐ Condominium | ☐ Malpractice – other professional |
| ☐ Contracts and indebtedness | ☒ Other |
| ☐ Eminent domain |    ☐ Antitrust/Trade Regulation |
| ☐ Auto negligence |    ☐ Business Transaction |
| ☐ Negligence – other |    ☒ Circuit Civil - Not Applicable |
|    ☐ Business governance |    ☐ Constitutional challenge-statute or ordinance |
|    ☐ Business torts |    ☐ Constitutional challenge-proposed amendment |
|    ☐ Environmental/Toxic tort |    ☐ Corporate Trusts |
|    ☐ Third party indemnification |    ☐ Discrimination-employment or other |
|    ☐ Construction defect |    ☐ Insurance claims |
|    ☐ Mass tort |    ☐ Intellectual property |
|    ☐ Negligent security |    ☐ Libel/Slander |
|    ☐ Nursing home negligence |    ☐ Shareholder derivative action |
|    ☐ Premises liability – commercial |    ☐ Securities litigation |
|    ☐ Premises liability – residential |    ☐ Trade secrets |
| ☐ Products liability |    ☐ Trust litigation |
| ☐ Real Property/Mortgage foreclosure | |
|    ☐ Commercial foreclosure | ☐ County Civil |
|    ☐ Homestead residential foreclosure |    ☐ Small Claims up to $8,000 |
|    ☐ Non-homestead residential foreclosure |    ☐ Civil |
|    ☐ Other real property actions |    ☐ Replevins |
| ☐ Professional malpractice |    ☐ Evictions |
|    ☐ Malpractice – business |    ☐ Other civil (non-monetary) |
|    ☐ Malpractice – medical | |

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒  Monetary;
☒  Non-monetary declaratory or injunctive relief;
☐  Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:**
(Specify)

<u>3</u>

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ Yes
☒ No

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ No
☐ Yes – If "yes" list all related cases by name, case number and court:

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
☐ Yes
☒ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature:   <u>s/ Kevin Drummond</u>
Attorney or party
FL Bar No.:  <u>1002238</u>
(Bar number, if attorney)
<u>Kevin Drummond</u>
(Type or print name)
Date:  <u>08/14/2020</u>

## RETURN OF SERVICE

| State of Florida | County of Miami Dade | Circuit Court |
|---|---|---|

Case Number: 2020-017369-CA-01

Plaintiff:
**ISLAND WIFI LIMITED, LLC A FOREIGN LIMITED LIABILITY COMPANY**

vs.

Defendant:
**AT&T MOBILITY NATIONAL ACCOUNTS LLC, A FOREIGN LIMITED LIABILITY COMPANY**

For:
Kevin Drummond
Blue Line Law Firm, Pllc
1645 Palm Beach Lakes Blvd
Suite 1200
West Palm Beach, FL 33401

Received by L & L Process, LLC. on the 28th day of August, 2020 at 2:32 pm to be served on **AT&T MOBILITY NATIONAL ACCOUNTS LLC C/O CT CORPORATION SYSTEM, 1200 SOUTH PINE ISLAND ROAD, PLANTATION, FL 33324**.

I, Katherine Font, do hereby affirm that on the **28th day of August, 2020** at **2:55 pm, I:**

served a **CORPORATION** by delivering a true copy of the **Summons 20 Day Corporate Service, Plaintiff's First Verified Amended Complaint & Incorporated Memorandum of Law, Emergency Motion for Entry of Temporary Injunction and Notice to Defendant** with the date and hour of service endorsed thereon by me, to: **DONNA MOCH AS SENIOR CORPORATE OPERATIONS MANAGER FOR C.T. CORPORATION SYSTEM** as **REGISTERED AGENT** for **AT&T MOBILITY NATIONAL ACCOUNTS LLC**, at the address of: **1200 SOUTH PINE ISLAND ROAD, PLANTATION, FL 33324**, and informed said person of the contents therein, in compliance with state statutes.

I do hereby certify that I have no interest in the above styled action; that I am over the age of eighteen years; and that I am a Special Appointed Process Server in and for Broward County, Florida.  Under penalty of perjury, I declare that I have read the foregoing Verified Return of Service and the facts contained herein are true and correct to the best of my knowledge. NO NOTARY REQUIRED PURSUANT TO F.S.92.525(2)

Katherine Font
SPS #920

**L & L Process, LLC.**
**13876 SW 56 Street**
**Suite 200**
**Miami, FL 33175**
**(305) 772-8804**

Our Job Serial Number: LLP-2020002336

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1t

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2020-017369-CA-01 |
|---|---|---|
| PLAINTIFF(S)<br><br>ISLAND WIFI LIMITED, LLC.,<br>A Foreign Limited Liability Company,<br><br>Plaintiff, | VS. DEFENDANT(S)<br>AT&T MOBILITY NATIONAL<br>ACCOUNTS LLC., A Foreign Limited<br>Liability Company<br>Defendant, | SERVICE |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on

defendant(s): __AT&T MOBILITY NATIONAL ACCOUNTS LLC__

        __c/o C T CORPORATION SYSTEM__

        __1200 SOUTH PINE ISLAND ROAD__

        __PLANTATION, FL 33324__

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: _Kevin Drummond, Esq._

**CLOCK IN**

whose address is: 1645 Palm Beach Lakes Blvd., Suite 1200, West Palm Beach, FL. 33401
Telephone 888-611-9511

E-Service Intake@tbllf.com

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to, 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | d. Honer 21397<br><br>DEPUTY CLERK | DATE<br><br>8/27/2020 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
A *Foreign Limited Liability Company*
Plaintiff,

V.                                                          Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

---

## PLAINTIFF'S FIRST VERIFIED AMENDED COMPLAINT & INCORPORATED MEMORANDUM OF LAW

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned

counsel, hereby files this Amended Complaint for Declaratory, Monetary and Emergency

Injunctive Relief, and respectfully states as follows:

# I. INTRODUCTION

Plaintiff Island Wi-fi Limited, LLC., is a startup company, in the business of providing wi-

fi capable mobile devices to a broad spectrum of clients and the general public. Defendant "AT&T"

is the largest telecommunications provider globally. Plaintiff and Defendant are parties to a

contractual agreement commencing on or about November 20, 2019 and lasting two years. A copy

of the contract is attached hereto as (Ex. A). The general terms of the contract require Defendant

to provide Plaintiff with an account wherein Plaintiff can add or remove, at its leisure individual

lines of service, for which Defendant provides unlimited data services at a set rate per-line. Both

of the parties faithfully performed the contract for eight-months without issue between them.

Plaintiff timely and routinely paid the monthly bill and enjoyed the service provided by Defendant

On July 17, 2020, Defendant informed Plaintiff, without consultation, that Plaintiff's account would be terminated on August 17, 2020, due to Plaintiff's usage of the paid for lines of unlimited data. Plaintiff has paid more than $200,000.00 in monthly bills over the short life of the contract and invested more in its own business growth.

This litigation quickly followed, and Plaintiff seeks to have this Honorable Court adjudicate the contractual rights of the parties as Defendant has unilaterally and materially altered the contract by restricting the Plaintiff's usage of its account, shortening the term of the contract and failing to perform as required by the contract. Defendant's actions are causing increasing harm to the Plaintiff's international business reputation and goodwill amongst its customers. On August 17, 2020, the threatened termination date, Defendant's counsel ensured Plaintiff's counsel via email, "[t]he status quo is being maintained until further notice" and that there was no need for Plaintiff to pursue an emergency injunction. (Ex. B). Despite the reassurance, On August 18, 2020, Defendant not only breached their own interpretation of the "status-quo" but once again shifted it in their favor by restricting the Plaintiff's from utilizing lines of service it that were previously paid for. Further the "status-quo" that should be maintained is the mutual performance of the contractual agreement, as written, by both parties, not "status-quo," defined by the Defendant which includes their material breach and bad faith performance.[1]

---

[1] In the case of *Annex Indus. Park, LLc. v. Corner Land.*, LLC, 206, So. 3d 739, the trial court enjoined a party accused of trespassing from any *future* entry upon the land of another. *Corner* previously gave permission to *Annex.* to use a portion of its land, and later withdrew said permission. *Id* at 740. Even after a Cease and desist *Annex.* continued to use *Corner's* property. *Id. Corner* sought a temporary injunction and the trial court granted it. *Id.*.On appeal, Florida's Third District Court of Appeal upheld the injunction and dismissed *Annex.'s* argument that the injunction disturbed the status quo and was therefore improper. *Id.* at 741. In doing so, the District Court ruled that "a trial court does not abuse its discretion by enjoining an alleged continuing trespass, even if the injunction disturbs, rather than preserves, the status quo. *Id.* at 740.

## A. NEGOTIATIONS AND CONTRACT FORMATION

1.      The parties initial dealings before signing the contract lasted over 90 days as Plaintiff sought to understand the market for which its business would operate.

2.      Prior to signing the contract, Plaintiff discussed the parties contract at length with Defendant's representatives Kareem Najjar & Matthew Kutcher.

3.      Plaintiff represented by its executive officers, negotiated the contractual terms, and selected what was believed to be a mutually beneficial service plan.

4.      Based upon the representations of Defendant's representatives, Kareem Najjar and Matthew Kutcher, Plaintiff's business-to-business contract was appropriate for the Plaintiff's needs.

5.      AT&T required a United States entity be formed for the contracted services within the United States, accordingly Plaintiff's entity was formed on October 30, 2019. Defendant was well aware of the newly formed entity.

6.      Plaintiff is startup business in the United States and modeled its business operations from a lucrative company operated abroad. They do not have in-house counsel, or much experience with contract drafting.

7.      Defendant is a telecommunications provider believed to be valued at more than $200 billion with untold resources at its disposal, drafted the contract, and trained the representatives who advised Plaintiff.

8.      Before contracting with AT&T, Plaintiff researched "would be competitors" who advertise that they use AT&T's service to supply data services to their own customers.

9.      Plaintiff discussed these business models and practices with AT&T's representative Matthew Kutcher & Kareem Najjar prior to signing the contract with Defendant.

10.     Defendant's representatives stated that this was not permissible if they are using the brand of AT&T without permission.

11.     Kutcher assured Plaintiff the proposed contract supplied by AT&T permitted Island Wi-fi's proposed uses for the business-to-business data packages and products.

12.     Initially Plaintiff's contract was submitted for approval, by Kutcher, under the name of the foreign entity.

13.     Plaintiff's contract was rejected due to the foreign status of that entity.

14.     Plaintiff then formed a United States L.L.C.

15.     At the time of Plaintiff receiving the final contract, Kutcher was well aware that Plaintiff's business revolved around selling wi-fi services, as the name "MyIslandWifi" implies.

16.     Plaintiff reiterated these plans to Kutcher numerous times before signing the contract, and within the 30-day cancellation period after execution.

17.     Before signing the contract or making any formal agreement, Kutcher and Najjar supplied Plaintiff with ten (10) SIM cards to "test the network's ability and coverage."

18.     During negotiations, Plaintiff specifically pointed out the clause related to reselling and was assured that it was not an issue as long as the branding of AT&T was not used.

19.     Plaintiff was told this "reselling clause" was standard in all of Defendant's business-to-business contracts.

20.     Plaintiff's representative then explained the business operations and success of the foreign Wi-fi company to Najjar and/or Kutcher.

21.      Plaintiff demonstrated a successful business model and clear ability to generate revenue in addition to opening a large volume of individual lines.

22.     During negotiations, Defendant's representatives informed that due to Plaintiff's recent incorporation date of October 30, 2019, and lack of credit a $1,000.00 deposit per-line opened on the account would be required. (Ex. B).

23.     As of the filing of this complaint, the total deposit would be in excess of three-million dollars if AT&T had not waived this requirement.[2] (Ex. B).

24.     Defendant waived the $1,000.00 deposit requirement.

25.     Plaintiff's representative specifically required that international roaming be prohibited on all lines on the account.

26.     Plaintiff signed the contract on or about November 20, 2019 and began performance shortly thereafter; the contract expires on or about November 20, 2021.

## B. THE CONTRACTUAL TERMS

27.     The terms of the contract require Plaintiff to pay per-line of service purchased from the Defendant plus any applicable activation fees, taxes, or other charges. (Ex. A).

28.     The terms require Plaintiff to pay at least $45,000.00 annually for Defendant's service under the contract's minimum revenue provision. (Ex. A.)

29.     If Plaintiff failed to consume $45,000.00 of service from Defendant annually, Plaintiff would pay the difference between any lesser amount billed and $45,000.00. (Ex. A).

30.     This means AT&T expected, required, or would otherwise penalize Plaintiff, if enough lines of service did not remain active throughout each year of the agreement, on average more than 2,000 aggregate lines based on monthly billing/counting. (Ex. A).

---

[2] The deposit requirement would have paid for the monthly charge for the entire contractual term, plus an additional 9 months.

31.     The crux of the agreement requires AT&T to provide unlimited internet for each line Plaintiff pays for, Plaintiff receives a SIM card that can be activated and inserted into a mobile device, deactivated or suspended at Plaintiff's will and reactivated if Plaintiff chooses.

32.     Plaintiff has paid its monthly bill to AT&T every month and has performed all of its obligations under the contract, including Plaintiff's most recent bill for the billing cycle of August 5, 2020 through September 4, 2020, in excess of $70,000.00, is paid in full.

33.     AT&T reasonably expected that Plaintiff's business would generate a large amount of lines but knew if Plaintiff failed to do so the contract contained a minimum revenue requirement of $45,000.00, for which Defendant would still profit. (Ex. A).

## C. AT&T'S KNOWLEDGE OF PLAINTIFF'S OPERATIONS INTENTIONALLY WAIVED THE RIGHT TO TERMINATE THE CONTRACT

34.     Before signing the contract, Plaintiff discussed the foreign business known as MyIslandWi-fi with Defendant's representatives Kareem Najjar & Matthew Kutcher.

35.     Plaintiff's representative explained how it operated, how many lines of service it generated, its profitability, and how many new lines of service were expected on this new United States account and how the Plaintiff's business sought to model the other entity.

36.     Defendant's representative(s) assured Plaintiff and its representatives that the contractual agreement was appropriate for Plaintiff's needs, namely selling wi-fi, as the name "MyIslandWi-fi" suggests.

37.     Before and after signing the contract, Plaintiff has used numerous email addresses with @MyIslandWifi.com as the common domain to communicate with Defendant's representatives

38.     Plaintiff's representative's signature block contains a link to the website – www.myislandwifi.com.

39.     Plaintiff's representative showed this website to Defendant's representatives Najjar and Kutcher.

40.     This website remains substantially the same today and it did then.

41.     This website makes it clear how the Plaintiff's business operates, namely selling Wi-fi.

42.     Defendant and its representatives had actual knowledge of Plaintiff's business operations, or at least the nature thereof before signing the contract.

43.     For execution of the contract, Defendant's representative Matthew Kutcher sent the contract to "Sales@MyIslandWifi.com." "Sales@MyIslandWifi.com" should have been a clear indication that Plaintiff sells wi-fi. ().

44.     After signing the contract, Plaintiff's representative sent an email directly to AT&T representative Kutcher, stating "[a]t this time we are waiting to complete orders due to the delays in the account," and requested an update on when the account would be active so Plaintiff's orders could be filled. (Ex. B).

45.     This communication clearly informs Defendant that Plaintiff does in fact sell or otherwise redistribute wi-fi. (Ex. B).

46.     Defendant nor its representatives confused this statement as referring to Plaintiff's personal order for necessary SIM cards.

47.     On December 10, 2019, Plaintiff spoke with Najjar about paragraph 9 of the contract between the parties, prohibited usages and reselling.

48.     Based upon that conversation, Plaintiff sought to exercise the 30-day termination clause.

49.     On December 11, 2019, Najjar emailed Kutcher to inform him of the conversation.

50. Defendant's representative Kutcher assured Plaintiff that "several AT&T customers use this contract for the very same reason, and if you have any questions or concerns, reach out to me directly."

51. Defendant's representative Kutcher stated to Plaintiff that he serviced several accounts doing the same distribution as Plaintiff.

52. Kutcher's representations induced the Plaintiff to sign the contract.

53. Kutcher's representations induced the Plaintiff to refrain from terminating the contract.

54. Kutcher had actual knowledge of Plaintiff's intended usage and business operations.

55. With this knowledge, Kutcher, for the purpose of bolstering his sales record, opened Plaintiff's account, and continuously ensured Plaintiff their operations fell within the scope of the contract.

56. Defendant adequately trains its representatives regarding the products and services they sell.

57. Kutcher knew these statements were false when he made them.

58. Kutcher knew these statements were likely to mislead consumers.

59. Kutcher made these statements with reckless disregard to their truth or falsity.

60. Kutcher made these statements with the intent to enrich AT&T, or himself.

61. Cancellation did not occur, because Defendant's representative(s), specifically Matthew Kutcher, again reassured Plaintiff that the contract was appropriate for Plaintiff's needs, ensuring Kutcher would meet his quota for new lines activated. (Ex. C).

62. Kutcher had full knowledge of the Plaintiff's needs and planned uses as he advised Plaintiff of the proper product.

63.     Defendant's representatives did not disclose to Plaintiff the existence of alternative products and account plans offered by AT&T, their affiliate(s), or subsidiary(ies), that permit the very business Plaintiff was engaged in.

64.     It was not until June 2020 that Plaintiff learned of the APEX[3] (AT&T Partner Exchange) program/product offered on AT&T's network.

65.     APEX would have been more appropriate for Plaintiff's business operations than the business-to-business contract supplied by the Defendant.

66.     Before entering into the contract, Defendant and/or their authorized representatives were informed by owner-Tripp, of the Plaintiff's intended business operations, directly and indirectly.

67.     Defendant had a duty to inform Plaintiff of the proper product or service.

68.     Instead Defendant seeks to terminate the contract, leaving Plaintiff's business with no alternative for its customers.

69.     Further demonstrating knowledge prior to July 17, 2020, AT&T actively assisted in resolving a dispute in May 2020 between Plaintiff and one of its customers.

70.     This dispute was causally related to AT&T products, services, and Plaintiff's accounts.

71.     This customer claimed ownership of approximately 200 lines of service on Plaintiff's account and sought move them onto an account not owned by Plaintiff.

72.     This customer accessed Plaintiff's account without authorization and attempted to transfer approximately 200 lines to a different account.

73.     The nature of this dispute evidences the nature of the Plaintiff's business operations, already known by the Defendant.

74.     Defendant intervened and resolved the issue in favor of the Plaintiff.

---

[3] The APEX program supports the very business that Plaintiff was engaged in, however Plaintiff's representative were never informed of its existence before the contract was executed.

75.     Defendant shut down the account the attempted transfer was directed.

76.     Defendant shut down the account the attempted transfer was directed because Horn was "reselling" Defendant's products and services.

77.     Plaintiff's account was allowed to remain open without objection.

78.     If Defendant made a reasonable inquiry into the matter it would have discovered Plaintiff's business operations.

79.     Defendant did make a reasonable inquiry into the matter.

80.     Defendant willfully ignored the obvious signs of Plaintiffs business operations.

81.     No later than May 2020, Defendant knew Plaintiff sold and distributed Wi-fi services and voiced no objection.

82.     Throughout the course of performance, AT&T allowed Plaintiff to generate more lines on the account, expand its customer base, grow as a business account holder with AT&T, and invest considerable sums of money into its business.

83.     In doing so, Defendant waived any right it may have possessed to terminate Plaintiff's contract for the reasons stated on July 17, 2020.

84.     Defendant had direct knowledge of the exact conduct that they are now using as the basis for declaring Plaintiff is in breach of the agreement and Plaintiff's account would be terminated.

85.     Defendant made no objections to Plaintiff's use of its products when Plaintiff, fearing something was amiss, attempted to terminate the agreement in December of 2019.

86.     Instead Defendant's representative Kutcher doubled down and assured Plaintiff's representative that they "had nothing to worry about as long as Island Wi-fi paid their bill."

87.     Defendant made no objections to Plaintiff's use of its products and services even after Defendant fraud department investigated the report made by Plaintiff's representative in May of 2020.

88.     On July 17, 2020, that same fraud department, without providing any alternative, threatened to close Plaintiff's account for activity that Defendant had knowledge of for more than six-months prior, or would have been discovered by reasonable diligence.

89.     Defendant's representatives Kareem Najjar and/or Matthew Kutcher purposefully did not disclose that the contract was inappropriate for Plaintiff's needs, *inter alia*, to generate profit, commissions, meet sales quotas and/or otherwise improve their overall work performance.

90.     Upon information and belief representative Kutcher was promoted to position that paid approximately a 50% higher salary around the time Plaintiff's contract was finalized.

91.     Defendant on numerous occasions, was made aware of the Plaintiff's usage of its products and services.

92.     Defendant on numerous occasions, accepted the Plaintiff's usage of its products and services.

93.      Defendant on numerous occasions, assented to Plaintiff's usage of its products and services by continuously billing, accepting payments, and providing service under the parties' contractual agreement.

94.     Defendant, with the same knowledge they currently have, assented to the contract, amendments thereto, and Plaintiffs usage of AT&T services.

## D. PLAINTIFF'S SUCCESSFUL BUSINESS VENTURE

95.     Due to many market factors especially the health crisis caused by the Novel Coronavirus, Plaintiff's services have come into extreme demand.

96.     Because of this Plaintiff added a substantial amount of lines to their account in order to meet the new demand.

97.     In November of 2020, Plaintiff's bill totaled $585.50.

98.     In December of 2020, Plaintiff's bill totaled $290.79. Plaintiff paid and Defendant continued to provide services, even though Plaintiff attempted to cancel this month.

99.     In January of 2020, Plaintiffs bill totaled $1,071.57. Plaintiff paid and Defendant continued to provide services.

100.    In February of 2020, Plaintiff's bill totaled $1,398.24. Plaintiff paid and Defendant continued to provide services.

101.    In March of 2020, Plaintiffs bill totaled $9,622.60. Plaintiff paid and Defendant continued to provide services.

102.    In April of 2020, Plaintiffs bill totaled $20,592.75. Plaintiff paid and Defendant continued to provide services.

103.    In May of 2020, Plaintiff's bill totaled $27,000.51. Plaintiff paid and Defendant continued to provide services, despite the fraudulent activity this month clearly demonstrating the nature of Plaintiff's business.

104.    In June of 2020, Plaintiffs totaled $105,197.59. Plaintiff paid and Defendant continued to provide services.

105.    As Plaintiff's customer list increased, so did its bill to AT&T, and as well as the amount of data services in which AT&T provided. Despite the sizeable increase in Plaintiff's lines of service, Defendant voiced no objection.

106.    As it stands, Plaintiff serves many types of clients ranging from U.S. public schools who have switched to distance learning; to clients who operate aquatic vessels currently at sea and will

be at sea at the time in which Defendant plans to unilaterally and without justification breach the parties' contractual agreement.

107.   Plaintiff's client's who operate aquatic vessels utilize Plaintiff's services to maintain safe and proper navigation, with accurate and up to date weather reports while at sea.

108.   If and when the vessels lose internet access, their navigation equipment will be unable to update weather reports and hazardous conditions at sea.

109.   AT&T knew or should have reasonably deduced the nature of Plaintiff's business operations before either signed the contract.

110.   Plaintiff's name "Island Wi-fi Limited" & "My Island Wi-fi" are good indicators that a reasonably prudent person would investigate, if concerned with reselling of data services.

111.   Further Plaintiff's statement "[a]t this time we are waiting to complete orders due to the delays in the account," in November of 2019 was another good indicator that Plaintiff was selling wifi, or maybe islands.

112.   If nothing else, Plaintiff demonstrating the sister-business in the Bahamas was a clear sign of the Plaintiff's business operations within the U.S.

113.   Defendant did not object to the Plaintiff's usage when it was apparent the Plaintiff was unlikely to meet its $45,000.00 minimum revenue requirement, as AT&T would have profited from the short fall.

114.   Nine months after execution, Defendant demonstrated its intent to prematurely terminate the contract and cease service of Plaintiff's account.

115.   This included lines of service for which Plaintiff had already paid for an advanced period.

## D. AT&T'S ANTICIPATORY BREACH OF THE CONTACT

116.    Since the inception of the agreement and for eight (8) months thereafter, both parties adhered to their contractual obligations.

117.    Plaintiff has paid the required monthly-bill and Defendant has provided contracted services

118.    Further Defendant allowed Plaintiff to control its account.

119.    Defendant has granted Plaintiff's previous requests to open new lines of service.

120.    Defendant has granted Plaintiff's previous requests for additional SIM cards, sometimes hundreds at a time.

121.    In early July 2020, Plaintiff's representative inquired into a product offered by AT&T, which may better serve the Plaintiff's needs, known as the APEX program. Plaintiff sought to transfer their accounts to the APEX program, but those efforts have been unsuccessful.

122.    On or about July 17, 2020, Defendant, by email, unequivocally repudiated the contract with the Plaintiff, citing that Plaintiff breached Paragraph 9 of the contract.

123.    Coincidentally, Plaintiff initially expressed concern with this very clause on December 11, 2019.

124.    Plaintiff was assured by AT&T representative Kutcher that there was no problem with the current contract or Plaintiff's use of AT&T services.

125.    Defendant declared its intent to terminate data service to more than 3,000 lines on Plaintiff's account, for which Plaintiff is paying for and is current on all of its required monthly payments and has otherwise performed all obligations under the contract. (Ex. D).

126.    Defendant repudiated the agreement with Plaintiff or seeks to do so, not because of the alleged reselling violation, but because of the volume of usage of the "unlimited internet" being used by Plaintiff. (Ex. D).

127.    Based on information from Defendant's representatives, AT&T's APEX platform does in fact offer a contract/product that would be appropriate for the Plaintiffs business needs.

128.    This product should have been disclosed to Plaintiff at the onset, and certainly no later than December 11, 2019.[4]

129.    Further, if the current product is improper, that is solely the Defendant's fault, not the Plaintiff's wrongdoing, as Plaintiff has been completely transparent with Defendant regarding Plaintiff's usage of AT&T products.

130.    At the time of contracting, Defendant purposefully withheld information it knew Plaintiff would have reasonably wanted to know or be told.

131.    Defendant knowingly allowed Plaintiff to contract under terms that were insufficient to meet the Plaintiff's needs.

132.    AT&T has not offered Plaintiff any compromise, including transferring Plaintiff's lines to an APEX account.

133.    Simply put, AT&T, in bad faith, is threatening and seems determined to unlawfully breach the contract that it fraudulently induced Plaintiff into signing.

134.    This is demonstrated by the July 17, 2020, email and the August 21, 2020 restrictions placed on Plaintiff's account, despite AT&T's counsel's assurances otherwise.

135.    AT&T does not keep its word when dealing with the Plaintiff.

---

[4] December 10 is when Plaintiff expressed concern over the reselling clause and expressed its desire to terminate the existing contract

## E. THE START OF LITIGATION

136.    On July 17, 2020, Defendant emailed Plaintiff a statement that Plaintiff had breached the contract as a result Plaintiff's account would be terminated on August 17, 2020, some fifteen (15) months before its natural termination.

137.    Further AT&T during the time period between July 17 and August 17, unlawfully denied Plaintiff from adding new lines of service, effectively rendering Plaintiff's business lifeless, severely diminishing its profitability, and causing Plaintiff to lose goodwill with tis consumers.

138.    Plaintiff hired counsel and litigation commenced.

## F. DEFENDANT'S CONTINUOUS BREACH & BAD FAITH PERFORMANCE

139.    Upon being served with Plaintiff's Notice to seek Injunctive Relief and Motion for Injunctive Relief, AT&T's senior litigation counsel Patricia Cruz, reached out to Plaintiff's counsel.

140.    On Monday August 17, 2020, AT&T's, Senior Legal Counsel, Patricia Cruz sent an email to Plaintiff's counsel stating that AT&T would not be terminating Plaintiff's account as they previously stated. (Ex. B).

141.    Attorney Cruz also stated that the parties would continue to operate under the "status quo"[5] without much clarity but ensured there was no need for the emergency injunction.

142.    Plaintiff's counsel sought clarification to determine what circumstances constituted "status quo." (Ex. B).

143.    On Thursday August 20, 2020, Plaintiff and AT&T's representative(s) discussed Plaintiff's desire to add more lines to the account, something he was not able to do between July 17, 2020 and August 17, 2020.

---

[5] Maintaining the status quo is the purpose of injunctive relief. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941). Defendant has assured Plaintiff that the status quo would be maintained, then breached even that promise only a few days later. Plaintiff is left with no other remedy than for this Honorable Court to enter an injunction against Defendant.

144.    Defendant initially added 250 lines at the request of the Plaintiff to its account and assured Plaintiff that the necessary SIM cards would arrive the next day.

145.    Plaintiff then represented to its clients that it would begin to fill some of the approximately 3,000 orders that have accumulated between July 17, 2020 and August 17, 2020.

146.    On Friday August 21, 2020, Plaintiff received 25 of the 250 promised SIM cards.

147.    On Friday August 21, 2020, without any correspondence to Plaintiff or Plaintiff's counsel, Defendant further restricted access to Plaintiff's account.

148.    Defendant restricted access by preventing Plaintiff from assigning SIM cards to pre-existing-activated lines on Plaintiff's account.

149.    Plaintiff was as previously allowed to assign SIM cards at its leisure.

150.    This practice is commonly referred to as "SIM swapping" and Defendant has permitted this since the inception of the contract. Again, materially breaching the contract by failing to maintain the status-quo as Defendant's counsel stated. (Ex D).

151.    Further, Plaintiff was forced to rely on "SIM swapping" between July 17, 2020 and August 17, 2020 because Defendant unlawfully denied Plaintiff's right to add new lines to its account, curtailing Plaintiff's ability to service its service existing customers, engage with new clients and generate revenue.

152.    As of Friday August 21, 2020, AT&T has also denied processing Plaintiff's requests for additional SIM cards, breaching their obligations once again.

153.    On Monday August 24, 2020, Defendant again breached the contractual agreement and the "status-quo" guarantee of their counsel Patricia Cruz when AT&T unilaterally closed 125 of the 250 newly added lines of service.

154.     Further, on August 24, 2020, Plaintiff was verbally informed that AT&T granted Plaintiff ten (10) days to transfer onto the APEX platform supported by AT&T. Problematic is that the ten (10) days apparently started August 17, 2020, however no such information was communicated to Plaintiff or counsel, who was in contact with Defendant's in-house counsel as well as local counsel the same day (August 17, 2020).

155.     On Tuesday, August 25, 2020, Defendant's new counsel finally clarified that "status quo" meant extreme restrictions on Plaintiff's ability to manage and operate its own account, including restrictions that Defendant placed after Cruz initially stated "status quo."

156.     Defendant's further breached the contract when its representative verbally informed Plaintiff of notes located on Plaintiff's account[6], once again Plaintiff cannot add any new lines of service to its account.

157.     When speaking with Plaintiff's counsel on Monday August 17, 2020, Defendant's outside counsel requested, among other things, to be brought up to speed regarding this dispute and to have a follow up conversation on Tuesday August 25, 2020, day 9 of the 10 of the undisclosed-unilateral negotiated transfer period.

158.     There has been no communication between Plaintiff and APEX/AT&T regarding pricing structure, how to maneuver the account to APEX platform, or a multitude of other negotiations that will be required to make this transfer. Plaintiff's counsel requested to be contacted by a representative who is familiar with the APEX platform, hoping to resolve this issue and possibly transfer Plaintiff's account to the APEX platform.

---

[6] Plaintiff does not have access to this information to ascertain for itself the truth or validity of the claim, nor what date said instructions were entered.

159.    August 24, 2020, Plaintiff sent an email to its account manager, asking for further information from the individual who claimed to inform Plaintiff's counsel of the 10-day transfer period onto the APEX platform.  No response has been received.

160.    Even before the July 17, 2020 unlawful repudiation of the contract, AT&T has unilaterally and without notice to the Plaintiff, "involuntarily suspended" lines on Plaintiff's account, without just cause or any apparent standard for such actions. Despite suspending service to specific lines, Defendant continues to charge Plaintiff for the suspended lines of service. Defendant's conduct reeks of bad faith, breach, and unfair business practices that reflect poorly on Defendant's company.

161.    Plaintiff is hemorrhaging both money and clients as its brand is facing undue damage and lost revenue of more than $150,000.00 monthly because Defendant unlawfully refuses to perform under the parties contract by severely limiting the Plaintiff's ability to service its clients in the professional and reputable manner they are accustomed to.

162.    Plaintiff's business will close if the breach continues as Defendant is the only service provided the Plaintiff contracts with.

## COUNT I – BREACH OF CONTRACT

163.    Plaintiff restates the facts and allegations contained in paragraphs 1-162 and incorporate them herein by reference.

164.    Plaintiff and Defendant are bound by a valid written contract.

165.    Plaintiff has performed all duties imposed upon them by the contract.

166.    Defendant seeks to wrongfully breach the contract and has communicated its intent to do so.

167.    Defendant's statements and conduct amount to an anticipatory breach of contract.

168.    Plaintiff is entitled to relief and damages incurred as a result of Defendant's unlawful conduct.

WHEREFORE Plaintiff ISLAND WIFI LIMITED LLC., respectfully request this

Honorable Court enter a judgment and/or order:

A. Temporarily enjoining the Defendant from terminating the internet services for which Defendant is obligated to provide to Plaintiff,

B. Temporarily enjoining the Defendant from terminating any services for which Defendant is contractually obligated to provide to Plaintiff,

C. Ordering the Defendant to reactivate any line of service for which Defendant may have already terminated service to,

D. Declaring that the Defendant does not have a right to breach the contract with Plaintiff,

E. Declaring the Defendant's threatened action to terminate the services of Plaintiff is unlawfully and/or a breach or the party's contract,

F. Declaring that the Defendant's threatened action to terminate the services of Plaintiff would cause irreparable harm and/or unreasonable threat to the health safety and welfare of others.

G. Awarding the Plaintiff damages as a direct and proximate result of Defendants unlawful conduct,

H. An award of attorney's fees and costs and/or

I. For any further relief this Honorable Court deems just and proper.

## COUNT II – FRAUD

169.    Plaintiff restates the facts and an allegation contained in paragraphs 1-162 and incorporates them herein by reference.

170.    At all times material here to, including before November 15, 2019, Defendant and or Defendant's representatives knowingly and intentionally made false statements of material fact to Plaintiff regarding the services which they sold to Plaintiff. Namely Defendant misrepresented the services available to Plaintiff under the contract negotiated between the parties, and the purposes for which these services could be used.

171.    Defendant knew that the statements were false.

172.    Defendant knew that their omissions concerned a material fact and that a reasonable consumer negotiating his or her contract would want to know the withheld facts.

173.    Defendant knew that had the contract would not cover Plaintiffs intended business, Plaintiff would not have elected to sign the agreement.

174.    Defendant knew that their false statements and omissions would induce Plaintiff into signing the contract and rely on the Defendant's services to grow its business and service its clients.

175.    Defendant intended that the false statements and omissions would induce Plaintiff to act on such false statements and omissions by entering into a contract and paying more than $200,000.00, for services which Defendant later refuses to provide, despite Plaintiff faithful performance under the contract.

176.    Plaintiff suffered damages in justifiable reliance on Defendant's false statements and representation.

177.    The Defendant under the doctrine of *respondeat superior* and the law of agency, is liable to Plaintiff for the false statements and omission of its employees.

WHEREFORE, Plaintiff demands judgment for monetary damages to be proven at trial, punitive damages against Defendant, and any further relief this Honorable Court deems just and proper.

## COUNT III – INJUNCTIVE RELIEF

178.   Plaintiff restates the facts and allegations in the preceding paragraphs and incorporates them herein by reference.

179.   Plaintiff has demonstrated that the facts of this case, accompanying Memorandum of Law, and evidence provided that:

      A. Irreparable Harm Would Occur if an Injunction is Not Granted,

      B. Plaintiff has Clear Legal Right to the Relief Requested Herein,

      C. Plaintiff Lacks an Adequate Remedy at Law, and

      D. Consideration of the Public Interest.

WHEREFORE Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY SERVICES LLC., and all its affiliated entities from disconnecting, discontinuing, or in any manner interrupting the service of Plaintiffs account or lines of service for a period of at least 120 days, or until such longer time deemed necessary by this Court.

## II. MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY INJUNCTION

### ARGUMENT

#### A. Standard for Granting a Motion for Injunctive Relief

The "obvious purpose of a temporary injunction" is to maintain the status quo pending the outcome of litigation. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941) (en banc) (bold and underlining added for emphasis). In order to obtain a temporary injunction a Plaintiff must satisfy a four-part test under Florida law by demonstrating: "[l] a substantial likelihood of success on the merits; a [2] lack of an adequate remedy at law; [3] irreparable harm absent the entry of an injunction; and [4] that injunctive relief will serve the public interest." *Liberty Counsel v. Fla.Bar Bd. of Governors*, 12 So.3d 183, 186 (Fla. 2009)(quoting *Reform Party of Fla. v. Black*, 885 So.2d 303, 305 (Fla. 2004).

The Plaintiff here meets the four-prong test and granting a temporary injunction will preserve the status quo as Defendant has already promised to do. An injunction will permit Plaintiff to avoid dissolution, , protect its clients on vessels that rely on the service for instantaneous updates of weather during this hurricane season, find an alternative carrier, or alter the contract to include the proper product AT&T could have and should have offered in the first place. Absolutely no harm will be imposed on Defendant if the court grants this Motion for Emergency Relief, as the Defendant (working under a multi-national corporate conglomerate) already agreed to maintain the status quo – then failed to do so in less than a week of making that guarantee.

## B. Plaintiff is Likely to Succeed on the Merits - Clear Legal Right

It is well settled law that in order to prevail on a claim for breach of contract, a litigant must demonstrate: (a) the existence of a contract, which is demonstrated by the parties performance of the written agreement, (b) a breach of the contract, which is demonstrated by AT&T's refusal to allow Plaintiff to activate new lines on its account and subsequent restrictions placed after agreeing to maintain the "status-quo" otherwise known as performing under the contract, (c) damages resulting from the breach, which are evident by the fact that Plaintiff will suffer a loss of revenue, demolition of its international brand and harm to owner-Tripp's personal reputation,[7] and (d) the party claiming a breach by the other, must demonstrate they have performed or are legally excused from performing all of their own contractual obligations.[8] An anticipatory breach occurs when one party, before the time to perform, demonstrates a refusal to perform by their words or actions. The nonbreaching party is excused from future performance & must demonstrate the ability to perform its contractual obligations.[9]

### i.  Plaintiff's Claim for Breach of Contract

1. If Plaintiff were to take this action to trial, the evidence discussed above would clearly demonstrate that:

    i.    AT&T knew and assented to  the Plaintiff's intended business operations before entering into the contractual agreement with Plaintiff.

    ii.   AT&T knew and ratified the Plaintiff's actual business operations no later than May of 2020 and continued to perform the contract with Plaintiff.

---

[7] *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).
[8] *Old Republic Ins. co. v. Von Onweller Constr. Co.*, 239 So.2d 503, 505 (Fla. 2d DCA 1970).
[9] *Id.*

iii.    AT&T continued to service Plaintiffs account, with actual knowledge of the conduct AT&T now uses as the basis for termination the contract – thereby waiving their right to cancel the contract for said conduct.

iv.    Despite the Plaintiff following up several times to ensure the Defendant approved of its business operations, the Defendant specifically agreed that Plaintiff could operate its business in selling wifi.

v.    The Defendant acted in bad faith by alleging Plaintiff was in breach of the contract thus grounds for termination of service, upon Plaintiff's inquiry to switch to the APEX program.

vi.    Caused Plaintiff damages by refusing to allow new lines of service from July 17-August 17, resulting in a back log of nearly 3,000 unfilled orders, despite Plaintiff's account being current. Plaintiff has already been harmed as they must turn away new business, and rumors have begun to circulate as to why Plaintiff has turned away thousands of new customers and lines of service.

vii.    Defendant agreed to and ratified the Plaintiff's business operations.

viii.    The Defendant waived any right to claim breach, by having knowledge of the actions that Defendant now asserts are ground for breach and termination of the contract - performed their obligations and allowed Plaintiff to perform, without objection.

ix.    Defendant fraudulently induced Plaintiff into entering into the contractual agreement by withholding material information regarding the contract.

x.    Plaintiff has paid each and every dime due by them to Defendant.

Plaintiff's claim for breach of contract is based on the Defendant's failure to perform on one hand and rooted in the doctrine of anticipatory repudiation on the other. Defendant failed to give adequate assurances or signaled intent to breach the contract.

Here, there is no doubt that the parties have a valid written contractual agreement, binding upon them, and that the parties have performed under said contract for several months. Further the documentation, emails, and affidavit of Plaintiff's executive demonstrates that the parties performed the contract and that AT&T had actual knowledge of the business operations of Plaintiff. Defendant demonstrated bad faith in July of 2020, upon receipt of a proposal from Plaintiff, when it claimed a violation of the agreement by Plaintiff and unequivocally announced its intent to prematurely terminate the contract with the Plaintiff, and offered no alternative. Plaintiff's use of Defendant's data services was known to Defendant from the inception of the agreement and all times thereafter. Despite this, it now uses Paragraph 9, and the known use of the data services by Plaintiff, as the basis for the terminating of the contract. As such, Defendant has legally waived this argument because it accepted performance under the contract by Plaintiff with no objection and with knowledge of the business model it now finds objectionable. Aside from having knowledge of the right, and an intention to waive said right, the Defendant actually encouraged and ratified the Plaintiff's business model several times over the first eight months of the contract, demonstrating Defendant's intent to waive the right to cancel. Consequently, Defendant cannot at this late stage complain and has no legal right to terminate the contract for conduct it was aware of and encouraged. The doctrines of waiver and estoppel prevent Defendant from terminating the agreement or would operate as affirmative defenses if Defendant countersued Plaintiff.

### ii. Conduct of Defendant's Representatives Demonstrates that the Waiver of a Known Right was Intentional

"The elements of waiver are: (l) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.[10]  Waiver may be implied by conduct, but that conduct must make out a clear case.[11] The burden of proving the affirmative defense of estoppel and waiver rests upon the party invoking it.[12] Mere delay is insufficient to support a defense of waiver or estoppel.[13]

### iii. AT&T had Actual and Constructive Knowledge of the its Right within Paragraph 9 of the Contract and Simply Waived it Through Their Language and Conduct.

**a. The Defendant's lawyers drafted the contract containing Paragraph 9.**

Here, at the time the contract was executed, the defendant was aware of Paragraph 9 that prohibits the resell service or program components. In fact, the clause was questioned by the Plaintiff. As a result, Defendant's representatives reassured the Plaintiff that is was merely a form contract.  On this reassurance, the Plaintiff executed the contract. Moreover, throughout the contractual relationship, AT&T has always had the right for which they assert is the basis to terminate the Plaintiffs account over a year before its expiration. This right is found within the Defendant's services terms which it provides and unilaterally changes from time to time. AT&T was fully aware of its own contractual rights as written by its own lawyers as the drafters of the contract at the time paragraph 9 was drafted, the contract executed, and later waived. Accordingly, not only did the right exist but Defendant had actual knowledge of it.

---

[10] *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. Pd 1098, 1104 (Fla. 5th DCA 2004). Citing *Zurstrassen v. Stonier*, 786 So.2d 65, 70 (Fla. 4th DCA 2001).

[11] *Goodwin*, at 1104. Citing *Fireman's Fund Ins. Co. v. Vogel*, 195 So.2d 20, 24 (Fla 2d DCA 1967).

[12] *Goodwin*, at 1104. *Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So.2d 997, 998 (Fla.4th DCA 1981).

[13] *Mercede*, at 392; Citing *Air Prods. & Chem., Inc. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989)(applying Florida Law in holding no clear waiver shown after five-year delay).

### b. The Defendant's Statements and Conduct Evidence an Intentional Waiver of Paragraph 9.

A party waives a breach of contract when it continues to abide by the contract after learning of a breach. *Plaza Builders, Inc. v. Regis*, 502 So. 2d 918, 922 (Fla. 2d DCA 1986) (finding a waiver when a party became aware of a breach of contract and it continued to deal with the other party after learning that the party was unable to acquire the required license).

Here, only a month (December 2019) after executing the contract the Plaintiff further inquired into whether the contract was suitable for its type of business. Once again, the Defendant provided reassurances that Paragraph 9 was of no consequence and its business model was acceptable. Later in May of 2020, the Defendant helped the Plaintiff regain access to 200 lines after one of Plaintiff's clients sought to steal the lines and transferred them over without authorization. Once again, the Defendant saw into the Plaintiff's business operations and made no issue of the business model.

While Defendant thought it struck a good deal it permitted the Plaintiff's business model. Only after it became less profitable under the contract as a result of the success of Plaintiff's business, did the Defendant seek to change its stance on Paragraph 9.

Plaintiffs entity was newly formed, and it had neither credit nor client to its name or brand within the United States nor any business relationship with Defendant. Nonetheless, Defendant

extended favorable contractual terms to the Plaintiff, with the caveat that Plaintiff pay at least $45,000.00 annually, to the Defendant regardless of service lines used. For five-months, Plaintiff's bill was insignificant to say the least. At less than $2,000.00, monthly, it seemed Plaintiff was not going to make its minimum annual fee amount. By April 2020, Plaintiff's bill began to increase to a number that would in fact exceed the $45,000.00 annual minimum . By June with the return to the U.S. of the boating and yachting clientele, Plaintiffs amassed an impressive

$105,197.59 bill for the month, Plaintiff was well above the minimum and out pacing expectations. It was at this time, AT&T first claimed that Plaintiff was in violation of the agreement.

Until then AT&T knew that Plaintiff was technically breaching the agreement but simply chose it was good business to waive its objection. AT&T knew at the time of the contract in November 2019, again in December of 2019, and again on May 31, 2020 of the circumstances they now assert as grounds for terminating the Plaintiff's account.

Notably, the Sales@MyIslandWifi.com email address and the business-to-business contract showed circumstances and nature of Plaintiff's business. This was evident before the expiration of the 30-day cancellation period of the contract. Further, AT&T knew the Plaintiff sold wi-fi, AT&T or at least their duly authorized representatives permitted such conduct by the Plaintiff in order to boost their sales performance or meet their activation quotas.

Accordingly, after repeatedly reassuring the Plaintiff, knowing of the Plaintiff's business model, and waiting eight (8) months to object to the business model, it is clear that the Defendant waived any objection to the Plaintiff's business model several times over.

### C. Plaintiff will Face Irreparable Harm if the Injunction is Not Granted

Florida courts have found an injured party has suffered irreparable harm when they demonstrate: 1-suffered monetary damages, 2-will continue to suffer monetary damages, 3-injury to businesses goodwill and business reputation. *Tiffany Sands, Inc. v. Mezhibovsky*, 463 So. 2d 349, 351(Fla. 3d DCA 1985), citing, *Puga v. Suave Shoe Corp.*, 374 So.2d 552 (Fla. 3d DCA 1979).

In the instant case, Plaintiff is currently suffering financial harm because Defendant no longer allows them to open lines of service, or even activate lines they own. Plaintiff will certainly suffer future financial harm, and that amount is not readily ascertainable In a few short

month's Plaintiffs business grew exponentially, as demonstrated by the large monthly bills paid to Defendant compared to the amount of the monthly bills when the parties started the contract. Currently Plaintiff has unfulfilled customer orders due to the Defendant's conduct. The parties have over a year left on their contractual term, and Plaintiff is entitled to its profits until November of 2021. Those amounts are unascertainable.

Further Plaintiff has already sustained injury to its goodwill amongst its customers, many whom Plaintiff also serves abroad. Plaintiff has lost numerous orders already and its customers have begun to complain about the inability to rely on Plaintiff for their data services needs.

### D. Plaintiff Lacks an Adequate Remedy at Law.

A party lacks an adequate remedy at law where damages are unavailable or are "so speculative as not to be susceptible of proof." *So. Colonization Co. v. Derfler,* 75 So. 790, 794 (Fla. 1917); see also *Thompson v. Planning Comm 'n,* 464 So.2d 1231, 1237 (Fla. 1st DCA 1985) (where damages are speculative, the remedy is inadequate).

Here, the Plaintiff will be dissolved should the injunction not be granted. The Plaintiff was created and openly set up for this type of business. The business does not have other contracts and solely relies on AT&T for its services. In other words, the company operates under this one contract. Should the plaintiff continue to breach, aside from the lost business opportunities outlined above and below, the company will shut down. This cannot be remedied with a later money judgment or a later order requiring the defendant to specifically perform. At that point, it will be too late, and this multinational corporation will have eliminated the Plaintiff from existence and therefore competition. This injunction is the only lifeline that will keep the Plaintiff from drowning, otherwise known as Chapter 11.

On the other hand, the Defendant is part of a multinational conglomerate that can absorb the status quo for ninety (90) days without sustaining any harm whatsoever,  In fact, the Defendant will benefit by continuing to receive the Plaintiff's payments under the contract.

Additionally, Plaintiff will suffer enormous losses that cannot be ascertained now, or at any reasonable time in the future. Further, these losses cannot simply be recovered with financial payment. Plaintiff's international brand, albeit less than three years in the making, has grown at a significant rate and at a time where economic uncertainty is on the rise globally. If Defendant is permitted to cancel Plaintiff's accounts or continue the unfair tactics exhibited since the filing and serving of this suit, the harm to the international brand will be permanent. Plaintiff's clients who will lose access reliable weather reports while at sea will never forget the ordeal that would follow. The Island Wi-fi brand globally will be forever impacted and the liability Plaintiff may face is untold, should any harm come to any clients due to the loss of crucial internet service. In their written opinion *of Liza Danielle, Inc. v. Jamko, Inc.*, Florida's Third District Court of Appeals adopts the following statement:

> Lack of an adequate remedy at law is a prerequisite for equitable relief, and furthermore, "an injunction will not lie where there is a choice between the ordinary processes of law and the injunction, the former being sufficient to furnish the full relief to which the complaining party is entitled." 29 Fla.Jur.2d, Injunctions 17. On the other hand, however, it has been said that "in order to preclude pursuit of equitable remedies an available legal remedy must be plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice." 29 Fla. Jur.2d, Injunctions 18.

408 So. 2d 735, 738 (1982). Considering the above, it seems quite deserving in this matter that AT&T be enjoined from the egregious conduct it has exhibited. AT&T is a large corporation with vast financial resources, certainly enough resources to litigate its disputes. It is AT&T who has the adequate remedy should the claim be true that Plaintiff is in breach, instead AT&T chooses an unlawful approach and submit false guarantees through their counsel but breaching the contract

harming the Plaintiff. The injunction requested will not harm AT&T as it will simply require a communications provider to keep open an account, for which it is paid for, and for which it makes profit. To deny the Plaintiff's injunction would condone the party who has an adequate remedy at law, financial resources to pursue it, but chooses to ignore that avenue and opt for a less judicious approach.

If Defendant is permitted, without obstacle to continue to breach its contractual agreements in this case, then the message is loud and clear — big businesses in America may breach agreements substantially impair lives and get away with it.

### E. Public Policy Consideration Favors an Injunction Based on the Danger Posed to Plaintiff's Clients and the Position of the Parties.

Public policy strongly favors an individual's right to contract as they choose, within the confines of the law. Courts across the United States, including our Supreme Court have held close to the notion that "a freely negotiated private agreement unaffected by fraud, undue influence, or overweening bargaining power should be given full effect." *Manrique v. Fabbri*, 493 so. 2d 437, 439 (Fla. 1986). Citing *The Bremen v. Zapata Off-Shore Co.*, (407 U.S. 1, 1972).

If this injunction is not granted, many of the clients of the Plaintiff will be stuck at sea without the instantaneous weather updates and tracking they relied on with the wi-fi service.  It can be dangerous for such clients to navigate on their vessels when they planned on using wi-1fi for such services. This is especially alarming given that it is hurricane season.  A ninety (90) injunction will not only serve to save a business but it may actually save lives and allow clients to avoid peril.

Specifically, Plaintiff's clients may be forced to endure hazardous conditions at sea. This is not conjecture, but reality, as Defendant originally planned to terminate service on August 17, 2020. Hurricane Laura made it path through the Gulf of Mexico, where Plaintiff's customers are

known to frequent, just days after AT&T would have shut down their internet capabilities, had it not been for the Plaintiff initiating this litigation. If AT&T shuts down the account, Plaintiffs clients will be placed in jeopardy and lives will be endangered

AT&T is one, if not the largest telecommunications provider in the United States, and likely globally. AT&T certainly was not overcome in their bargaining power in this agreement by a company of less than 20 employees, only a few days old at the time of contracting. In balancing the hardships of the parties, it is clear that the Defendants breach weighs heavier on the Plaintiffs than it does on the Defendants. Defendant is an international company. Its offices in will remain open and active, and there is no reason to assume that Defendant will need to close their doors if they abide by the contract. In fact, the contract will positively affect the Defendant's sales and profits.

Consequently, the parties' agreement should be given its full effect. The only way to do that, is for this Honorable Court to grant this Emergency Petition for Plaintiff immediately, as starting on *August 27, 2020*, the Plaintiff has experienced irreparable harm. If the injunction is issued, Plaintiff will continue making all payments and complying with all contractual obligations owed. Further Plaintiff is aware and capable of posting any reasonable bond ordered by this Honorable Court.

## CONCLUSION

Plaintiff has demonstrated, through this sworn petition, sworn complaint and accompanying affidavit that the facts of this case and evidence provided:

A.      Irreparable harm would occur if an injunction is not granted,

B.      Plaintiff has a substantial likelihood of success on the merits,

C.      Plaintiff lacks an adequate remedy at law, and

D.      Consideration of the Public Interest supports the injunction.

**WHEREFORE** Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., and all its affiliated entities from: disconnecting, discontinuing, or in any manner interrupting the service of Plaintiff's account including Plaintiff's use of the account and accompanying portal, for a period of at least ninety 90 days, or until such time deemed necessary by this Court, that the Court may hear the parties and determine to lift or extend the injunction, an award of reasonable attorney's fees, court costs and any further relief this Honorable Court Deems just and proper.

## **VERIFICATION OF PLAINTIFF**

I understand that I am swearing and affirming under oath to the truthfulness of the claims

made in this verified motion and that the punishment for knowingly making a false statement

includes fines and/or imprisonment. The facts and allegations contained herein are true to the best

of my knowledge, recollection, and materials available to me at this time.

8-28/2020

**Date**

Whitney Lee Tripp   8-28/2020

Whitney Lee Tripp

Before me, the undersigned authority, on this _28_ day of _August_, 2020, personally
appeared _WHITNEY TRIPP_, who has been duly sworn and deposed, states
under oath that the facts and allegations contained within the foregoing instrument
_Verified Amend. Compl_ are true and accurate to the best of their
recollection and that they understand the penalty for making false statements under oath.

____ **Personally Known**

✓ **Produced Identification** LA. DRV. EXP 1-3-2022

**Notary Public**

JACOB AUGUSTUS SPRAGG
State of Florida-Notary Public
Commission # GG 198963
My Commission Expires
March 21, 2022

_____ Print, type, or stamp commissioned name.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Verified Motion

for Emergency Injunction has been served on Defendant's registered agent CT Corporate

Systems.


Respectfully Submitted,

BLUE LINE LAW FIRM, PLLC


By: /s/ Kevin Drummond
KEVIN DRUMMOND, ESQ. (FBN 1002238)
   1645 Palm Beach Lakes Blvd., Suite 1200
   West Palm Beach, FL 33401
   Telephone: 888-611-9511
   Facsimile: 561-892-3330
   E-Service: intake@tbllf.com

EXHIBIT A

**AT&T reserves the right to withdraw this Agreement, if this Agreement is not executed by the Customer before: 02/28/2020**

 AT&T

**Location Account ID: 10000002562**

### AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT
### VERSION 13-A

| Island Wifi Limited | | | 800-570-0316 |
|---|---|---|---|
| Customer Legal Name ("Customer") | | D/B/A | Main Telephone Number |
| 41 SE 5th St Suite 2005 | Miami | FL | 33131 |
| Street Address | City | State | ZIP Code |
| LeAnne Rozelle | | 800-570-0316 | |
| Primary Contact Name and Email Address | | Primary Contact Telephone Number | |
| Check one: ☐ Corporation | ☐ Partnership | ☒ Limited Liability Corporation/Partnership ☐ Other | |
| State of Formation: | <u>LA</u> | **Effective Date:** _____ (To be completed by AT&T only) | |

**Agreement:** This AT&T Corporate Digital Advantage Agreement between Customer, on behalf of itself and as agent for its Affiliates, and AT&T Mobility National Accounts LLC ("AT&T"), on behalf of itself and as agent for the Carriers, consists of (a) this Cover Page, (b) the attached AT&T Corporate Digital Advantage Program Description (the "Program Description"), (c) the General Terms and Conditions in effect on the Effective Date and found at the Program Website ("General Terms and Conditions"), and (d) all AT&T materials incorporated by reference in the foregoing, such as applicable Attachments found at the Program Website and Sales Information, and the AT&T Acceptable Use Policy found at www.att.com/legal/terms.aup.html (collectively, the "Agreement").

**Program Website:**     **www.att.com/cda**

**Term:** The Agreement is for an initial term beginning on the Effective Date and continuing for a period of:
☒ Two years   ☐ Three years   ☐ Four years   ☐ Five years

At the end of this initial term, the Agreement will automatically renew for successive one (1) year terms unless either party gives the other party notice of its intent not to renew at least ninety (90) days prior to the end of the then current term.

**Initial MAC:**                                                                                                                $45,000

**By signing below, the parties agree to be bound by the terms and conditions of the Agreement.**

| Customer (by its authorized representative) | AT&T (by its authorized representative) |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

## AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
## PROGRAM DESCRIPTION

**1.   Service.**  AT&T, through Carriers, will provide Service to Customer, its Affiliates and their respective Employees.  Employees may receive Service under the Agreement as CRUs or IRUs.

## 2.   AT&T Corporate Digital Advantage Program Eligibility Requirement.

**2.1     Minimum Revenue Requirement.**  Customer must generate at least $45,000 in Service Revenue per Term Year.  If Customer fails to achieve this revenue requirement in any Term Year, Customer will pay AT&T the difference between $45,000 and the Service Revenue amount that Customer actually paid in such Term Year.  In the event Customer fails to comply with this eligibility requirement, Customer is no longer eligible for the Service Discount or any other program components, and AT&T may immediately discontinue provisioning all such program components in addition to pursuing any other remedies available under the Agreement.

## 3.   Service Discount and MAC Contribution.

**3.1     Generally.**  Subject to the restrictions set forth in this Section, AT&T will provide Customer with the Service Discount specified in Table 3.1 below based on Customer's MAC.  All Qualified Charges incurred by Customer, its Affiliates and their respective CRUs in AT&T Markets contribute towards the MAC.  **AT&T may restrict certain Plans or certain other discount programs from either contributing to Customer's MAC or qualifying for the Service Discount or both.  AT&T will advise Customer if such restrictions apply.**  AT&T will only apply the Service Discount to the Monthly Service Charge of eligible Voice Service and Wireless Data Service Plans.  It may take several billing cycles for the Service Discount to be applied.

Table 3.1
MSC Service Discount

| MAC | MSC Service Discount for CRUs | MSC Service Discount for IRUs |
|---|---|---|
| $45,000 and higher | 20% | 18% |

**3.2     MAC Modification.**  Customer's initial MAC is set forth on the Cover Page.  Customer may modify its MAC for the subsequent Term Year.  Any such modification is subject to AT&T's consent, which will not be unreasonably withheld or delayed, and the parties will memorialize the modification in a signed writing.  Customer must notify AT&T of its desire to modify the MAC within thirty (30) days after each Term Year; however, the authorized modification will become effective as soon thereafter as reasonably practicable.  In connection with any such MAC modification, AT&T may (a) modify Customer's Service Discount; and/or (b) permit or restrict Customer's access to certain other program components.  Customer's MAC modification will not affect the Reconciliation Obligation for the prior Term Year (see §3.3 of the Program Description).

**3.3     Service Discount Reconciliation.**  If Customer fails to achieve the MAC, as modified, Customer will pay AT&T the difference between the amount of the Service Discount received by Customer, and/or End Users, and the amount of the Service Discount for which Customer would have qualified considering Service Revenue actually received by AT&T during that Term Year (the "Reconciliation Obligation").  In the event Customer owes the Reconciliation Obligation, AT&T may reduce Customer's Service Discount percentage by an amount sufficient to offset the Reconciliation Obligation.  The amount and duration of this Service Discount reduction is at AT&T's sole discretion, provided that AT&T will not offset more than the total amount of the Reconciliation Obligation.

**3.4     Ramp Year.**  If Customer has a MAC of $200,000 or higher, then, during the first Term Year only, Customer will be deemed to have achieved its MAC for that first Term Year if AT&T receives Service Revenue in an amount equal to 75% of the MAC on or before the first anniversary of the Effective Date.  This §3.4 applies only for purposes of determining whether Customer has achieved its MAC during the first Term Year and does not apply to or otherwise affect Customer's obligations under §2 of the Program Description or any other obligations under the Agreement.

**4.   Sponsorship Program.**  Customer's Employees may elect to participate in the Sponsorship Program as IRUs.  Employees must be validated in order to become IRUs, and any Employees not so validated will not be IRUs under the Agreement and will not receive corresponding program benefits.

**4.1     Sponsorship Program Activation Processes and Procedures.**  Each IRU participating in the Sponsorship Program: (a) must enter into, and be individually responsible for complying with an IRU Service Agreement including, without limitation, the corresponding obligations to comply with all of the terms and conditions of the chosen Plan and to pay all charges incurred under the IRU Service Agreement; and (b) must follow the activation, validation, migration, upgrade and related policies, procedures and processes established by AT&T from time to time, including without limitation paying any applicable enrollment fees.

**4.2     Sponsorship Program Features.**  Under the Sponsorship Program: (a) IRUs may choose from select Plans available to Customer within each AT&T Market (provided they qualify for the chosen Plan); (b) IRUs will receive the Service Discount in accordance with §3 of the Program Description; (c) Qualified Charges incurred by IRUs will contribute to Customer's MAC in accordance with §3 of the Program Description; and (d) IRUs and their usage will contribute to Customer's eligibility requirements set forth in §2 of the Program Description.

**4.3     Marketing Assistance.**  Customer will assist AT&T in obtaining Employees' participation in the Sponsorship Program as follows:

• Posting and maintaining a hyperlink from Customer's intranet site for Employee-related benefits to the att.com landing page established for Customer's IRUs;

### AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
### PROGRAM DESCRIPTION

• Posting AT&T-provided Sponsorship Program flyers or digital signage in break room(s) and/or other Employee common area(s) of Customer's main campus at least once per calendar quarter;

• Permitting AT&T sales representatives to participate in two (2) "onsite events" per year at the Customer's main campus, the date and time of which shall be mutually agreed upon by the parties; and

• Any other mutually agreed upon marketing efforts, which shall be documented in a writing signed by both parties.

**5.** **Financial Responsibility.** Customer must pay for all charges incurred under the Agreement, regardless of whether such charges were incurred by Customer, its Affiliates or their respective CRUs. Customer is not liable for any charges incurred by IRUs under this Agreement or any IRU Service Agreement.

**6.** **Invoicing Options.** With respect to Service, Customer will have the invoicing options set forth in this §6.

    **6.1** **Consolidated Invoicing.** Under consolidated invoicing, AT&T will provide an online invoice to Customer each month that consolidates all CRUs' Service charges for the preceding monthly billing cycle, except as may otherwise be noted in applicable online or printed terms and conditions of an AT&T offer, product, service, or Plan. This invoicing method is only available through Premier. Consolidated invoicing is not offered in conjunction with Corporate Responsibility User invoicing. Customer must promptly notify AT&T of any Numbers to be added or deleted from Customer's online invoice.

    **6.2** **Corporate Responsibility User Invoicing.** Under Corporate Responsibility User invoicing, AT&T will provide invoices to Customer's CRUs each month that set forth such CRUs' Service charges for the preceding monthly billing cycle. Corporate Responsibility User invoicing is not offered in conjunction with consolidated invoicing.

**7.** **Cancellation Fee.** In the event AT&T offers and Customer elects to purchase Equipment with a service commitment, the service commitment begins either on the date (a) the Equipment is activated with a new CRU line of Service or (b) an existing CRU line under the Agreement is upgraded to the Equipment (with or without a migration to a different Plan). For each CRU that is terminated from Service more than 30 days after activation but prior to the expiration of the applicable service commitment, Customer agrees to pay AT&T with respect to each device identifier or Number assigned to such CRU, in addition to all other amounts owed, a Cancellation Fee in the amount specified below ("Cancellation Fee"). The Cancellation Fee for certain specified Equipment (e.g., smartphones) will be $325 minus $10 for each full month toward the service commitment that the CRU completes. (For a complete list of the specified Equipment, check www.att.com/equipmentETF.) Otherwise, the Cancellation Fee will be $150 minus $4 for each full month toward the service commitment that the CRU completes. The Cancellation Fee is not a penalty, but rather a charge to compensate AT&T for Customer's failure to satisfy the service commitment. For the avoidance of doubt, Customer will not pay any Cancellation Fee(s) under one of AT&T's device installment plan pricing options described in the applicable online Attachment found at the Program Website. Customer acknowledges and agrees that porting a CRU's Number to a non-AT&T service provider before the end of the applicable service commitment constitutes a termination subject to this Cancellation Fee. Customer may terminate a CRU's Service within the first 30 days after activation without incurring a Cancellation Fee, but equipment restocking or other fees may apply. Customer should refer to AT&T's returns policy at www.wireless.att.com/cell-phone-service/legal/return-policy.jsp, or such other site as AT&T may designate from time to time, for additional details.

**8.** **Customer's Affiliates.** Customer agrees that any of its Affiliates receiving Service under the Agreement meet, and will continue to meet throughout the term of the Agreement, the definition of "Affiliate" set forth in the General Terms and Conditions.

**9.** **Resale and Other Prohibited Uses.** Customer, its Affiliates (if applicable) and their respective CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third parties whether directly or indirectly including, without limitation, through machine to machine transmissions.

**10. Definitions.** In addition to terms defined elsewhere, these terms have the following meanings in the Agreement:

    **10.1** **"CRU" and "Corporate Responsibility User"** mean an Employee receiving Service under Customer's account.

    **10.2** **"Effective Date"** means the effective date of this Agreement.

    **10.3** **"Employees"** means Customer's or its Affiliate's current, validated personnel receiving Federal W-2 or K-1 tax treatment.

    **10.4** **"End Users"** means CRUs and IRUs, collectively.

    **10.5** **"IRU" and "Individual Responsibility User"** mean an Employee receiving Service under an individual account in accordance with the Sponsorship Program.

    **10.6** **"IRU Service Agreement"** means a separate wireless service agreement between an IRU and AT&T for Service, Equipment and related matters.

    **10.7** **"MAC"** means Customer's minimum annual commitment of Service Revenue.

    **10.8** **"Monthly Service Charge"** means the set fee charged monthly for use of the Service available with a particular Plan (i.e., the monthly "plan charge", not the monthly per device "access charge", if any).

    **10.9** **"Non-Qualified Charges"** refers to the following charges: (a) charges for long distance service, (b) all charges for local landline interconnect, toll services and other charges arising from or related to wireless operators providing long distance service, (c) monthly access charges related to AT&T's abbreviated dialing code product, (d) all charges for Equipment, (e) roaming charges

## AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
### PROGRAM DESCRIPTION

if not using AT&T's wireless network, (f) charges for other goods and services that Customer, a CRU and/or an IRU authorizes to be charged through the wireless bill; (g) shipping and handling charges; (h) all Taxes; and (i) all other charges not described as "Qualified Charges" herein.

**10.10 "Qualified Charges"** refers to the following undiscounted AT&T Mobile Services charges: (a) one-time charges for Service activation and conversion, (b) the Monthly Service Charge, (c) home wireless usage charges, (d) roaming charges incurred by Numbers provisioned from AT&T Markets while roaming in other AT&T Markets and using AT&T's wireless network, (e) charges for detail billing, (f) charges for tethering if using AT&T's wireless network, (g) charges for additional wireless service features such as voice mail if using AT&T's wireless network, but excluding enhanced features such as directory assistance or fee-based information services and (h) monthly recurring access charges for qualified Supplemental Services identified at www.att.com/abs-addtl-terms from time to time.

**10.11 "Service Discount"** means a monthly discount on eligible AT&T Mobile Services that is based on Customer's MAC and applied to an eligible End User's Monthly Service Charge as described in this Program Description.

**10.12 "Service Revenue"** means revenue from Qualified Charges received by AT&T.

**10.13 "Term Year"** means any year of the term of the Agreement, including any renewal year.

**11. OTHER PROGRAM COMPONENTS.** Provided Customer is in compliance with the Agreement and maintains its MAC in the amount of $45,000 or higher, AT&T will make available to Customer the additional custom offers described in this Section 11 (including subsections) during the applicable Offer Period and only with respect to CRU lines of service for which Customer has met the corresponding eligibility requirements.

### 11.1. Waiver of Select Fees

| Custom Offer | Offer Period | Eligibility Requirements |
|---|---|---|
| Waiver of Activation Fee (i.e., start of Service fee) | Initial term and renewal term(s) | Activate a new CRU line of Service on an available Voice Service Plan and/or Wireless Data Service Plan during the Offer Period. |
| Waiver of Equipment Shipping Fee | Initial term and renewal term(s) | Purchase new Equipment for a new or existing CRU line of Service during the Offer Period. (Shipping carrier will be determined by AT&T.) |

**11.2. Accessory Discounts.** AT&T will make available Accessory Discounts as described below. Accessory Discounts are applicable only to select phone and tablet accessories identified as discount-eligible at point of sale, which are determined solely by AT&T and may vary from time to time. Accessory Discounts may not be combined with any other promotional accessory pricing or offers.

| Accessory Discount for CRUs | Accessory Discount for IRUs |
|---|---|
| 25% | 25% |

### 11.3 Custom Equipment Pricing

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| iPhone® XR (64GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $299.99 | Initial term and renewal term(s) | During the Offer Period: <br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and <br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® S10 (128GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $599.99 | Initial term and renewal term(s) | During the Offer Period: <br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and <br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® A10E | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $24.00 | Initial term and renewal term(s) | During the Offer Period: <br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and <br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| * Offer subject to Equipment availability. | | | | |

**AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A**
**PROGRAM DESCRIPTION**

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| ** Price does not include applicable taxes and may not be combined with other Equipment-related discounts or other offers. | | | | |

### 11.4. Additional Plans

AT&T will make available to Customer the Custom Plans described below (each a "Custom Plan"). Each Custom Plan is subject to additional plan-specific pricing and terms set forth in the corresponding Sales Information, as modified by AT&T from time to time and which is incorporated herein by reference.

| Custom Plan | Offer Period | Eligibility Requirements | Sales Information* |
|---|---|---|---|
| AT&T Business Select Exclusive Plans | Initial term and renewal term(s) | New or existing CRU line with an eligible smartphone, feature phone or data-only Equipment (i.e., tablet, LaptopConnect/aircard, or mobile hotspot device) | See Sales Information found at www.att.com/bizselectexclusive |

* Incorporated by reference into this Agreement.

### 11.5. AT&T Digital Concierge Credit.

| AT&T Digital Concierge Credit Amount | Qualified Service | Offer Period | Eligibility Requirements |
|---|---|---|---|
| $20.00 | For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher | First 120 days after the Effective Date. | During the Offer Period:<br>• For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher during the Offer Period; and<br>• Activate it with a new CRU line of service in accordance with the corresponding Qualified Service; and<br>• Continue to receive in accordance with the corresponding Qualified Service at the time the AT&T Digital Concierge Credit is applied. ** |

** Each AT&T Digital Concierge Credit will appear on the applicable invoice as a "bottom of the bill" credit applied after application of discounts, taxes, surcharges and fees. AT&T Digital Concierge Credit shall be inclusive of credits associated with surcharges and fees assessed on the Service. It will take up to three (3) billing cycles after the 120 day Offer Period for each AT&T Digital Concierge Credit to appear.

### 11.6. Activation Credits

| Activation Credit Amount | Qualified Equipment | Qualified Plan* | Offer Period | Eligibility Requirements |
|---|---|---|---|---|
| $100.00 | Smartphone | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | First 120 days after the Effective Date | During the Offer Period:<br>• Purchase the Qualified Equipment from AT&T with an Equipment Installment Plan or other available smartphone installment plan installment agreement; and<br>• Activate it with a new CRU line of service on the corresponding Qualified Plan; and<br>• Each Qualified Activation must continue to be on the Qualified Plan at the time the Activation Credit is applied.** |

* Plan pricing and terms are set forth in the applicable Sales Information, which is incorporated by reference into the Agreement.
** Each Activation Credit will appear on the applicable invoice on the bottom of the bill after application of discounts, taxes, surcharges and fees. It will take up to three (3) billing cycles after activation for the Activation Credit to appear.

**12. Incorporation of Agreement.** The terms, conditions and defined terms set forth in all documents comprising the Agreement including, without limitation, the Cover Page, this Program Description, the General Terms and Conditions, and other applicable online terms and conditions, apply throughout all such documents.

EXHIBIT B

Case 1:20-cv-23741-WPD Document 1-1 Entered on FLSD Docket 09/09/2020 Page 52 of 181

8/24/2020     Spragg Law Firm Mail - SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.



Jacob Spragg <jacob@spragglawfirm.com>

# SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>              Mon, Aug 17, 2020 at 12:36 PM
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Please accept this e-mail as confirmation that no action will be taken on the account while Litigation counsel reviews the dispute. Hence, there is no need for an emergency hearing on your motion for injunctive relief.

Also, I understand other employees are receiving subpoenas via e-mail. Do not contact any AT&T employee directly regarding this matter, as they are represented parties. Please only communicate with me until further notice. If you have sent any other emails to any other employees since Friday, please forward those to me.

Thank you for your attention.

**Patricia Simone Cruz**

Assistant Vice President - Senior Legal Counsel - Litigation

**AT&T**

600 N.W. 79th Avenue, Room 684, Miami, FL 33126

Office: 786.792.5470 | Cell: 786.452.5962 | pc515g@att.com

MOBILIZING **YOUR** WORLD

This message may contain attorney-client privileged communications and/or attorney work product. This email and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this email is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this email is strictly prohibited.

[Quoted text hidden]
[Quoted text hidden]

> [Quoted text hidden]
> [Quoted text hidden]
>
> Thank you,
>
> --

Case 1:20-cv-23741-WPD   Document 1-1   Entered on FLSD Docket 09/09/2020   Page 53 of 181

8/24/2020                          Spragg Law Firm Mail - SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

[Quoted text hidden]

[Quoted text hidden]

Case 1:20-cv-23741-WPD   Document 1-1   Entered on FLSD Docket 09/09/2020   Page 54 of 181

8/24/2020                 Spragg Law Firm Mail - SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.



Jacob Spragg <jacob@spragglawfirm.com>

## SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>                                    Mon, Aug 17, 2020 at 2:01 PM
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Kevin - I would like to clarify your statement: "we agree that an emergency order needs to be filed or heard at this time."
Maybe there was a typo in your email, but AT&T does *not* agree that an emergency order needs to be entered or that an
emergency motion needs to be heard at this time. The emergency motion sought an order to maintain the status quo.
The status quo is being maintained until further notice. I am in the process of reviewing the dispute. As soon as I have a
chance to consult with my clients, I will get back to you regarding AT&T's position regarding termination. In the meantime,
I do agree a stay of the litigation is appropriate. Please send a draft agreed order staying litigation for my review. Thank
you.

[Quoted text hidden]

Exhibit C

 **Gmail**

J Spragg <jacobspragg8@gmail.com>

## Fwd: Island WIFI Limited - Account 287295933298

**leo tripp** <leo.tripp@myislandwifi.com>
To: JacobSpragg8@gmail.com

Mon, Aug 3, 2020 at 6:42 PM

---------- Forwarded message ---------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri, Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>

 **AT&T**

RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale prohibition in the AT&T Service Agreement. Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third-parties whether directly or indirectly, including, without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete the message from*

your computer. Any other uses, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited."

*Leo Tripp*

CEO of Island Wifi Ltd. dba "My Island Wifi"
(318) 218-9447 Direct Cell / WhatsApp
Leo.Tripp@MyIslandWiFi.com
www.MyIslandWiFi.com

EXHIBIT D

 **Gmail**                                              J Spragg <jacobspragg8@gmail.com>

## Fwd: Island WIFI Limited - Account 287295933298

**leo tripp** <leo.tripp@myislandwifi.com>                          Mon, Aug 3, 2020 at 6:42 PM
To: JacobSpragg8@gmail.com

---------- Forwarded message ---------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri, Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>



RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale prohibition in the AT&T Service Agreement.  Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third-parties whether directly or indirectly, including, without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed.  If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete the message from*

your computer.  Any other uses, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited."

## Leo Tripp

CEO of Island Wifi Ltd.  dba "My Island Wifi"
(318) 218-9447 Direct Cell / WhatsApp
Leo.Tripp@MyIslandWiFi.com
www.MyIslandWiFi.com

 **CT Corporation**

**Service of Process Transmittal**
08/28/2020
CT Log Number 538168003

| | |
|---|---|
| **TO:** | Jill M Calafiore, Rm 3A119A<br>AT&T Corp.<br>One AT&T Way-<br>Bedminster, NJ 07921- |

**RE:** **Process Served in Florida**

**FOR:** AT&T Mobility National Accounts LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ISLAND WIFI LIMITED, LLC., etc., Pltf. vs. AT&T MOBILITY NATIONAL ACCOUNTS LLC., etc., Dft. |
| **DOCUMENT(S) SERVED:** | Summonses, Notice(s), Motion, Emergency Injunction, First Verified Amended Complaint, Verification, Certificate, Attachment(s) |
| **COURT/AGENCY:** | Miami-Dade County Circuit Court, FL<br>Case # 2020017369CA01 |
| **NATURE OF ACTION:** | Breach of contract and fraud against the plaintiff hereby served in the matter |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/28/2020 at 04:20 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Kevin Drummond<br>BLUE LINE LAW FIRM, PLLC<br>1645 Palm Beach Lakes Blvd., Suite 1200<br>West Palm Beach, FL 33401<br>888-611-9511 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/29/2020, Expected Purge Date: 09/08/2020<br><br>Image SOP<br><br>Email Notification,  Jill M Calafiore  jcalafiore@att.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan St Ste 900<br>Dallas, TX 75201-3140 |
| **For Questions:** | 877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

Page 1 of  1 / DC

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



## PROCESS SERVER DELIVERY DETAILS

**Date:**            Fri, Aug 28, 2020

**Server Name:**     Shirley Lowe

**Location:**        Miami, FL

| Entity Served | AT&T MOBILITY NATIONAL ACCOUNTS LLC |
|---------------|-------------------------------------|
| Agent Name    | C T CORPORATION SYSTEM              |
| Case Number   | 2020-017369-CA-01                   |
| Jurisdiction  | FL                                  |



X IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | 2020-017369-CA-01 |

| PLAINTIFF(S) | VS.  DEFENDANT(S) | SERVICE |
|---|---|---|
| ISLAND WIFI LIMITED, LLC.,<br>A Foreign Limited Liability Company,<br><br>Plaintiff, | AT&T MOBILITY NATIONAL<br>ACCOUNTS LLC., A Foreign Limited<br>Liability Company<br>Defendant, | |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on

defendant(s):  __AT&T MOBILITY NATIONAL ACCOUNTS LLC__

__c/o C T CORPORATION SYSTEM__

__1200 SOUTH PINE ISLAND ROAD__

__PLANTATION, FL 33324__

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney:  __Kevin Drummond, Esq.__

whose address is: 1645 Palm Beach Lakes Blvd., Suite 1200, West Palm Beach, FL. 33401
Telephone 888-611-9511

E-Service Intake@tbllf.com

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,**
**or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.**
**When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons
on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before
service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so a default will be entered against that defendant for
the relief demanded in the complaint or petition.

| HARVEY RUVIN<br>CLERK of COURTS | *d. Horner* 21397<br>DEPUTY CLERK | DATE<br><br>8/27/2020 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to
participate in this proceeding, you are entitled, at no cost to you, to the provision of certain
assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA
Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400,
Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email
ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your
scheduled court appearance, or immediately upon receiving this notification if the time
before the scheduled appearance is less than seven (7) days; if you are hearing or voice
impaired, call 711."

Filing # 112160371 E-Filed 08/20/2020 09:48:30 PM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. <br> ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION** <br> ☒ CIVIL <br> ☐ DISTRICTS <br> ☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE** <br> **(a) GENERAL FORMS** | **CASE NUMBER** <br> 2020-017369-CA-01 |
| **PLAINTIFF(S)** <br><br> ISLAND WIFI LIMITED, LLC., <br> A Foreign Limited Liability Company, <br><br> Plaintiff, | **VS. DEFENDANT(S)** <br> AT&T MOBILITY NATIONAL <br> ACCOUNTS LLC., A Foreign Limited <br> Liability Company <br><br> Defendant, | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s):   **AT&T MOBILITY NATIONAL ACCOUNTS LLC**

  c/o C T CORPORATION SYSTEM

  1200 SOUTH PINE ISLAND ROAD

  PLANTATION, FL 33324

*(vertical text: CLOCK IN)*

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney:  Kevin Drummond, Esq.

whose address is: 1645 Palm Beach Lakes Blvd., Suite 1200, West Palm Beach, FL. 33401
Telephone 888-611-9511

E-Service Intake@tbllf.com

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to file a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN** <br> **CLERK of COURTS** | *d. Honer* <br> **DEPUTY CLERK** | **DATE** <br><br> ·  8/27/2020 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY FLORIDA
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
*A Foreign Limited Liability Company*
Plaintiff,

Case No: TO BE DETERMINTED BY COURT

v.

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

## NOTICE TO DEFENDANT OF:

## PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANT AT&T MOBILITY SERVICES LLC.

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned

counsel, hereby files this Notice to Defendant of Plaintiff's Emergency Motion for Injunctive

Relief, and respectfully states as follows:

1. Plaintiff and Defendant have an ongoing business dispute.

2. Plaintiff hereby notifies Defendant of Plaintiffs Intent to Seek Ex-Parte Injunctive Relief.

3. Defendant may contact Plaintiff's Counsel at the information in the signature stamp

   located on page two.

### CERTIFICATION OF SERVICE

I hereby CERTIFY that a true and correct copy of the foregoing Notice of Plaintiff's

Emergency Motion for Injunctive Relief, has been served on Defendant's Registered Agent

CT Corp. Services, by process server scheduled for service on August 14, 2020,

demonstrating notice of seeking this relief.

Dated this 14 day of August, 2020.

Respectfully Submitted,

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
A *Foreign Limited Liability Company*
Plaintiff,

V.                                                    Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

## EMERGENCY MOTION FOR ENTRY OF TEMPROARY INJUNCTION

Plaintiff, ISLAND WIFI LIMTIED, LLC., hereby moves this court for the entry of a Temporary

Injunction against Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., in the same or

substantially the same form attached hereto as Exhibit A. As grounds for this motion Plaintiff

refers the Court to the allegations in the Verified Amended Complaint fined in this matter and the

evidence to be presented at the hearing on this motion.

Respectfully Submitted,

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Verified Motion

for Emergency Injunction has been served on Defendant's registered agent CT Corporate

Systems.

<div style="margin-left:40%;">

Respectfully Submitted,

BLUE LINE LAW FIRM, PLLC

By: /s/ Kevin Drummond
KEVIN DRUMMOND, ESQ. (FBN 1002238)
1645 Palm Beach Lakes Blvd., Suite 1200
West Palm Beach, FL 33401
Telephone: 888-611-9511
Facsimile: 561-892-3330
E-Service: intake@tbllf.com

</div>

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
A *Foreign Limited Liability Company*
Plaintiff,

V.                                                      Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

_____

## EMERGENCY INJUNCTION AGAINST

## AT&T MOBILITY NATIONAL ACCOUNTS LLC.

This matter cam before the Court on the ___ day of _____, 2020, upon Plaintiff's Emergency

Motion for Entry of Temporary Injunction. The Court has reviewed Plaintiff's motion together

with the Verified Amended Complaint upon which it is based, received evidence, and is otherwise

fully advised in the premises,

Based upon the evidence presented, the Court finds:

1. Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., is a foreign Limited Liability
   Corporation and is subject to the jurisdiction of this Court and venue is proper in this county.

2. The Amended Verified Complaint and Emergency Motion for Entry of Temporary Injunction
   have been filed and are in proper form.

3. Plaintiff, ISLAND WIFI LIMITED LLC., has made a prima facie showing that Plaintiff and
   Defendant have a valid written contract, binding upon them, and that Defendant is not entitled
   to cancel the contract.

3

4. The evidence demonstrates that Plaintiff has no adequate remedy at law and will be irreparably harmed if Defendant is not enjoined, from cancelling the contract, from disrupting the services provided thereunder and from limiting the Plaintiff's access to its account.

5. Plaintiff's injury will be not only financial but harm to its business reputation and goodwill amongst its customers.

6. Plaintiff's customers likely face dangerous obstacles and undue risk to their health, safety, and welfare.

   Accordingly, it is hereby ORDERED:

A. Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., and all persons and entities acting in concert or participation, shall be and are hereby enjoined from cancelling Plaintiff ISLAND WIFI LIMITED LLC's contract or interfering with Plaintiff's use of its account as permitted by the contract.

B. Plaintiff shall post a surety bond for the issuance of this Temporary Injunction in the amount of $5,000.00, or deposit $5,000.00 into the registry of the Court where it shall be held until further order of this Court, which security shall confirm to the requirements of *Fla. R. Civ. P.* 1.610(b); and

C. Plaintiff shall immediately cause a conformed copy of this Emergency Temporary Injunction to be served upon Defendant or upon counsel of record, if any, and this Emergency Temporary Injunction shall take effect upon service upon Defendant, or its counsel off record, if any, and the filing of the bond described in (B) hereof.

DONE and ORDERED in Miami-Dade County Florida, at _____ am/pm this ____ day of _____, 2020.

_____
Circuit Court Judge

4

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
A *Foreign Limited Liability Company*
Plaintiff,

V.                                                          Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

## **PLAINTIFF'S FIRST VERIFIED AMENDED COMPLAINT & INCORPORATED MEMORANDUM OF LAW**

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned

counsel, hereby files this Amended Complaint for Declaratory, Monetary and Emergency

Injunctive Relief, and respectfully states as follows:

## **I. INTRODUCTION**

Plaintiff Island Wi-fi Limited, LLC., is a startup company, in the business of providing wi-

fi capable mobile devices to a broad spectrum of clients and the general public. Defendant "AT&T"

is the largest telecommunications provider globally. Plaintiff and Defendant are parties to a

contractual agreement commencing on or about November 20, 2019 and lasting two years. A copy

of the contract is attached hereto as (Ex. A). The general terms of the contract require Defendant

to provide Plaintiff with an account wherein Plaintiff can add or remove, at its leisure individual

lines of service, for which Defendant provides unlimited data services at a set rate per-line. Both

of the parties faithfully performed the contract for eight-months without issue between them.

Plaintiff timely and routinely paid the monthly bill and enjoyed the service provided by Defendant

On July 17, 2020, Defendant informed Plaintiff, without consultation, that Plaintiff's account would be terminated on August 17, 2020, due to Plaintiff's usage of the paid for lines of unlimited data. Plaintiff has paid more than $200,000.00 in monthly bills over the short life of the contract and invested more in its own business growth.

This litigation quickly followed, and Plaintiff seeks to have this Honorable Court adjudicate the contractual rights of the parties as Defendant has unilaterally and materially altered the contract by restricting the Plaintiff's usage of its account, shortening the term of the contract and failing to perform as required by the contract. Defendant's actions are causing increasing harm to the Plaintiff's international business reputation and goodwill amongst its customers. On August 17, 2020, the threatened termination date, Defendant's counsel ensured Plaintiff's counsel via email, "[t]he status quo is being maintained until further notice" and that there was no need for Plaintiff to pursue an emergency injunction. (Ex. B). Despite the reassurance, On August 18, 2020, Defendant not only breached their own interpretation of the "status-quo" but once again shifted it in their favor by restricting the Plaintiff's from utilizing lines of service it that were previously paid for. Further the "status-quo" that should be maintained is the mutual performance of the contractual agreement, as written, by both parties, not "status-quo," defined by the Defendant which includes their material breach and bad faith performance.[1]

---

[1] In the case of *Annex Indus. Park. LLc v. Corner Land.*, LLC, 206, So. 3d 739, the trial court enjoined a party accused of trespassing from any future entry upon the land of another. *Corner* previously gave permission to *Annex.* to use a portion of its land, and later withdrew said permission. *Id* at 740. Even after a Cease and desist *Annex.* continued to use *Corner's* property. *Id. Corner* sought a temporary injunction and the trial court granted it. *Id.* On appeal, Florida's Third District Court of Appeal upheld the injunction and dismissed *Annex. 's* argument that the injunction disturbed the status quo and was therefore improper. *Id.* at 741. In doing so, the District Court ruled that "a trial court does not abuse its discretion by enjoining an alleged continuing trespass, even if the injunction disturbs, rather than preserves, the status quo. *Id.* at 740.

## A. NEGOTIATIONS AND CONTRACT FORMATION

1.   The parties initial dealings before signing the contract lasted over 90 days as Plaintiff sought to understand the market for which its business would operate.

2.   Prior to signing the contract, Plaintiff discussed the parties contract at length with Defendant's representatives Kareem Najjar & Matthew Kutcher.

3.   Plaintiff represented by its executive officers, negotiated the contractual terms, and selected what was believed to be a mutually beneficial service plan.

4.   Based upon the representations of Defendant's representatives, Kareem Najjar and Matthew Kutcher, Plaintiff's business-to-business contract was appropriate for the Plaintiff's needs.

5.   AT&T required a United States entity be formed for the contracted services within the United States, accordingly Plaintiff's entity was formed on October 30, 2019. Defendant was well aware of the newly formed entity.

6.   Plaintiff is startup business in the United States and modeled its business operations from a lucrative company operated abroad. They do not have in-house counsel, or much experience with contract drafting.

7.   Defendant is a telecommunications provider believed to be valued at more than $200 billion with untold resources at its disposal, drafted the contract, and trained the representatives who advised Plaintiff.

8.   Before contracting with AT&T, Plaintiff researched "would be competitors" who advertise that they use AT&T's service to supply data services to their own customers.

9.   Plaintiff discussed these business models and practices with AT&T's representative Matthew Kutcher & Kareem Najjar prior to signing the contract with Defendant.

10.     Defendant's representatives stated that this was not permissible if they are using the brand of AT&T without permission.

11.     Kutcher assured Plaintiff the proposed contract supplied by AT&T permitted Island Wi-fi's proposed uses for the business-to-business data packages and products.

12.     Initially Plaintiff's contract was submitted for approval, by Kutcher, under the name of the foreign entity.

13.     Plaintiff's contract was rejected due to the foreign status of that entity.

14.     Plaintiff then formed a United States L.L.C.

15.     At the time of Plaintiff receiving the final contract, Kutcher was well aware that Plaintiff's business revolved around selling wi-fi services, as the name "MyIslandWifi" implies.

16.     Plaintiff reiterated these plans to Kutcher numerous times before signing the contract, and within the 30-day cancellation period after execution.

17.     Before signing the contract or making any formal agreement, Kutcher and Najjar supplied Plaintiff with ten (10) SIM cards to "test the network's ability and coverage."

18.     During negotiations, Plaintiff specifically pointed out the clause related to reselling and was assured that it was not an issue as long as the branding of AT&T was not used.

19.     Plaintiff was told this "reselling clause" was standard in all of Defendant's business-to-business contracts.

20.     Plaintiff's representative then explained the business operations and success of the foreign Wi-fi company to Najjar and/or Kutcher.

21.     Plaintiff demonstrated a successful business model and clear ability to generate revenue in addition to opening a large volume of individual lines.

22. During negotiations, Defendant's representatives informed that due to Plaintiff's recent incorporation date of October 30, 2019, and lack of credit a $1,000.00 deposit per-line opened on the account would be required. (Ex. B).

23. As of the filing of this complaint, the total deposit would be in excess of three-million dollars if AT&T had not waived this requirement.[2] (Ex. B).

24. Defendant waived the $1,000.00 deposit requirement.

25. Plaintiff's representative specifically required that international roaming be prohibited on all lines on the account.

26. Plaintiff signed the contract on or about November 20, 2019 and began performance shortly thereafter; the contract expires on or about November 20, 2021.

## B. THE CONTRACTUAL TERMS

27. The terms of the contract require Plaintiff to pay per-line of service purchased from the Defendant plus any applicable activation fees, taxes, or other charges. (Ex. A).

28. The terms require Plaintiff to pay at least $45,000.00 annually for Defendant's service under the contract's minimum revenue provision. (Ex. A.)

29. If Plaintiff failed to consume $45,000.00 of service from Defendant annually, Plaintiff would pay the difference between any lesser amount billed and $45,000.00. (Ex. A).

30. This means AT&T expected, required, or would otherwise penalize Plaintiff, if enough lines of service did not remain active throughout each year of the agreement, on average more than 2,000 aggregate lines based on monthly billing/counting. (Ex. A).

---

[2] The deposit requirement would have paid for the monthly charge for the entire contractual term, plus an additional 9 months.

31.     The crux of the agreement requires AT&T to provide unlimited internet for each line Plaintiff pays for, Plaintiff receives a SIM card that can be activated and inserted into a mobile device, deactivated or suspended at Plaintiff's will and reactivated if Plaintiff chooses.

32.     Plaintiff has paid its monthly bill to AT&T every month and has performed all of its obligations under the contract, including Plaintiff's most recent bill for the billing cycle of August 5, 2020 through September 4, 2020, in excess of $70,000.00, is paid in full.

33.     AT&T reasonably expected that Plaintiff's business would generate a large amount of lines but knew if Plaintiff failed to do so the contract contained a minimum revenue requirement of $45,000.00, for which Defendant would still profit. (Ex. A).

## C. AT&T'S KNOWLEDGE OF PLAINTIFF'S OPERATIONS INTENTIONALLY WAIVED THE RIGHT TO TERMINATE THE CONTRACT

34.     Before signing the contract, Plaintiff discussed the foreign business known as MyIslandWi-fi with Defendant's representatives Kareem Najjar & Matthew Kutcher.

35.     Plaintiff's representative explained how it operated, how many lines of service it generated, its profitability, and how many new lines of service were expected on this new United States account and how the Plaintiff's business sought to model the other entity.

36.     Defendant's representative(s) assured Plaintiff and its representatives that the contractual agreement was appropriate for Plaintiff's needs, namely selling wi-fi, as the name "MyIslandWi-fi" suggests.

37.     Before and after signing the contract, Plaintiff has used numerous email addresses with @MyIslandWifi.com as the common domain to communicate with Defendant's representatives

38.     Plaintiff's representative's signature block contains a link to the website – www.myislandwifi.com.

39.     Plaintiff's representative showed this website to Defendant's representatives Najjar and Kutcher.

40.     This website remains substantially the same today and it did then.

41.     This website makes it clear how the Plaintiff's business operates, namely selling Wi-fi.

42.     Defendant and its representatives had actual knowledge of Plaintiff's business operations, or at least the nature thereof before signing the contract.

43.     For execution of the contract, Defendant's representative Matthew Kutcher sent the contract to "Sales@MyIslandWifi.com." "Sales@MyIslandWifi.com" should have been a clear indication that Plaintiff sells wi-fi. ().

44.     After signing the contract, Plaintiff's representative sent an email directly to AT&T representative Kutcher, stating "[a]t this time we are waiting to complete orders due to the delays in the account," and requested an update on when the account would be active so Plaintiff's orders could be filled. (Ex. B).

45.     This communication clearly informs Defendant that Plaintiff does in fact sell or otherwise redistribute wi-fi. (Ex. B).

46.     Defendant nor its representatives confused this statement as referring to Plaintiff's personal order for necessary SIM cards.

47.     On December 10, 2019, Plaintiff spoke with Najjar about paragraph 9 of the contract between the parties, prohibited usages and reselling.

48.     Based upon that conversation, Plaintiff sought to exercise the 30-day termination clause.

49.     On December 11, 2019, Najjar emailed Kutcher to inform him of the conversation.

50.     Defendant's representative Kutcher assured Plaintiff that "several AT&T customers use this contract for the very same reason, and if you have any questions or concerns, reach out to me directly."

51.     Defendant's representative Kutcher stated to Plaintiff that he serviced several accounts doing the same distribution as Plaintiff.

52.     Kutcher's representations induced the Plaintiff to sign the contract.

53.     Kutcher's representations induced the Plaintiff to refrain from terminating the contract.

54.     Kutcher had actual knowledge of Plaintiff's intended usage and business operations.

55.     With this knowledge, Kutcher, for the purpose of bolstering his sales record, opened Plaintiff's account, and continuously ensured Plaintiff their operations fell within the scope of the contract.

56.     Defendant adequately trains its representatives regarding the products and services they sell.

57.     Kutcher knew these statements were false when he made them.

58.     Kutcher knew these statements were likely to mislead consumers.

59.     Kutcher made these statements with reckless disregard to their truth or falsity.

60.     Kutcher made these statements with the intent to enrich AT&T, or himself.

61.     Cancellation did not occur, because Defendant's representative(s), specifically Matthew Kutcher, again reassured Plaintiff that the contract was appropriate for Plaintiff's needs, ensuring Kutcher would meet his quota for new lines activated. (Ex. C).

62.     Kutcher had full knowledge of the Plaintiff's needs and planned uses as he advised Plaintiff of the proper product.

63.     Defendant's representatives did not disclose to Plaintiff the existence of alternative products and account plans offered by AT&T, their affiliate(s), or subsidiary(ies), that permit the very business Plaintiff was engaged in.

64.     It was not until June 2020 that Plaintiff learned of the APEX[3] (AT&T Partner Exchange) program/product offered on AT&T's network.

65.     APEX would have been more appropriate for Plaintiff's business operations than the business-to-business contract supplied by the Defendant.

66.     Before entering into the contract, Defendant and/or their authorized representatives were informed by owner-Tripp, of the Plaintiff's intended business operations, directly and indirectly.

67.     Defendant had a duty to inform Plaintiff of the proper product or service.

68.     Instead Defendant seeks to terminate the contract, leaving Plaintiff's business with no alternative for its customers.

69.     Further demonstrating knowledge prior to July 17, 2020, AT&T actively assisted in resolving a dispute in May 2020 between Plaintiff and one of its customers.

70.     This dispute was causally related to AT&T products, services, and Plaintiff's accounts.

71.     This customer claimed ownership of approximately 200 lines of service on Plaintiff's account and sought move them onto an account not owned by Plaintiff.

72.     This customer accessed Plaintiff's account without authorization and attempted to transfer approximately 200 lines to a different account.

73.     The nature of this dispute evidences the nature of the Plaintiff's business operations, already known by the Defendant.

74.     Defendant intervened and resolved the issue in favor of the Plaintiff.

---

[3] The APEX program supports the very business that Plaintiff was engaged in, however Plaintiff's representative were never informed of its existence before the contract was executed.

75.    Defendant shut down the account the attempted transfer was directed.

76.    Defendant shut down the account the attempted transfer was directed because Horn was "reselling" Defendant's products and services.

77.    Plaintiff's account was allowed to remain open without objection.

78.    If Defendant made a reasonable inquiry into the matter it would have discovered Plaintiff's business operations.

79.    Defendant did make a reasonable inquiry into the matter.

80.    Defendant willfully ignored the obvious signs of Plaintiffs business operations.

81.    No later than May 2020, Defendant knew Plaintiff sold and distributed Wi-fi services and voiced no objection.

82.    Throughout the course of performance, AT&T allowed Plaintiff to generate more lines on the account, expand its customer base, grow as a business account holder with AT&T, and invest considerable sums of money into its business.

83.    In doing so, Defendant waived any right it may have possessed to terminate Plaintiff's contract for the reasons stated on July 17, 2020.

84.    Defendant had direct knowledge of the exact conduct that they are now using as the basis for declaring Plaintiff is in breach of the agreement and Plaintiff's account would be terminated.

85.    Defendant made no objections to Plaintiff's use of its products when Plaintiff, fearing something was amiss, attempted to terminate the agreement in December of 2019.

86.    Instead Defendant's representative Kutcher doubled down and assured Plaintiff's representative that they "had nothing to worry about as long as Island Wi-fi paid their bill."

87.    Defendant made no objections to Plaintiff's use of its products and services even after Defendant fraud department investigated the report made by Plaintiff's representative in May of 2020.

88.    On July 17, 2020, that same fraud department, without providing any alternative, threatened to close Plaintiff's account for activity that Defendant had knowledge of for more than six-months prior, or would have been discovered by reasonable diligence.

89.    Defendant's representatives Kareem Najjar and/or Matthew Kutcher purposefully did not disclose that the contract was inappropriate for Plaintiffs needs, *inter alia*, to generate profit, commissions, meet sales quotas and/or otherwise improve their overall work performance.

90.    Upon information and belief representative Kutcher was promoted to position that paid approximately a 50% higher salary around the time Plaintiff's contract was finalized.

91.    Defendant on numerous occasions, was made aware of the Plaintiff's usage of its products and services.

92.    Defendant on numerous occasions, accepted the Plaintiff's usage of its products and services.

93.    Defendant on numerous occasions, assented to Plaintiff's usage of its products and services by continuously billing, accepting payments, and providing service under the parties' contractual agreement.

94.    Defendant, with the same knowledge they currently have, assented to the contract, amendments thereto, and Plaintiffs usage of AT&T services.

## D. PLAINTIFF'S SUCCESSFUL BUSINESS VENTURE

95.    Due to many market factors especially the health crisis caused by the Novel Coronavirus, Plaintiff's services have come into extreme demand.

96. Because of this Plaintiff added a substantial amount of lines to their account in order to meet the new demand.

97. In November of 2020, Plaintiff's bill totaled $585.50.

98. In December of 2020, Plaintiff's bill totaled $290.79. Plaintiff paid and Defendant continued to provide services, even though Plaintiff attempted to cancel this month.

99. In January of 2020, Plaintiffs bill totaled $1,071.57. Plaintiff paid and Defendant continued to provide services.

100. In February of 2020, Plaintiff's bill totaled $1,398.24. Plaintiff paid and Defendant continued to provide services.

101. In March of 2020, Plaintiffs bill totaled $9,622.60. Plaintiff paid and Defendant continued to provide services.

102. In April of 2020, Plaintiffs bill totaled $20,592.75. Plaintiff paid and Defendant continued to provide services.

103. In May of 2020, Plaintiff's bill totaled $27,000.51. Plaintiff paid and Defendant continued to provide services, despite the fraudulent activity this month clearly demonstrating the nature of Plaintiff's business.

104. In June of 2020, Plaintiffs totaled $105,197.59. Plaintiff paid and Defendant continued to provide services.

105. As Plaintiffs customer list increased, so did its bill to AT&T, and as well as the amount of data services in which AT&T provided. Despite the sizeable increase in Plaintiffs lines of service, Defendant voiced no objection.

106. As it stands, Plaintiff serves many types of clients ranging from U.S. public schools who have switched to distance learning; to clients who operate aquatic vessels currently at sea and will

be at sea at the time in which Defendant plans to unilaterally and without justification breach the parties' contractual agreement.

107.    Plaintiff's client's who operate aquatic vessels utilize Plaintiff's services to maintain safe and proper navigation, with accurate and up to date weather reports while at sea.

108.    If and when the vessels lose internet access, their navigation equipment will be unable to update weather reports and hazardous conditions at sea.

109.    AT&T knew or should have reasonably deduced the nature of Plaintiff's business operations before either signed the contract.

110.    Plaintiff's name "Island Wi-fi Limited" & "My Island Wi-fi" are good indicators that a reasonably prudent person would investigate, if concerned with reselling of data services.

111.    Further Plaintiff's statement "[a]t this time we are waiting to complete orders due to the delays in the account," in November of 2019 was another good indicator that Plaintiff was selling wifi, or maybe islands.

112.    If nothing else, Plaintiff demonstrating the sister-business in the Bahamas was a clear sign of the Plaintiff's business operations within the U.S.

113.    Defendant did not object to the Plaintiff's usage when it was apparent the Plaintiff was unlikely to meet its $45,000.00 minimum revenue requirement, as AT&T would have profited from the short fall.

114.    Nine months after execution, Defendant demonstrated its intent to prematurely terminate the contract and cease service of Plaintiff's account.

115.    This included lines of service for which Plaintiff had already paid for an advanced period.

## D. AT&T's ANTICIPATORY BREACH OF THE CONTACT

116.    Since the inception of the agreement and for eight (8) months thereafter, both parties adhered to their contractual obligations.

117.    Plaintiff has paid the required monthly-bill and Defendant has provided contracted services

118.    Further Defendant allowed Plaintiff to control its account.

119.    Defendant has granted Plaintiff's previous requests to open new lines of service.

120.    Defendant has granted Plaintiff's previous requests for additional SIM cards, sometimes hundreds at a time.

121.    In early July 2020, Plaintiff's representative inquired into a product offered by AT&T, which may better serve the Plaintiff's needs, known as the APEX program. Plaintiff sought to transfer their accounts to the APEX program, but those efforts have been unsuccessful.

122.    On or about July 17, 2020, Defendant, by email, unequivocally repudiated the contract with the Plaintiff, citing that Plaintiff breached Paragraph 9 of the contract.

123.    Coincidentally, Plaintiff initially expressed concern with this very clause on December 11, 2019.

124.    Plaintiff was assured by AT&T representative Kutcher that there was no problem with the current contract or Plaintiff's use of AT&T services.

125.    Defendant declared its intent to terminate data service to more than 3,000 lines on Plaintiff's account, for which Plaintiff is paying for and is current on all of its required monthly payments and has otherwise performed all obligations under the contract. (Ex. D).

126.    Defendant repudiated the agreement with Plaintiff or seeks to do so, not because of the alleged reselling violation, but because of the volume of usage of the "unlimited internet" being used by Plaintiff. (Ex. D).

127.    Based on information from Defendant's representatives, AT&T's APEX platform does in fact offer a contract/product that would be appropriate for the Plaintiffs business needs.

128.    This product should have been disclosed to Plaintiff at the onset, and certainly no later than December 11, 2019.⁴

129.    Further, if the current product is improper, that is solely the Defendant's fault, not the Plaintiff's wrongdoing, as Plaintiff has been completely transparent with Defendant regarding Plaintiff's usage of AT&T products.

130.    At the time of contracting, Defendant purposefully withheld information it knew Plaintiff would have reasonably wanted to know or be told.

131.    Defendant knowingly allowed Plaintiff to contract under terms that were insufficient to meet the Plaintiff's needs.

132.    AT&T has not offered Plaintiff any compromise, including transferring Plaintiff's lines to an APEX account.

133.    Simply put, AT&T, in bad faith, is threatening and seems determined to unlawfully breach the contract that it fraudulently induced Plaintiff into signing.

134.    This is demonstrated by the July 17, 2020, email and the August 21, 2020 restrictions placed on Plaintiff's account, despite AT&T's counsel's assurances otherwise.

135.    AT&T does not keep its word when dealing with the Plaintiff.

---

⁴ December 10 is when Plaintiff expressed concern over the reselling clause and expressed its desire to terminate the existing contract

## E. THE START OF LITIGATION

136. On July 17, 2020, Defendant emailed Plaintiff a statement that Plaintiff had breached the contract as a result Plaintiff's account would be terminated on August 17, 2020, some fifteen (15) months before its natural termination.

137. Further AT&T during the time period between July 17 and August 17, unlawfully denied Plaintiff from adding new lines of service, effectively rendering Plaintiff's business lifeless, severely diminishing its profitability, and causing Plaintiff to lose goodwill with tis consumers.

138. Plaintiff hired counsel and litigation commenced.

## F. DEFENDANT'S CONTINUOUS BREACH & BAD FAITH PERFORMANCE

139. Upon being served with Plaintiff's Notice to seek Injunctive Relief and Motion for Injunctive Relief, AT&T's senior litigation counsel Patricia Cruz, reached out to Plaintiff's counsel.

140. On Monday August 17, 2020, AT&T's, Senior Legal Counsel, Patricia Cruz sent an email to Plaintiff's counsel stating that AT&T would not be terminating Plaintiff's account as they previously stated. (Ex. B).

141. Attorney Cruz also stated that the parties would continue to operate under the "status quo"[5] without much clarity but ensured there was no need for the emergency injunction.

142. Plaintiff's counsel sought clarification to determine what circumstances constituted "status quo." (Ex. B).

143. On Thursday August 20, 2020, Plaintiff and AT&T's representative(s) discussed Plaintiff's desire to add more lines to the account, something he was not able to do between July 17, 2020 and August 17, 2020.

---

[5] Maintaining the status quo is the purpose of injunctive relief. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941). Defendant has assured Plaintiff that the status quo would be maintained, then breached even that promise only a few days later. Plaintiff is left with no other remedy than for this Honorable Court to enter an injunction against Defendant.

144. Defendant initially added 250 lines at the request of the Plaintiff to its account and assured Plaintiff that the necessary SIM cards would arrive the next day.

145. Plaintiff then represented to its clients that it would begin to fill some of the approximately 3,000 orders that have accumulated between July 17, 2020 and August 17, 2020.

146. On Friday August 21, 2020, Plaintiff received 25 of the 250 promised SIM cards.

147. On Friday August 21, 2020, without any correspondence to Plaintiff or Plaintiff's counsel, Defendant further restricted access to Plaintiff's account.

148. Defendant restricted access by preventing Plaintiff from assigning SIM cards to pre-existing-activated lines on Plaintiff's account.

149. Plaintiff was as previously allowed to assign SIM cards at its leisure.

150. This practice is commonly referred to as "SIM swapping" and Defendant has permitted this since the inception of the contract. Again, materially breaching the contract by failing to maintain the status-quo as Defendant's counsel stated. (Ex D).

151. Further, Plaintiff was forced to rely on "SIM swapping" between July 17, 2020 and August 17, 2020 because Defendant unlawfully denied Plaintiff's right to add new lines to its account, curtailing Plaintiff's ability to service its service existing customers, engage with new clients and generate revenue.

152. As of Friday August 21, 2020, AT&T has also denied processing Plaintiff's requests for additional SIM cards, breaching their obligations once again.

153. On Monday August 24, 2020, Defendant again breached the contractual agreement and the "status-quo" guarantee of their counsel Patricia Cruz when AT&T unilaterally closed 125 of the 250 newly added lines of service.

154.    Further, on August 24, 2020, Plaintiff was verbally informed that AT&T granted Plaintiff ten (10) days to transfer onto the APEX platform supported by AT&T. Problematic is that the ten (10) days apparently started August 17, 2020, however no such information was communicated to Plaintiff or counsel, who was in contact with Defendant's in-house counsel as well as local counsel the same day (August 17, 2020).

155.    On Tuesday, August 25, 2020, Defendant's new counsel finally clarified that "status quo" meant extreme restrictions on Plaintiff's ability to manage and operate its own account, including restrictions that Defendant placed after Cruz initially stated "status quo."

156.    Defendant's further breached the contract when its representative verbally informed Plaintiff of notes located on Plaintiff's account[6], once again Plaintiff cannot add any new lines of service to its account.

157.    When speaking with Plaintiff's counsel on Monday August 17, 2020, Defendant's outside counsel requested, among other things, to be brought up to speed regarding this dispute and to have a follow up conversation on Tuesday August 25, 2020, day 9 of the 10 of the undisclosed-unilateral negotiated transfer period.

158.    There has been no communication between Plaintiff and APEX/AT&T regarding pricing structure, how to maneuver the account to APEX platform, or a multitude of other negotiations that will be required to make this transfer. Plaintiff's counsel requested to be contacted by a representative who is familiar with the APEX platform, hoping to resolve this issue and possibly transfer Plaintiff's account to the APEX platform.

---

[6] Plaintiff does not have access to this information to ascertain for itself the truth or validity of the claim, nor what date said instructions were entered.

159.    August 24, 2020, Plaintiff sent an email to its account manager, asking for further information from the individual who claimed to inform Plaintiff's counsel of the 10-day transfer period onto the APEX platform. No response has been received.

160.    Even before the July 17, 2020 unlawful repudiation of the contract, AT&T has unilaterally and without notice to the Plaintiff, "involuntarily suspended" lines on Plaintiff's account, without just cause or any apparent standard for such actions. Despite suspending service to specific lines, Defendant continues to charge Plaintiff for the suspended lines of service. Defendant's conduct reeks of bad faith, breach, and unfair business practices that reflect poorly on Defendant's company.

161.    Plaintiff is hemorrhaging both money and clients as its brand is facing undue damage and lost revenue of more than $150,000.00 monthly because Defendant unlawfully refuses to perform under the parties contract by severely limiting the Plaintiff's ability to service its clients in the professional and reputable manner they are accustomed to.

162.    Plaintiff's business will close if the breach continues as Defendant is the only service provided the Plaintiff contracts with.

## COUNT I – BREACH OF CONTRACT

163.    Plaintiff restates the facts and allegations contained in paragraphs 1-162 and incorporate them herein by reference.

164.    Plaintiff and Defendant are bound by a valid written contract.

165.    Plaintiff has performed all duties imposed upon them by the contract.

166.    Defendant seeks to wrongfully breach the contract and has communicated its intent to do so.

167.    Defendant's statements and conduct amount to an anticipatory breach of contract.

168. Plaintiff is entitled to relief and damages incurred as a result of Defendant's unlawful conduct.

WHEREFORE Plaintiff ISLAND WIFI LIMITED LLC., respectfully request this

Honorable Court enter a judgment and/or order:

A. Temporarily enjoining the Defendant from terminating the internet services for which Defendant is obligated to provide to Plaintiff,

B. Temporarily enjoining the Defendant from terminating any services for which Defendant is contractually obligated to provide to Plaintiff,

C. Ordering the Defendant to reactivate any line of service for which Defendant may have already terminated service to,

D. Declaring that the Defendant does not have a right to breach the contract with Plaintiff,

E. Declaring the Defendant's threatened action to terminate the services of Plaintiff is unlawfully and/or a breach or the party's contract,

F. Declaring that the Defendant's threatened action to terminate the services of Plaintiff would cause irreparable harm and/or unreasonable threat to the health safety and welfare of others.

G. Awarding the Plaintiff damages as a direct and proximate result of Defendants unlawful conduct,

H. An award of attorney's fees and costs and/or

I. For any further relief this Honorable Court deems just and proper.

## COUNT II – FRAUD

169. Plaintiff restates the facts and an allegation contained in paragraphs 1-162 and incorporates them herein by reference.

170.    At all times material here to, including before November 15, 2019, Defendant and or Defendant's representatives knowingly and intentionally made false statements of material fact to Plaintiff regarding the services which they sold to Plaintiff. Namely Defendant misrepresented the services available to Plaintiff under the contract negotiated between the parties, and the purposes for which these services could be used.

171.    Defendant knew that the statements were false.

172.    Defendant knew that their omissions concerned a material fact and that a reasonable consumer negotiating his or her contract would want to know the withheld facts.

173.    Defendant knew that had the contract would not cover Plaintiffs intended business, Plaintiff would not have elected to sign the agreement.

174.    Defendant knew that their false statements and omissions would induce Plaintiff into signing the contract and rely on the Defendant's services to grow its business and service its clients.

175.    Defendant intended that the false statements and omissions would induce Plaintiff to act on such false statements and omissions by entering into a contract and paying more than $200,000.00, for services which Defendant later refuses to provide, despite Plaintiff faithful performance under the contract.

176.    Plaintiff suffered damages in justifiable reliance on Defendant's false statements and representation.

177.    The Defendant under the doctrine of *respondeat superior* and the law of agency, is liable to Plaintiff for the false statements and omission of its employees.

WHEREFORE, Plaintiff demands judgment for monetary damages to be proven at trial, punitive damages against Defendant, and any further relief this Honorable Court deems just and proper.

## COUNT III – INJUNCTIVE RELIEF

178. Plaintiff restates the facts and allegations in the preceding paragraphs and incorporates them herein by reference.

179. Plaintiff has demonstrated that the facts of this case, accompanying Memorandum of Law, and evidence provided that:

      A. Irreparable Harm Would Occur if an Injunction is Not Granted,

      B. Plaintiff has Clear Legal Right to the Relief Requested Herein,

      C. Plaintiff Lacks an Adequate Remedy at Law, and

      D. Consideration of the Public Interest.

WHEREFORE Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY SERVICES LLC., and all its affiliated entities from disconnecting, discontinuing, or in any manner interrupting the service of Plaintiffs account or lines of service for a period of at least 120 days, or until such longer time deemed necessary by this Court.

# II. MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY INJUNCTION

## ARGUMENT

### A. Standard for Granting a Motion for Injunctive Relief

The "obvious purpose of a temporary injunction" is to maintain the status quo pending the outcome of litigation. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941) (en banc) (bold and underlining added for emphasis). In order to obtain a temporary injunction a Plaintiff must satisfy a four-part test under Florida law by demonstrating: "[l] a substantial likelihood of success on the merits; a [2] lack of an adequate remedy at law; [3] irreparable harm absent the entry of an injunction; and [4] that injunctive relief will serve the public interest." *Liberty Counsel v. Fla.Bar Bd. of Governors*, 12 So.3d 183, 186 (Fla. 2009)(quoting *Reform Party of Fla. v. Black*, 885 So.2d 303, 305 (Fla. 2004).

The Plaintiff here meets the four-prong test and granting a temporary injunction will preserve the status quo as Defendant has already promised to do. An injunction will permit Plaintiff to avoid dissolution, , protect its clients on vessels that rely on the service for instantaneous updates of weather during this hurricane season, find an alternative carrier, or alter the contract to include the proper product AT&T could have and should have offered in the first place. Absolutely no harm will be imposed on Defendant if the court grants this Motion for Emergency Relief, as the Defendant (working under a multi-national corporate conglomerate) already agreed to maintain the status quo – then failed to do so in less than a week of making that guarantee.

### B. Plaintiff is Likely to Succeed on the Merits - Clear Legal Right

It is well settled law that in order to prevail on a claim for breach of contract, a litigant must demonstrate: (a) the existence of a contract, which is demonstrated by the parties performance of the written agreement, (b) a breach of the contract, which is demonstrated by AT&T's refusal to allow Plaintiff to activate new lines on its account and subsequent restrictions placed after agreeing to maintain the "status-quo" otherwise known as performing under the contract, (c) damages resulting from the breach, which are evident by the fact that Plaintiff will suffer a loss of revenue, demolition of its international brand and harm to owner-Tripp's personal reputation,[7] and (d) the party claiming a breach by the other, must demonstrate they have performed or are legally excused from performing all of their own contractual obligations.[8] An anticipatory breach occurs when one party, before the time to perform, demonstrates a refusal to perform by their words or actions. The nonbreaching party is excused from future performance & must demonstrate the ability to perform its contractual obligations.[9]

### i. Plaintiff's Claim for Breach of Contract

1. If Plaintiff were to take this action to trial, the evidence discussed above would clearly demonstrate that:

    i.    AT&T knew and assented to the Plaintiff's intended business operations before entering into the contractual agreement with Plaintiff.

    ii.    AT&T knew and ratified the Plaintiff's actual business operations no later than May of 2020 and continued to perform the contract with Plaintiff.

---

[7] *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).

[8] *Old Republic Ins. co. v. Von Onweller Constr. Co*, 239 So.2d 503, 505 (Fla. 2d DCA 1970)

[9] *Id.*

iii.     AT&T continued to service Plaintiffs account, with actual knowledge of the conduct AT&T now uses as the basis for termination the contract – thereby waiving their right to cancel the contract for said conduct.

iv.     Despite the Plaintiff following up several times to ensure the Defendant approved of its business operations, the Defendant specifically agreed that Plaintiff could operate its business in selling wifi.

v.     The Defendant acted in bad faith by alleging Plaintiff was in breach of the contract thus grounds for termination of service, upon Plaintiff's inquiry to switch to the APEX program.

vi.     Caused Plaintiff damages by refusing to allow new lines of service from July 17- August 17, resulting in a back log of nearly 3,000 unfilled orders, despite Plaintiff's account being current. Plaintiff has already been harmed as they must turn away new business, and rumors have begun to circulate as to why Plaintiff has turned away thousands of new customers and lines of service.

vii.     Defendant agreed to and ratified the Plaintiff's business operations.

viii.     The Defendant waived any right to claim breach, by having knowledge of the actions that Defendant now asserts are ground for breach and termination of the contract - performed their obligations and allowed Plaintiff to perform, without objection.

ix.     Defendant fraudulently induced Plaintiff into entering into the contractual agreement by withholding material information regarding the contract.

x.     Plaintiff has paid each and every dime due by them to Defendant.

Plaintiff's claim for breach of contract is based on the Defendant's failure to perform on one hand and rooted in the doctrine of anticipatory repudiation on the other. Defendant failed to give adequate assurances or signaled intent to breach the contract.

Here, there is no doubt that the parties have a valid written contractual agreement, binding upon them, and that the parties have performed under said contract for several months. Further the documentation, emails, and affidavit of Plaintiff's executive demonstrates that the parties performed the contract and that AT&T had actual knowledge of the business operations of Plaintiff. Defendant demonstrated bad faith in July of 2020, upon receipt of a proposal from Plaintiff, when it claimed a violation of the agreement by Plaintiff and unequivocally announced its intent to prematurely terminate the contract with the Plaintiff, and offered no alternative. Plaintiff's use of Defendant's data services was known to Defendant from the inception of the agreement and all times thereafter. Despite this, it now uses Paragraph 9, and the known use of the data services by Plaintiff, as the basis for the terminating of the contract. As such, Defendant has legally waived this argument because it accepted performance under the contract by Plaintiff with no objection and with knowledge of the business model it now finds objectionable. Aside from having knowledge of the right, and an intention to waive said right, the Defendant actually encouraged and ratified the Plaintiff's business model several times over the first eight months of the contract, demonstrating Defendant's intent to waive the right to cancel. Consequently, Defendant cannot at this late stage complain and has no legal right to terminate the contract for conduct it was aware of and encouraged. The doctrines of waiver and estoppel prevent Defendant from terminating the agreement or would operate as affirmative defenses if Defendant countersued Plaintiff.

## ii. Conduct of Defendant's Representatives Demonstrates that the Waiver of a Known Right was Intentional

"The elements of waiver are: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.[10] Waiver may be implied by conduct, but that conduct must make out a clear case.[11] The burden of proving the affirmative defense of estoppel and waiver rests upon the party invoking it.[12] Mere delay is insufficient to support a defense of waiver or estoppel.[13]

## iii. AT&T had Actual and Constructive Knowledge of the its Right within Paragraph 9 of the Contract and Simply Waived it Through Their Language and Conduct.

### a. The Defendant's lawyers drafted the contract containing Paragraph 9.

Here, at the time the contract was executed, the defendant was aware of Paragraph 9 that prohibits the resell service or program components. In fact, the clause was questioned by the Plaintiff. As a result, Defendant's representatives reassured the Plaintiff that is was merely a form contract. On this reassurance, the Plaintiff executed the contract. Moreover, throughout the contractual relationship, AT&T has always had the right for which they assert is the basis to terminate the Plaintiffs account over a year before its expiration. This right is found within the Defendant's services terms which it provides and unilaterally changes from time to time. AT&T was fully aware of its own contractual rights as written by its own lawyers as the drafters of the contract at the time paragraph 9 was drafted, the contract executed, and later waived. Accordingly, not only did the right exist but Defendant had actual knowledge of it.

---

[10] *Goodwin v. Blu Murray Ins. Agency, Inc.,* 939 So. Pd 1098, 1104 (Fla. 5th DCA 2004). Citing *Zurstrassen v. Stonier,* 786 So.2d 65, 70 (Fla. 4th DCA 2001).

[11] *Goodwin,* at 1104. Citing *Fireman's Fund Ins. Co. v. Vogel,* 195 So.2d 20, 24 (Fla 2d DCA 1967).

[12] *Goodwin,* at 1104. *Mercede v. Mercede Park Italian Restaurant, Inc.,* 392 So.2d 997, 998 (Fla.4th DCA 1981).

[13] *Mercede,* at 392; Citing *Air Prods. & Chem., Inc. Louisiana Land & Exploration Co.,* 867 F.2d 1376, 1380 (11th Cir. 1989)(applying Florida Law in holding no clear waiver shown after five-year delay).

## b. The Defendant's Statements and Conduct Evidence an Intentional Waiver of Paragraph 9.

A party waives a breach of contract when it continues to abide by the contract after learning of a breach. *Plaza Builders, Inc. v. Regis,* 502 So. 2d 918, 922 (Fla. 2d DCA 1986) (finding a waiver when a party became aware of a breach of contract and it continued to deal with the other party after learning that the party was unable to acquire the required license).

Here, only a month (December 2019) after executing the contract the Plaintiff further inquired into whether the contract was suitable for its type of business. Once again, the Defendant provided reassurances that Paragraph 9 was of no consequence and its business model was acceptable. Later in May of 2020, the Defendant helped the Plaintiff regain access to 200 lines after one of Plaintiff's clients sought to steal the lines and transferred them over without authorization. Once again, the Defendant saw into the Plaintiff's business operations and made no issue of the business model.

While Defendant thought it struck a good deal it permitted the Plaintiff's business model. Only after it became less profitable under the contract as a result of the success of Plaintiff's business, did the Defendant seek to change its stance on Paragraph 9.

Plaintiffs entity was newly formed, and it had neither credit nor client to its name or brand within the United States nor any business relationship with Defendant. Nonetheless, Defendant extended favorable contractual terms to the Plaintiff, with the caveat that Plaintiff pay at least $45,000.00 annually, to the Defendant regardless of service lines used. For five-months, Plaintiffs bill was insignificant to say the least. At less than $2,000.00, monthly, it seemed Plaintiff was not going to make its minimum annual fee amount. By April 2020, Plaintiffs bill began to increase to a number that would in fact exceed the $45,000.00 annual minimum . By June with the return to the U.S. of the boating and yachting clientele, Plaintiffs amassed an impressive

$105,197.59 bill for the month, Plaintiff was well above the minimum and out pacing expectations. It was at this time, AT&T first claimed that Plaintiff was in violation of the agreement.

Until then AT&T knew that Plaintiff was technically breaching the agreement but simply chose it was good business to waive its objection. AT&T knew at the time of the contract in November 2019, again in December of 2019, and again on May 31, 2020 of the circumstances they now assert as grounds for terminating the Plaintiff's account.

Notably, the Sales@MyIslandWifi.com email address and the business-to-business contract showed circumstances and nature of Plaintiff's business. This was evident before the expiration of the 30-day cancellation period of the contract. Further, AT&T knew the Plaintiff sold wi-fi, AT&T or at least their duly authorized representatives permitted such conduct by the Plaintiff in order to boost their sales performance or meet their activation quotas.

Accordingly, after repeatedly reassuring the Plaintiff, knowing of the Plaintiff's business model, and waiting eight (8) months to object to the business model, it is clear that the Defendant waived any objection to the Plaintiff's business model several times over.

## C. Plaintiff will Face Irreparable Harm if the Injunction is Not Granted

Florida courts have found an injured party has suffered irreparable harm when they demonstrate: 1-suffered monetary damages, 2-will continue to suffer monetary damages, 3-injury to businesses goodwill and business reputation. *Tiffany Sands, Inc. v. Mezhibovsky*, 463 So. 2d 349, 351(Fla. 3d DCA 1985), citing, *Puga v. Suave Shoe Corp.*, 374 So.2d 552 (Fla. 3d DCA 1979).

In the instant case, Plaintiff is currently suffering financial harm because Defendant no longer allows them to open lines of service, or even activate lines they own. Plaintiff will certainly suffer future financial harm, and that amount is not readily ascertainable In a few short

month's Plaintiffs business grew exponentially, as demonstrated by the large monthly bills paid to Defendant compared to the amount of the monthly bills when the parties started the contract. Currently Plaintiff has unfulfilled customer orders due to the Defendant's conduct. The parties have over a year left on their contractual term, and Plaintiff is entitled to its profits until November of 2021. Those amounts are unascertainable.

Further Plaintiff has already sustained injury to its goodwill amongst its customers, many whom Plaintiff also serves abroad. Plaintiff has lost numerous orders already and its customers have begun to complain about the inability to rely on Plaintiff for their data services needs.

### D. Plaintiff Lacks an Adequate Remedy at Law.

A party lacks an adequate remedy at law where damages are unavailable or are "so speculative as not to be susceptible of proof." *So. Colonization Co. v. Derfler*, 75 So. 790, 794 (Fla. 1917); see also *Thompson v. Planning Comm 'n*, 464 So.2d 1231, 1237 (Fla. 1st DCA 1985) (where damages are speculative, the remedy is inadequate).

Here, the Plaintiff will be dissolved should the injunction not be granted. The Plaintiff was created and openly set up for this type of business. The business does not have other contracts and solely relies on AT&T for its services. In other words, the company operates under this one contract. Should the plaintiff continue to breach, aside from the lost business opportunities outlined above and below, the company will shut down. This cannot be remedied with a later money judgment or a later order requiring the defendant to specifically perform. At that point, it will be too late, and this multinational corporation will have eliminated the Plaintiff from existence and therefore competition. This injunction is the only lifeline that will keep the Plaintiff from drowning, otherwise known as Chapter 11.

On the other hand, the Defendant is part of a multinational conglomerate that can absorb the status quo for ninety (90) days without sustaining any harm whatsoever, In fact, the Defendant will benefit by continuing to receive the Plaintiff's payments under the contract.

Additionally, Plaintiff will suffer enormous losses that cannot be ascertained now, or at any reasonable time in the future. Further, these losses cannot simply be recovered with financial payment. Plaintiff's international brand, albeit less than three years in the making, has grown at a significant rate and at a time where economic uncertainty is on the rise globally. If Defendant is permitted to cancel Plaintiff's accounts or continue the unfair tactics exhibited since the filing and serving of this suit, the harm to the international brand will be permanent. Plaintiff's clients who will lose access reliable weather reports while at sea will never forget the ordeal that would follow. The Island Wi-fi brand globally will be forever impacted and the liability Plaintiff may face is untold, should any harm come to any clients due to the loss of crucial internet service. In their written opinion *of Liza Danielle, Inc. v. Jamko, Inc.*, Florida's Third District Court of Appeals adopts the following statement:

> Lack of an adequate remedy at law is a prerequisite for equitable relief, and furthermore, "an injunction will not lie where there is a choice between the ordinary processes of law and the injunction, the former being sufficient to furnish the full relief to which the complaining party is entitled." 29 Fla.Jur.2d, Injunctions 17. On the other hand, however, it has been said that "in order to preclude pursuit of equitable remedies an available legal remedy must be plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice." 29 Fla. Jur.2d, Injunctions 18.

408 So. 2d 735, 738 (1982). Considering the above, it seems quite deserving in this matter that AT&T be enjoined from the egregious conduct it has exhibited. AT&T is a large corporation with vast financial resources, certainly enough resources to litigate its disputes. It is AT&T who has the adequate remedy should the claim be true that Plaintiff is in breach, instead AT&T chooses an unlawful approach and submit false guarantees through their counsel but breaching the contract

harming the Plaintiff. The injunction requested will not harm AT&T as it will simply require a
communications provider to keep open an account, for which it is paid for, and for which it makes
profit. To deny the Plaintiff's injunction would condone the party who has an adequate remedy at
law, financial resources to pursue it, but chooses to ignore that avenue and opt for a less judicious
approach.

If Defendant is permitted, without obstacle to continue to breach its contractual agreements
in this case, then the message is loud and clear — big businesses in America may breach
agreements substantially impair lives and get away with it.

### E. Public Policy Consideration Favors an Injunction Based on the Danger Posed to Plaintiff's Clients and the Position of the Parties.

Public policy strongly favors an individual's right to contract as they choose, within the
confines of the law. Courts across the United States, including our Supreme Court have held close
to the notion that "a freely negotiated private agreement unaffected by fraud, undue influence, or
overweening bargaining power should be given full effect." *Manrique v. Fabbri*, 493 so. 2d 437,
439 (Fla. 1986). Citing *The Bremen v. Zapata Off-Shore Co.*, (407 U.S. 1, 1972).

If this injunction is not granted, many of the clients of the Plaintiff will be stuck at sea
without the instantaneous weather updates and tracking they relied on with the wi-fi service.  It
can be dangerous for such clients to navigate on their vessels when they planned on using wi-1fi
for such services. This is especially alarming given that it is hurricane season.  A ninety (90)
injunction will not only serve to save a business but it may actually save lives and allow clients to
avoid peril.

Specifically, Plaintiff's clients may be forced to endure hazardous conditions at sea. This
is not conjecture, but reality, as Defendant originally planned to terminate service on August 17,
2020. Hurricane Laura made it path through the Gulf of Mexico, where Plaintiff's customers are

known to frequent, just days after AT&T would have shut down their internet capabilities, had it
not been for the Plaintiff initiating this litigation. If AT&T shuts down the account, Plaintiffs
clients will be placed in jeopardy and lives will be endangered

AT&T is one, if not the largest telecommunications provider in the United States, and likely
globally. AT&T certainly was not overcome in their bargaining power in this agreement by a
company of less than 20 employees, only a few days old at the time of contracting. In balancing
the hardships of the parties, it is clear that the Defendants breach weighs heavier on the Plaintiffs
than it does on the Defendants. Defendant is an international company. Its offices in will remain
open and active, and there is no reason to assume that Defendant will need to close their doors if
they abide by the contract. In fact, the contract will positively affect the Defendant's sales and
profits.

Consequently, the parties' agreement should be given its full effect. The only way to do
that, is for this Honorable Court to grant this Emergency Petition for Plaintiff immediately, as
starting on *August 27, 2020*, the Plaintiff has experienced irreparable harm. If the injunction is
issued, Plaintiff will continue making all payments and complying with all contractual obligations
owed. Further Plaintiff is aware and capable of posting any reasonable bond ordered by this
Honorable Court.

## CONCLUSION

Plaintiff has demonstrated, through this sworn petition, sworn complaint and
accompanying affidavit that the facts of this case and evidence provided:

A.      Irreparable harm would occur if an injunction is not granted,

B.      Plaintiff has a substantial likelihood of success on the merits,

C.      Plaintiff lacks an adequate remedy at law, and

D.    Consideration of the Public Interest supports the injunction.

**WHEREFORE** Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., and all its affiliated entities from: disconnecting, discontinuing, or in any manner interrupting the service of Plaintiff's account including Plaintiff's use of the account and accompanying portal, for a period of at least ninety 90 days, or until such time deemed necessary by this Court, that the Court may hear the parties and determine to lift or extend the injunction, an award of reasonable attorney's fees, court costs and any further relief this Honorable Court Deems just and proper.

## VERIFICATION OF PLAINTIFF

I understand that I am swearing and affirming under oath to the truthfulness of the claims made in this verified motion and that the punishment for knowingly making a false statement includes fines and/or imprisonment. The facts and allegations contained herein are true to the best of my knowledge, recollection, and materials available to me at this time.

8-28/2020
**Date**

Whitney Lee Ong 8-28/2020
Whitney Lee Tripp

Before me, the undersigned authority, on this 28 day of August, 2020, personally appeared WHITNEY TRIPP, who has been duly sworn and deposed, states under oath that the facts and allegations contained within the foregoing instrument Verified Amend. Compl. are true and accurate to the best of their recollection and that they understand the penalty for making false statements under oath.

_____ **Personally Known**

✓ **Produced Identification** LA. DRIV. EXP 1-3-2022

**Notary Public**

JACOB AUGUSTUS SPRAGG
State of Florida-Notary Public
Commission # GG 198963
My Commission Expires
March 21, 2022

_____ **Print, type, or stamp commissioned name.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Verified Motion

for Emergency Injunction has been served on Defendant's registered agent CT Corporate

Systems.

Respectfully Submitted,

BLUE LINE LAW FIRM, PLLC

By: /s/ Kevin Drummond
KEVIN DRUMMOND, ESQ. (FBN 1002238)
    1645 Palm Beach Lakes Blvd., Suite 1200
    West Palm Beach, FL 33401
    Telephone: 888-611-9511
    Facsimile: 561-892-3330
    E-Service: intake@tbllf.com

AT&T reserves the right to withdraw this Agreement, if this Agreement is not executed by the Customer before: 02/28/2020

 **AT&T**

Location Account ID: 10000002562

## AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT
### VERSION 13-A

| Island Wifi Limited | | | 800-570-0316 |
|---|---|---|---|
| Customer Legal Name ("Customer") | | D/B/A | Main Telephone Number |
| 41 SE 5th St Suite 2005 | Miami | FL | 33131 |
| Street Address | City | State | ZIP Code |
| LeAnne Rozelle | | 800-570-0316 | |
| Primary Contact Name and Email Address | | Primary Contact Telephone Number | |
| Check one: ☐ Corporation | ☐ Partnership | ☒ Limited Liability Corporation/Partnership | ☐ Other |
| State of Formation: | LA | **Effective Date:** _____ (To be completed by AT&T only) | |

**Agreement:** This AT&T Corporate Digital Advantage Agreement between Customer, on behalf of itself and as agent for its Affiliates, and AT&T Mobility National Accounts LLC ("AT&T"), on behalf of itself and as agent for the Carriers, consists of (a) this Cover Page, (b) the attached AT&T Corporate Digital Advantage Program Description (the "Program Description"), (c) the General Terms and Conditions in effect on the Effective Date and found at the Program Website ("General Terms and Conditions"), and (d) all AT&T materials incorporated by reference in the foregoing, such as applicable Attachments found at the Program Website and Sales Information, and the AT&T Acceptable Use Policy found at www.att.com/legal/terms.aup.html (collectively, the "Agreement").

**Program Website:**     www.att.com/cda

**Term:** The Agreement is for an initial term beginning on the Effective Date and continuing for a period of:
☒ Two years   ☐ Three years   ☐ Four years   ☐ Five years

At the end of this initial term, the Agreement will automatically renew for successive one (1) year terms unless either party gives the other party notice of its intent not to renew at least ninety (90) days prior to the end of the then current term.

**Initial MAC:**     $45,000

**By signing below, the parties agree to be bound by the terms and conditions of the Agreement.**

| Customer<br>(by its authorized representative) | AT&T<br>(by its authorized representative) |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

## AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
## PROGRAM DESCRIPTION

**1. Service.** AT&T, through Carriers, will provide Service to Customer, its Affiliates and their respective Employees. Employees may receive Service under the Agreement as CRUs or IRUs.

## 2. AT&T Corporate Digital Advantage Program Eligibility Requirement.

**2.1 Minimum Revenue Requirement.** Customer must generate at least $45,000 in Service Revenue per Term Year. If Customer fails to achieve this revenue requirement in any Term Year, Customer will pay AT&T the difference between $45,000 and the Service Revenue amount that Customer actually paid in such Term Year. In the event Customer fails to comply with this eligibility requirement, Customer is no longer eligible for the Service Discount or any other program components, and AT&T may immediately discontinue provisioning all such program components in addition to pursuing any other remedies available under the Agreement.

## 3. Service Discount and MAC Contribution.

**3.1 Generally.** Subject to the restrictions set forth in this Section, AT&T will provide Customer with the Service Discount specified in Table 3.1 below based on Customer's MAC. All Qualified Charges incurred by Customer, its Affiliates and their respective CRUs in AT&T Markets contribute towards the MAC. **AT&T may restrict certain Plans or certain other discount programs from either contributing to Customer's MAC or qualifying for the Service Discount or both. AT&T will advise Customer if such restrictions apply.** AT&T will only apply the Service Discount to the Monthly Service Charge of eligible Voice Service and Wireless Data Service Plans. It may take several billing cycles for the Service Discount to be applied.

Table 3.1
MSC Service Discount

| MAC | MSC Service Discount for CRUs | MSC Service Discount for IRUs |
|---|---|---|
| $45,000 and higher | 20% | 18% |

**3.2 MAC Modification.** Customer's initial MAC is set forth on the Cover Page. Customer may modify its MAC for the subsequent Term Year. Any such modification is subject to AT&T's consent, which will not be unreasonably withheld or delayed, and the parties will memorialize the modification in a signed writing. Customer must notify AT&T of its desire to modify the MAC within thirty (30) days after each Term Year; however, the authorized modification will become effective as soon thereafter as reasonably practicable. In connection with any such MAC modification, AT&T may (a) modify Customer's Service Discount; and/or (b) permit or restrict Customer's access to certain other program components. Customer's MAC modification will not affect the Reconciliation Obligation for the prior Term Year (see §3.3 of the Program Description).

**3.3 Service Discount Reconciliation.** If Customer fails to achieve the MAC, as modified, Customer will pay AT&T the difference between the amount of the Service Discount received by Customer, and/or End Users, and the amount of the Service Discount for which Customer would have qualified considering Service Revenue actually received by AT&T during that Term Year (the "Reconciliation Obligation"). In the event Customer owes the Reconciliation Obligation, AT&T may reduce Customer's Service Discount percentage by an amount sufficient to offset the Reconciliation Obligation. The amount and duration of this Service Discount reduction is at AT&T's sole discretion, provided that AT&T will not offset more than the total amount of the Reconciliation Obligation.

**3.4 Ramp Year.** If Customer has a MAC of $200,000 or higher, then, during the first Term Year only, Customer will be deemed to have achieved its MAC for that first Term Year if AT&T receives Service Revenue in an amount equal to 75% of the MAC on or before the first anniversary of the Effective Date. This §3.4 applies only for purposes of determining whether Customer has achieved its MAC during the first Term Year and does not apply to or otherwise affect Customer's obligations under §2 of the Program Description or any other obligations under the Agreement.

**4. Sponsorship Program.** Customer's Employees may elect to participate in the Sponsorship Program as IRUs. Employees must be validated in order to become IRUs, and any Employees not so validated will not be IRUs under the Agreement and will not receive corresponding program benefits.

**4.1 Sponsorship Program Activation Processes and Procedures.** Each IRU participating in the Sponsorship Program: (a) must enter into, and be individually responsible for complying with an IRU Service Agreement including, without limitation, the corresponding obligations to comply with all of the terms and conditions of the chosen Plan and to pay all charges incurred under the IRU Service Agreement; and (b) must follow the activation, validation, migration, upgrade and related policies, procedures and processes established by AT&T from time to time, including without limitation paying any applicable enrollment fees.

**4.2 Sponsorship Program Features.** Under the Sponsorship Program: (a) IRUs may choose from select Plans available to Customer within each AT&T Market (provided they qualify for the chosen Plan); (b) IRUs will receive the Service Discount in accordance with §3 of the Program Description; (c) Qualified Charges incurred by IRUs will contribute to Customer's MAC in accordance with §3 of the Program Description; and (d) IRUs and their usage will contribute to Customer's eligibility requirements set forth in §2 of the Program Description.

**4.3 Marketing Assistance.** Customer will assist AT&T in obtaining Employees' participation in the Sponsorship Program as follows:

• Posting and maintaining a hyperlink from Customer's intranet site for Employee-related benefits to the att.com landing page established for Customer's IRUs;

• Posting AT&T-provided Sponsorship Program flyers or digital signage in break room(s) and/or other Employee common area(s) of Customer's main campus at least once per calendar quarter;

• Permitting AT&T sales representatives to participate in two (2) "onsite events" per year at the Customer's main campus, the date and time of which shall be mutually agreed upon by the parties; and

• Any other mutually agreed upon marketing efforts, which shall be documented in a writing signed by both parties.

5.  **Financial Responsibility.** Customer must pay for all charges incurred under the Agreement, regardless of whether such charges were incurred by Customer, its Affiliates or their respective CRUs. Customer is not liable for any charges incurred by IRUs under this Agreement or any IRU Service Agreement.

6.  **Invoicing Options.** With respect to Service, Customer will have the invoicing options set forth in this §6.

    **6.1   Consolidated Invoicing.** Under consolidated invoicing, AT&T will provide an online invoice to Customer each month that consolidates all CRUs' Service charges for the preceding monthly billing cycle, except as may otherwise be noted in applicable online or printed terms and conditions of an AT&T offer, product, service, or Plan. This invoicing method is only available through Premier. Consolidated invoicing is not offered in conjunction with Corporate Responsibility User invoicing. Customer must promptly notify AT&T of any Numbers to be added or deleted from Customer's online invoice.

    **6.2   Corporate Responsibility User Invoicing.** Under Corporate Responsibility User invoicing, AT&T will provide invoices to Customer's CRUs each month that set forth such CRUs' Service charges for the preceding monthly billing cycle. Corporate Responsibility User invoicing is not offered in conjunction with consolidated invoicing.

7.  **Cancellation Fee.** In the event AT&T offers and Customer elects to purchase Equipment with a service commitment, the service commitment begins either on the date (a) the Equipment is activated with a new CRU line of Service or (b) an existing CRU line under the Agreement is upgraded to the Equipment (with or without a migration to a different Plan). For each CRU that is terminated from Service more than 30 days after activation but prior to the expiration of the applicable service commitment, Customer agrees to pay AT&T with respect to each device identifier or Number assigned to such CRU, in addition to all other amounts owed, a Cancellation Fee in the amount specified below ("Cancellation Fee"). The Cancellation Fee for certain specified Equipment (e.g., smartphones) will be $325 minus $10 for each full month toward the service commitment that the CRU completes. (For a complete list of the specified Equipment, check www.att.com/equipmentETF.) Otherwise, the Cancellation Fee will be $150 minus $4 for each full month toward the service commitment that the CRU completes. The Cancellation Fee is not a penalty, but rather a charge to compensate AT&T for Customer's failure to satisfy the service commitment. For the avoidance of doubt, Customer will not pay any Cancellation Fee(s) under one of AT&T's device installment plan pricing options described in the applicable online Attachment found at the Program Website. Customer acknowledges and agrees that porting a CRU's Number to a non-AT&T service provider before the end of the applicable service commitment constitutes a termination subject to this Cancellation Fee. Customer may terminate a CRU's Service within the first 30 days after activation without incurring a Cancellation Fee, but equipment restocking or other fees may apply. Customer should refer to AT&T's returns policy at www.wireless.att.com/cell-phone-service/legal/return-policy.jsp, or such other site as AT&T may designate from time to time, for additional details.

8.  **Customer's Affiliates.** Customer agrees that any of its Affiliates receiving Service under the Agreement meet, and will continue to meet throughout the term of the Agreement, the definition of "Affiliate" set forth in the General Terms and Conditions.

9.  **Resale and Other Prohibited Uses.** Customer, its Affiliates (if applicable) and their respective CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third parties whether directly or indirectly including, without limitation, through machine to machine transmissions.

10. **Definitions.** In addition to terms defined elsewhere, these terms have the following meanings in the Agreement:

    **10.1   "CRU" and "Corporate Responsibility User"** mean an Employee receiving Service under Customer's account.

    **10.2   "Effective Date"** means the effective date of this Agreement.

    **10.3   "Employees"** means Customer's or its Affiliate's current, validated personnel receiving Federal W-2 or K-1 tax treatment.

    **10.4   "End Users"** means CRUs and IRUs, collectively.

    **10.5   "IRU" and "Individual Responsibility User"** mean an Employee receiving Service under an individual account in accordance with the Sponsorship Program.

    **10.6   "IRU Service Agreement"** means a separate wireless service agreement between an IRU and AT&T for Service, Equipment and related matters.

    **10.7   "MAC"** means Customer's minimum annual commitment of Service Revenue.

    **10.8   "Monthly Service Charge"** means the set fee charged monthly for use of the Service available with a particular Plan (i.e., the monthly "plan charge", not the monthly per device "access charge", if any).

    **10.9   "Non-Qualified Charges"** refers to the following charges:  (a) charges for long distance service, (b) all charges for local landline interconnect, toll services and other charges arising from or related to wireless operators providing long distance service, (c) monthly access charges related to AT&T's abbreviated dialing code product, (d) all charges for Equipment, (e) roaming charges

if not using AT&T's wireless network, (f) charges for other goods and services that Customer, a CRU and/or an IRU authorizes to be charged through the wireless bill; (g) shipping and handling charges; (h) all Taxes; and (i) all other charges not described as "Qualified Charges" herein.

**10.10 "Qualified Charges"** refers to the following undiscounted AT&T Mobile Services charges: (a) one-time charges for Service activation and conversion, (b) the Monthly Service Charge, (c) home wireless usage charges, (d) roaming charges incurred by Numbers provisioned from AT&T Markets while roaming in other AT&T Markets and using AT&T's wireless network, (e) charges for detail billing, (f) charges for tethering if using AT&T's wireless network, (g) charges for additional wireless service features such as voice mail if using AT&T's wireless network, but excluding enhanced features such as directory assistance or fee-based information services and (h) monthly recurring access charges for qualified Supplemental Services identified at www.att.com/abs-addtl-terms from time to time.

**10.11 "Service Discount"** means a monthly discount on eligible AT&T Mobile Services that is based on Customer's MAC and applied to an eligible End User's Monthly Service Charge as described in this Program Description.

**10.12 "Service Revenue"** means revenue from Qualified Charges received by AT&T.

**10.13 "Term Year"** means any year of the term of the Agreement, including any renewal year.

**11. OTHER PROGRAM COMPONENTS.** Provided Customer is in compliance with the Agreement and maintains its MAC in the amount of $45,000 or higher, AT&T will make available to Customer the additional custom offers described in this Section 11 (including subsections) during the applicable Offer Period and only with respect to CRU lines of service for which Customer has met the corresponding eligibility requirements.

**11.1. Waiver of Select Fees**

| Custom Offer | Offer Period | Eligibility Requirements |
|---|---|---|
| Waiver of Activation Fee (i.e., start of Service fee) | Initial term and renewal term(s) | Activate a new CRU line of Service on an available Voice Service Plan and/or Wireless Data Service Plan during the Offer Period. |
| Waiver of Equipment Shipping Fee | Initial term and renewal term(s) | Purchase new Equipment for a new or existing CRU line of Service during the Offer Period. (Shipping carrier will be determined by AT&T.) |

**11.2. Accessory Discounts.** AT&T will make available Accessory Discounts as described below. Accessory Discounts are applicable only to select phone and tablet accessories identified as discount-eligible at point of sale, which are determined solely by AT&T and may vary from time to time. Accessory Discounts may not be combined with any other promotional accessory pricing or offers.

| Accessory Discount for CRUs | Accessory Discount for IRUs |
|---|---|
| 25% | 25% |

**11.3 Custom Equipment Pricing**

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| iPhone® XR (64GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $299.99 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® S10 (128GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $599.99 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® A10E | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $24.00 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| * Offer subject to Equipment availability. | | | | |

Island Wifi Limited _V1_SR905W_111519
1-BVLO62V_8554_NBSRBSE

AT&T and Customer Confidential Information
Page 4 of 5

acda_msc_mac_2yr_06-16-2019
v13-A

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| ** Price does not include applicable taxes and may not be combined with other Equipment-related discounts or other offers. | | | | |

### 11.4. Additional Plans

AT&T will make available to Customer the Custom Plans described below (each a "Custom Plan"). Each Custom Plan is subject to additional plan-specific pricing and terms set forth in the corresponding Sales Information, as modified by AT&T from time to time and which is incorporated herein by reference.

| Custom Plan | Offer Period | Eligibility Requirements | Sales Information* |
|---|---|---|---|
| AT&T Business Select Exclusive Plans | Initial term and renewal term(s) | New or existing CRU line with an eligible smartphone, feature phone or data-only Equipment (i.e., tablet, LaptopConnect/aircard, or mobile hotspot device) | See Sales Information found at www.att.com/blzselectexclusive |
| * Incorporated by reference into this Agreement. | | | |

### 11.5. AT&T Digital Concierge Credit.

| AT&T Digital Concierge Credit Amount | Qualified Service | Offer Period | Eligibility Requirements |
|---|---|---|---|
| $20.00 | For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher | First 120 days after the Effective Date. | During the Offer Period:<br>• For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher during the Offer Period; and<br>• Activate it with a new CRU line of service in accordance with the corresponding Qualified Service; and<br>• Continue to receive in accordance with the corresponding Qualified Service at the time the AT&T Digital Concierge Credit is applied. ** |
| ** Each AT&T Digital Concierge Credit will appear on the applicable invoice as a "bottom of the bill" credit applied after application of discounts, taxes, surcharges and fees. AT&T Digital Concierge Credit shall be inclusive of credits associated with surcharges and fees assessed on the Service. It will take up to three (3) billing cycles after the 120 day Offer Period for each AT&T Digital Concierge Credit to appear. | | | |

### 11.6. Activation Credits

| Activation Credit Amount | Qualified Equipment | Qualified Plan* | Offer Period | Eligibility Requirements |
|---|---|---|---|---|
| $100.00 | Smartphone | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | First 120 days after the Effective Date | During the Offer Period:<br>• Purchase the Qualified Equipment from AT&T with an Equipment Installment Plan or other available smartphone installment plan installment agreement; and<br>• Activate it with a new CRU line of service on the corresponding Qualified Plan; and<br>• Each Qualified Activation must continue to be on the Qualified Plan at the time the Activation Credit is applied.** |
| * Plan pricing and terms are set forth in the applicable Sales Information, which is incorporated by reference into the Agreement.<br>** Each Activation Credit will appear on the applicable invoice on the bottom of the bill after application of discounts, taxes, surcharges and fees. It will take up to three (3) billing cycles after activation for the Activation Credit to appear. | | | | |

**12. Incorporation of Agreement.** The terms, conditions and defined terms set forth in all documents comprising the Agreement including, without limitation, the Cover Page, this Program Description, the General Terms and Conditions, and other applicable online terms and conditions, apply throughout all such documents.



Jacob Spragg <jacob@spragglawfirm.com>

# SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>                                          Mon, Aug 17, 2020 at 12:36 PM
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Please accept this e-mail as confirmation that no action will be taken on the account while Litigation counsel reviews the dispute. Hence, there is no need for an emergency hearing on your motion for injunctive relief.

Also, I understand other employees are receiving subpoenas via e-mail. Do not contact any AT&T employee directly regarding this matter, as they are represented parties. Please only communicate with me until further notice. If you have sent any other emails to any other employees since Friday, please forward those to me.

Thank you for your attention.

**Patricia Simone Cruz**

Assistant Vice President - Senior Legal Counsel - Litigation

**AT&T**

600 N.W. 79th Avenue, Room 684, Miami, FL 33126

Office: 786.792.5470 | Cell: 786.452.5962 | pc515g@att.com

MOBILIZING **YOUR** WORLD

This message may contain attorney-client privileged communications and/or attorney work product. This email and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this email is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this email is strictly prohibited.

[Quoted text hidden]
[Quoted text hidden]

> [Quoted text hidden]
> [Quoted text hidden]
>
> Thank you,
>
>
> --



Jacob Spragg <jacob@spragglawfirm.com>

## SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Mon, Aug 17, 2020 at 2:01 PM

Kevin - I would like to clarify your statement: "we agree that an emergency order needs to be filed or heard at this time." Maybe there was a typo in your email, but AT&T does *not* agree that an emergency order needs to be entered or that an emergency motion needs to be heard at this time. The emergency motion sought an order to maintain the status quo. The status quo is being maintained until further notice. I am in the process of reviewing the dispute. As soon as I have a chance to consult with my clients, I will get back to you regarding AT&T's position regarding termination. In the meantime, I do agree a stay of the litigation is appropriate. Please send a draft agreed order staying litigation for my review. Thank you.

[Quoted text hidden]

 Gmail

J Spragg <jacobspragg8@gmail.com>

## Fwd: Island WIFI Limited - Account 287295933298

**leo tripp** <leo.tripp@myislandwifi.com>
To: JacobSpragg8@gmail.com

Mon, Aug 3, 2020 at 6:42 PM

--------- Forwarded message ---------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri. Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>



RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale prohibition in the AT&T Service Agreement. Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third-parties whether directly or indirectly, including, without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete the message from*

M Gmail

J Spragg <jacobspragg8@gmail.com>

---

## Fwd: Island WIFI Limited - Account 287295933298

leo tripp <leo.tripp@myislandwifi.com>
To: JacobSpragg8@gmail.com

Mon, Aug 3, 2020 at 6:42 PM

-------- Forwarded message --------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri, Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>



RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale
prohibition in the AT&T Service Agreement. Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or
> disseminate Service or any other program components to third-parties whether directly or indirectly, including,
> without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the
individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have
reason to believe that you have received this message in error, please notify the sender and delete the message from*

## RETURN OF SERVICE

| | | |
|---|---|---|
| State of Florida | County of Miami-Dade | Circuit Court |

Case Number: _____

Plaintiff:
**ISLAND WIFI LIMITED LLC**

vs.

Defendant:
**AT&T MOBILITY NATIONAL ACCOUNTS LLC**

For:
Kevin Drummond
Blue Line Law Firm, Pllc
1645 Palm Beach Lakes Blvd
Suite 1200
West Palm Beach, FL 33401

Received by L & L Process, LLC. on the 14th day of August, 2020 at 1:25 pm to be served on **AT&T MOBILITY NATIONAL ACCOUNTS LLC C/O CT CORPORATION, 1200 SOUTH PINE ISLAND ROAD, PLANTATION, FL.**

I, Katherine Font, do hereby affirm that on the **14th day of August, 2020** at **2:36 pm, I:**

served a **CORPORATION** by delivering a true copy of the **Plaintiff's Emergency Motion for Injunctive Relief Against Defendant AT&T Mobility Services LLC, Notice to Defendants of: plaintiff's Emergency Motion for Injunctive Relief Against Defendant** with the date and hour of service endorsed thereon by me, to: **DONNA MOCH AS SENIOR CORPORATE OPERATIONS MANAGER FOR C.T. CORPORATION SYSTEM** as **REGISTERED AGENT** for **AT&T MOBILITY NATIONAL ACCOUNTS LLC**, at the address of: **1200 SOUTH PINE ISLAND ROAD, PLANTATION, FL 33324**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 60, Sex: F, Race/Skin Color: WHITE, Height: 5'3", Weight: 140, Hair: BROWN, Glasses: N

I do hereby certify that I have no interest in the above styled action; that I am over the age of eighteen years; and that I am a Special Appointed Process Server in and for Broward County, Florida. Under penalty of perjury, I declare that I have read the foregoing Verified Return of Service and the facts contained herein are true and correct to the best of my knowledge. NO NOTARY REQUIRED PURSUANT TO F.S.92.525(2)

Katherine Font
SPS #920

**L & L Process, LLC.**
**13876 SW 56 Street**
**Suite 200**
**Miami, FL 33175**
**(305) 772-8804**

Our Job Serial Number: LLP-2020002170

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1g

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY FLORIDA
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
*A Foreign Limited Liability Company*
Plaintiff,

Case No: TO BE DETERMINTED BY COURT

v.

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

---

## NOTICE TO DEFENDANT OF:

## PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANT AT&T MOBILITY SERVICES LLC.

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned

counsel, hereby files this Notice to Defendant of Plaintiff's Emergency Motion for Injunctive

Relief, and respectfully states as follows:

1. Plaintiff and Defendant have an ongoing business dispute.

2. Plaintiff hereby notifies Defendant of Plaintiffs Intent to Seek Ex-Parte Injunctive Relief.

3. Defendant may contact Plaintiff's Counsel at the information in the signature stamp

   located on page two.

CERTIFICATION OF SERVICE

I hereby CERTIFY that a true and correct copy of the foregoing Notice of Plaintiff's

Emergency Motion for Injunctive Relief, has been served on Defendant's Registered Agent

CT Corp. Services, by process server scheduled for service on August 14, 2020,

demonstrating notice of seeking this relief.

Dated this 14 day of August, 2020.

Respectfully Submitted,

BLUE LINE LAW FIRM, PLLC

By: /s/ Kevin Drummond
KEVIN DRUMMOND, ESQ. (FBN 1002238)
1645 Palm Beach Lakes Blvd., Suite 1200
West Palm Beach, FL. 33401
Telephone 888-661-9511
Facsimile: 561-892-3330
E-Service Intake@tbllf.com

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY FLORIDA
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
*A Foreign Limited Liability Company*
Plaintiff,

Case No: TO BE DETERMINTED BY COURT

v.

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

## PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANT AT&T MOBILITY SERVICES LLC.

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned counsel, hereby files this Emergency Motion for Injunctive Relief, and respectfully states as follows:

## INTRODUCTION

**A. Facts Common to All Accounts**

**i.       Plaintiff's Background and Contract Formation**

1. On or about November 15, 2019, Plaintiff & Defendant entered into a binding contract, attached hereto as Exhibit A.

2. Plaintiff was represented by sole owner Whitney Tripp, who negotiated the contractual terms with Defendant's representatives for a more than 90 days before the signing of the contract.

3. Owner-Whitney Tripp is an entrepreneur, who has numerous successful business ventures in the United States and abroad, associated or similar to the business subject to this case and some not.

4. Owner-Tripp founded MyIslandWifi in the Bahamas and has developed a successful business model. Further Tripp has held various patents related to oil and drilling machinery.

5. The parties to this action signed their contract on or about November 15, 2019, and began performance shortly thereafter; the contract terminates on or about November 23, 2022. **However Defendant AT&T has demonstrated that they plan to breach the contract without cause and shut off the account for which Plaintiff has paid considerable amounts to maintain. If allowed, AT&T's actions will cause substantial and irreparable damage to Plaintiffs business and owner-Tripp's international brand.**

### STATEMENT OF THE CASE

6. The terms of the contract require Plaintiff to pay per line of service purchased from the Defendant plus any applicable fees, taxes, or other charges. <u>Plaintiff has paid its monthly bill to AT&T every month and has performed all of its obligations under the contract.</u>

7. As part of the agreement, Plaintiff had an obligation to pay AT&T at minimum $45,000.00 per year, in fees, for Defendant's service, or pay the difference between $45,000.00 and any less amount of charges generated throughout the year. This means AT&T expected, required, and would penalize Plaintiff, if Plaintiff did not carry sufficient number of lines throughout each year of the agreement, more than 2,000 aggregate lines billed monthly. **AT&T felt reasonably assured and expected that Plaintiff's business would generate large amount of lines or a large amount of profits to cover the penalty.**

8. As part of the agreement AT&T is required to provide unlimited internet for each line Plaintiff pays for, Plaintiff receives a SIM card that can be activated and inserted into a mobile device.

9. AT&T was aware of that the entity Island Wifi Limited was newly formed days prior to entering into the contract. AT&T originally required Plaintiff to place a $1,000.00 deposit on each new line of service opened. Defendant waived the deposit after owner-Tripp explained Island's business operations and demonstrated the success of the IslandWifi brand abroad. This was on or about November 7, 2019.

### AT&T Was Aware of Plaintiff's Business Operations and Intended Uses Before Entering Into the Contract and at All Times During Performance

10. Owner-Tripp discussed with Defendant's representatives Kareem Najjar & Matthew Kutcher the related Bahamas business of MyIslandWifi, how it operated, how many lines of service it generated, its profitability, and that he expected many lines on this new account. AT&T waived the $1,000.00 fee per line as the account would generate many lines of business for AT&T, *a mutually beneficial arrangement was arrived at*.

11. Defendant's representative(s) assured Tripp and Plaintiff that the contractual agreement was appropriate for Plaintiff's needs. (Exhibit B – October 30, 2019 Email).

12. In December of 2019, owner-Tripp asked specifically about the contract and its suitability for Plaintiff's business operations and plan. After speaking with Najjar, owner-Tripp sought to cancel the contract as he was unsure of its suitability. However cancellation did not occur, because – Defendant's representative(s), specifically Matthew Kutcher reassured Tripp that the contract was appropriate for Plaintiffs needs. (Exhibit C – December 15, 2019 Email).

13. Defendant's representatives did not disclose that Defendant or their affiliate(s) nor subsidiary(ies), in fact offered alternative products and account plans from AT&T that may have been appropriate for Plaintiff's needs.

14. Defendant's representative purposefully did not disclose that the contract was inappropriate for Plaintiff's needs, among other reasons, to generate profit, commissions, sales quotas and/or otherwise improve their overall work performance.

15. Before entering into the contract, Defendant and/or their authorized representatives were informed by Tripp, of the Plaintiff's intended business operations and actively assisted in resolving the March 2020 issues between Plaintiff and its customers related to the AT&T products and services. The nature of this dispute evidences the nature of the Plaintiff's business, as known by the Defendant. Therefore no later than March 2020, AT&T was well aware of Plaintiff's operation and voiced no objection for many months, allowing Plaintiff to generate more lines on the account, and grow as a business and account holder with AT&T. **AT&T had direct knowledge of the exact conduct that is now used as the basis for AT&T's threatened and fast approaching termination of Plaintiff's account services.**

16. Defendant and/or its authorized representatives were aware of the nature of Plaintiff's business before November 1, 2020, because owner-Tripp informed them of such when confronted by the deposit that would be required for each line. In response Defendant instead of charging a deposit per line, presented a contract with a minimum requirement.

**The March 2020 – Problematic Client and FCC Complaint**

17. In March of 2020, a client of Plaintiff's attempted to make unauthorized changes on the Plaintiff's account with AT&T. Owner-Tripp personally reported the fraudulent activity

to AT&T's fraud department and AT&T conducted an investigation into the matter. At the conclusion of their investigation, AT&T resolved the matter in favor of the Plaintiff, who then ceased all business arrangements with this problematic client.

18. In early July 2020, Plaintiff issued a demand letter to the problematic client from the March 2020 incident, for unpaid balances owed to Plaintiff.

19. On or about July 13, 2020, the problematic client from the March 2020 issue submitted a complaint to the Federal Communications Commission, alleging that MyIslandWifi-Bahamas Company, made unauthorized charges on the client's card. (Exhibit D – FCC Emails and Complaint).

20. These accusations are outright false and remain unproven. More suspiciously, the accusations come months after the alleged charges would have occurred and were made with the intent to disrupt Plaintiff's business.

**Despite Having Direct Knowledge of Plaintiff's Business Operations Before Inception of the Contract, AT&T Provided Plaintiff with AT&T Services and now Claims Breach Based Upon the Plaintiffs Business Operations**

21. Since the inception of the agreement, both parties have performed their contractual obligations owed to the other. Plaintiff has paid the required monthly-bill and Defendant has provided the purchased services.

22. On or before July 13, 2020, Defendant assigned a new representative for Plaintiff. Upon information and belief, Plaitniff's previous representative no longer works for the Defendant and it is unknown what circumstances led to this.

23. On or about July 13, 2020, the new representative from Defendant's company contacted Plaintiff's owner-Tripp, to inform him that an addendum had been submitted regarding the contract between the parties. This was also the highest month for active lines on

Plaintiff's account, in which Plaintiff's total bill was in excess of $100,000.00 and was paid timely.

24. On or about July 17, 2020, Defendant sent Plaintiff a notice, repudiating the contract with the Plaintiff and citing that Plaintiff breached the very paragraph owner-Tripp was told an addendum was submitted for – the reselling prohibition.

25. Defendants threaten to terminate the internet service to more than 3,000.00 devices for which Plaintiff is paying and is current on all of its required monthly payments, and has otherwise performed all obligations under the contract. (Exhibit E)

26. Defendant repudiated the agreement with Plaintiff or seeks to do so, not because of the alleged reselling violation, but because of the usage of the "unlimited internet" being used by Plaintiff. This is evident by Defendants communications. Based on information from Defendant's representatives, AT&T does in fact offer a contract/product that could be appropriate for the Plaintiff's business needs, if in actuality the current contract/product is improper. Further, if the current product is improper, that is solely the Defendant's fault, not the Plaintiff's wrongdoing. AT&T has not offered Plaintiff any sort of switch or compromise, simply AT&T, in bad faith, is threatening and seems determined to unlawfully breach the contract with Plaintiff.

27. Defendant made no objections to the use of products when Plaintiff was unlikely to attain $45,000.00 in annual sales, therefore Plaintiff would be paying a penalty to Defendant under the contract and Defendant would be paid for services not provided.

28. Defendant made no objections to the use of products when Plaintiff reported the March 2020 issue and AT&T did their own investigation.

29. Defendant made no objections to the use of products when Plaintiff attempted to terminate the agreement in December of 2019, fearing something was amiss. Instead AT&T doubled down and assured owner-Tripp that his company "had nothing to worry about."

30. Defendant on numerous occasions, accepted the usage of products and services by Plaintiff and assented by continuously billing, accepting payments, and providing service under the parties' contractual agreement. Defendant, with the same knowledge they currently have, assented to the contract, and Plaintiff's usage of AT&T services.

**Plaintiff's Successful Business Venture**

31. Due to many market factors especially the health crisis caused by the Novel Coronavirus, Plaintiff's services have come into extreme demand, and Plaintiff added a substantial amount of lines to their account in order to meet the new demand.

32. In November of 2020, Plaintiff's bill was a total of $585.50 for lines costing roughly $20.00 each per month, and other charges.

33. In December of 2020, Plaintiff's bill was a total of $290.79 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

34. In January of 2020, Plaintiff's bill was a total of $1,071.57 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

35. In February of 2020, Plaintiff's bill was a total of $1,398.24 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

36. In March of 2020, Plaintiff's bill was a total of $9,622.60 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.[1]

37. In April of 2020, Plaintiff's bill was a total of $20,592.75 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

38. In May of 2020, Plaintiff's bill was a total of $27,000.51 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

39. In June of 2020, Plaintiff's bill was a total of $105,197.59 for lines costing roughly $20.00 each per month. Plaintiff paid and Defendant continued to provide services.

40. As Plaintiff's customers increased, so did its bill to AT&T, and as well as the amount of data services in which AT&T provided.

41. As it stands, Plaintiff serves many types of clients ranging from U.S. public schools who have switched to distance learning; to clients who operate aquatic vessels currently at sea and will be at sea at the time in which Defendant plans to unilaterally and without justification breach the parties' contractual agreement.

42. The clients operating aquatic vessels utilize Plaintiff services to maintain navigation and communication equipment while at sea. If and when they lose internet access, their navigation and communication equipment will become obsolete, leaving them the sun and moon to navigate their vessels in open water.

## ARGUMENT

### A.  Standard for Granting a Motion for Injunctive Relief

The "obvious purpose" of a temporary injunction is to maintain the status quo pending the outcome of litigation. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941) (en

---

[1] Despite the sizeable increase in Plaintiff's lines of service, Defendant voiced no objection. This was the same time Plaintiff contacted the fraud department regarding lines of service being fraudulently moved from his account. This dispute was resolved in Plaintiff's favor.

banc). In order to obtain a temporary injunction a Plaintiff must "satisfy a four-part test under Florida law: '[(1)]a substantial likelihood of success on the merits; [(2)]lack of an adequate remedy at law; [(3)] irreparable harm absent the entry of an injunction; and [(4)] that injunctive relief will serve the public interest.'" *Liberty Counsel v. Fla.Bar Bd. of Governors*, 12 So.3d 183, 186 (Fla. 2009) (quoting *Reform Party of Fla. v. Black*, 885 So.2d 303, 305 (Fla. 2004).

As discussed below, Plaintiff will satisfy this four prong test, and granting a temporary injunction will preserve the status quo, will permit Plaintiff to continue its business operations, find an alternative carrier, or alter their contract with AT&T. Further absolutely no harm, or very little harm will be imposed on Defendant if the court grants this Motion for Emergency Relief.

## B. Plaintiff's Success on the Merits – Clear Legal Right

If Plaintiff were to take this action to trial, the evidence discussed above would clearly demonstrate that:

1. AT&T knew of the Plaintiff's intended business operations before entering into the contractual agreement with Plaintiff.

2. AT&T knew of the Plaintiff's actual business operations no later than March of 2020, and resolved conflicts for Plaintiff.

3. AT&T continued to service Plaintiff's account, with actual knowledge of the conduct AT&T now uses as the basis for termination the contract.

4. Upon receiving a proposed addendum to the contract Defendant decided to use, as a pretext, a breach on the part of Plaintiff to terminate the agreement and cause Plaintiff irreparable harm. Further AT&T has already refused to allow Plaintiff to add additional liens of service to the account, for which the balance is current. Plaintiff has already been

harmed as they must turn away new business, and rumors have begun to circulate as to why Plaintiff has turned away hundreds of new customers and service lines.

5. Defendant waived the right to claim breach, by having knowledge of the facts Defendant now asserts are ground for breach and termination of the contract - performed their obligations and allowed Plaintiff to perform, without objection.

6. Defendant fraudulently induced Plaintiff into entering into the contractual agreement by withhold material information regarding the contract.

7. Plaintiff has paid each and every dime due by them to Defendant.

It is well settled law that in order to prevail on a claim for breach of contract, a litigant must demonstrate:

a. the existence of a contract, which is demonstrated by the parties performance of the written agreement.,

b. a breach of the contract, which is demonstrated by AT&T's refusal to allow Plaintiff to activate new lines on its account, and

c. damages resulting from the breach, which are evident by the fact that Plaintiff will suffer a loss of revenue and demolition of its international brand.[2]

d. Further the party claiming a breach by the other, must demonstrate they have performed or are legally excused from performing all of their own contractual obligations.[3]

**I.      Plaintiff's Claim for Breach**

Plaintiff's claim for breach of contract is rooted in the doctrine of anticipatory repudiation, claiming that the Defendant has failed to give adequate assurances or has signaled its intent to breach the contract between the parties. An anticipatory breach occurs when one party, before

---

[2] *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).
[3] *Old Republic Ins. Co. v. Von Onweller Constr. Co.*, 239 So.2d 503, 505 (Fla. 2d DCA 1970).

the time to perform, demonstrates a refusal to perform by their words or actions.[4] The non-breaching party is excused from future performance & must demonstrate the ability to perform.[5]

Here there is no doubt that the parties have a valid written contractual agreement, and that the parties have performed under said contract for several months. Further the documentation, emails, and affidavit of owner-Tripp demonstrates that the parties performed the contract and that AT&T had actual knowledge of the business operations of Plaintiff. Defendant, upon receipt of a proposed addendum in July of 2020, claimed a violation of the agreement by Plaintiff and unequivocally announced its intent to prematurely terminate the contract with the Plaintiff. Defendant clearly had knowledge, no later than March of 2020, which it uses as the basis for the termination of the contract. However, Defendant has legally waived this argument because Defendant accepted performance under the contract by Plaintiff, with knowledge of the facts that Defendant claims constitutes a breach on behalf of the Plaintiff. **Therefore Defendant has no legal right to terminate the contract.** The doctrines of waiver and estoppel prevent Defendant from terminating the agreement or would operate as affirmative defenses if Defendant counter-sued Plaintiff.

## II.   <u>Defendant's Waiver</u>

"The elements of waiver are: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.[6] Waiver may be implied by conduct, but that conduct must make out a clear case.[7] The burden of proving the affirmative defense of

---

[4] *Alvarez v. Rendon,* 953 So. 2d 702, 709 (Fla. 5th DCA 2007).
[5] *Id.*
[6] *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1104 (Fla. 5th DCA 2004). Citing *Zurstrassen v. Stonier*, 786 So.2d 65, 70 (Fla. 4th DCA 2001).
[7] *Goodwin*, at 1104. Citing *Fireman's Fund Ins. Co. v. Vogel*, 195 So.2d 20, 24 (Fla. 2d DCA 1967).

estoppel and waiver rests upon the party invoking it.[8] Mere delay is insufficient to support a defense of waiver or estoppel.[9]

In the instant case, throughout the contractual relationship between the parties, AT&T has always had the right for which they assert is the basis to terminate the Plaintiffs account more than a year in advance of its natural termination. The right AT&T asserts is found within the services terms for which it provides and unilaterally changes from time to time. It follows that AT&T clearly knew they had contractual rights at the time they were waived.  Further it is evident that AT&T did not assert this right for many months and the likely reason is clear, simply follow the money – AT&T did not assert a known right because it seemed more profitable to do otherwise.

Plaintiff's entity was newly formed and it had neither credit to its name or brand within the United States nor any business relationship with Defendant. Nonetheless, Defendant extended favorable contractual terms to the Plaintiff, with the caveat that Plaintiff pay at least $45,000.00 annually, to the Defendant regardless of service lines used. For 5 months, Plaintiff's bill was insignificant to say the least. At less than $2,000.00, monthly, it seemed Plaintiff was not going to make its minimum annual fee amount. By April 2020, Plaintiff's bill began to increase to a number that would in fact exceed the $45,000.00 annual minimum, and by June, with an impressive $105,197.59 bill for the month, Plaintiff was well above the minimum and out pacing expectations. It was at this time, that AT&T claimed foul and asserted that Plaintiff was in violation of the agreement for the first time.

AT&T either knew and did not care, or failed to exercise reasonable diligence that would have discovered, if true, that Plaintiff was breaching the agreement.

[8] *Goodwin*, at 1104. *Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So.2d 997, 998 (Fla. 4th DCA 1981).
[9] *Mercede*, at 392; Citing *Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir.1989) (applying Florida law in holding no clear waiver shown after five-year delay)

### C. Plaintiff Lacks an Adequate Remedy at Law

A party lacks an adequate remedy at law where damages are unavailable or are "so speculative as not to be susceptible of proof." *So. Colonization Co. v. Derfler* 75 So. 790, 794 (Fla. 1917);see also *Thompson v. Planning Comm'n*, 464 So.2d 1231, 1237 (Fla. 1st DCA 1985) (where damages are speculative, the remedy is inadequate).

In the instant case, Plaintiff will suffer enormous losses that cannot be ascertained now, or at any reasonable time in the future. Further, these losses cannot simply be recovered with financial payment. Plaintiff's international brand, albeit less than a decade old, has grown at a significant rate and at a time where economic uncertainty is on the rise globally. If Defendant is permitted to cancel Plaintiff's accounts, the harm to the international brand will be permanent. Plaintiff's clients who will lose navigation and communication capabilities at sea will never forget the impeding ordeal. The Island Wifi brand globally will be impacted and the liability Plaintiff may face is untold, should any harm come to any clients due to the loss of crucial internet service. In their written opinion of *Liza Danielle, Inc. v. Jamko, Inc*., 408 So.2d 735, 738, Florida's Third District Court of Appeals adopts the following statement:

> Lack of an adequate remedy at law is a prerequisite for equitable relief, and furthermore, "an injunction will not lie where there is a choice between the ordinary processes of law and the injunction, the former being sufficient to furnish the full relief to which the complaining party is entitled." 29 Fla.Jur.2d, Injunctions § 17. On the other hand, however, it has been said that "in order to preclude pursuit of equitable remedies an available legal remedy must be plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice." 29 Fla. Jur.2d, Injunctions § 18.

**Considering the above, it seems quite deserving in this matter that AT&T be enjoined.** AT&T is a large corporation with vast financial resources. It is AT&T who has the adequate remedy should the claim be true that Plaintiff is in breach, instead AT&T chooses

an unlawful approach be breaching the contract harming the Plaintiff. The injunction requested will not harm AT&T as it will simply require a communications provider to keep open an account, for which it is paid for, and for which it makes profit. To deny the Plaintiff's injunction would condone the party who has an adequate remedy at law, financial resources to pursue it, ignoring that avenue and opting for a less judicious approach.

If Defendant is permitted, without obstacle to breach its contractual agreements in this case, then the message is loud and clear – big businesses in America may breach agreements, substantially impair lives and get away with it.

## D. Public Policy Consideration Favors an Injunction

Public policy strongly favors an individual's right to contract as they choose, within the confines of the law. Courts across the United States, including The Supreme Court have held closely to the notion that "a freely negotiated private agreement unaffected by fraud, undue influence, or overweening bargaining power should be given full effect." *Manrique v. Fabbri*, 493 So. 2d 437, 439 (Fla. 1986). Citing *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 1972.

AT&T one, if not the largest telecommunications provider in the United States certain was not overcome in their bargaining power in this agreement by a company of less than 20 employees. There has been no fraud alleged against Plaintiff, nor undue influence. Consequently, the parties' agreement should be given its full effect. The only way to do that, is for this Honorable Court to immediately grant this Emergency Petition for Plaintiff before **Sunday, August 16, 2020 at 11:00 P.M. at which time it may become moot.** At that time, Plaintiffs clients will be harmed, brand destroyed and the reputation of its owner, Whitney

Tripp, forever tarnished. If the injunction is issued, Plaintiff will continue making all payments and complying with all contractual obligations.

**E. Reactivation is Not Feasible**

If and once Defendant AT&T deactivates the SIM cards, they cannot be reactivated, the must be replaced and the time required to do such will be more than can be spared.

## CONCLUSION

Plaintiff has demonstrated, through sworn petition and affidavit that the facts of this case and evidence provided that:

A. Irreparable harm would occur if an injunction is not granted,

B. Plaintiff has a substantial likelihood of success on the merits,

C. Plaintiff lacks an adequate remedy at law, and

D. Consideration of the Public Interest supports the injunction.

WHEREFORE Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY SERVICES LLC., and all its affiliated entities from disconnecting, discontinuing, or in any manner interrupting the service of Plaintiff's account for a period of at least 120 days, or until such time deemed necessary by this Court, that the Court may hear the parties and determine to lift or extend the injunction.

## CERTIFICATE OF SERVICE

I hereby CERTIFY that a true and correct copy of the foregoing Emergency Motion for Injunctive Relief has been served on Defendant's Registered Agent CT Corp. Services, by process server scheduled for service on August 14, 2020, demonstrating notice of seeking this relief.

Dated this 14 day of August, 2020.

Respectfully Submitted,

BLUE LINE LAW FIRM, PLLC

**By: /s/ Kevin Drummond**
KEVIN DRUMMOND, ESQ. (FBN 1002238)
1645 Palm Beach Lakes Blvd., Suite 1200
West Palm Beach, FL. 33401
Telephone 888-661-9511
Facsimile: 561-892-3330
E-Service Intake@tbllf.com

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
*A Foreign Limited Liability Company*
Plaintiff,

V.                                                    Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

---

### <u>EMERGENCY MOTION FOR ENTRY OF TEMPROARY INJUNCTION</u>

Plaintiff, ISLAND WIFI LIMTIED, LLC., hereby moves this court for the entry of a Temporary

Injunction against Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., in the same or

substantially the same form attached hereto as Exhibit A. As grounds for this motion Plaintiff

refers the Court to the allegations in the Verified Amended Complaint fined in this matter and the

evidence to be presented at the hearing on this motion.

Respectfully Submitted,

1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Verified Motion

for Emergency Injunction has been served on Defendant's registered agent CT Corporate

Systems.

 

                        Respectfully Submitted,

                        BLUE LINE LAW FIRM, PLLC

 

                        By: /s/ Kevin Drummond_____
                        KEVIN DRUMMOND, ESQ. (FBN 1002238)
                          1645 Palm Beach Lakes Blvd., Suite 1200
                          West Palm Beach, FL 33401
                          Telephone: 888-611-9511
                          Facsimile: 561-892-3330
                          E-Service: intake@tbllf.com

Exhibit A

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
A *Foreign Limited Liability Company*
Plaintiff,

V.                                                    Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

---

## **EMERGENCY INJUNCTION AGAINST**

## **AT&T MOBILITY NATIONAL ACCOUNTS LLC.**

This matter cam before the Court on the ___ day of _____, 2020, upon Plaintiff's Emergency Motion for Entry of Temporary Injunction. The Court has reviewed Plaintiff's motion together with the Verified Amended Complaint upon which it is based, received evidence, and is otherwise fully advised in the premises,

Based upon the evidence presented , the Court finds:

1.  Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., is a foreign Limited Liability Corporation and is subject to the jurisdiction of this Court and venue is proper in this county.

2.  The Amended Verified Complaint and Emergency Motion for Entry of Temporary Injunction have been filed and are in proper form.

3.  Plaintiff, ISLAND WIFI LIMITED LLC., has made a prima facie showing that Plaintiff and Defendant have a valid written contract, binding upon them, and that Defendant is not entitled to cancel the contract.

3

4. The evidence demonstrates that Plaintiff has no adequate remedy at law and will be irreparably harmed if Defendant is not enjoined, from cancelling the contract, from disrupting the services provided thereunder and from limiting the Plaintiff's access to its account.

5. Plaintiff's injury will be not only financial but harm to its business reputation and goodwill amongst its customers.

6. Plaintiff's customers likely face dangerous obstacles and undue risk to their health, safety, and welfare.

Accordingly, it is hereby ORDERED:

A. Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., and all persons and entities acting in concert or participation, shall be and are hereby enjoined from cancelling Plaintiff ISLAND WIFI LIMITED LLC's contract or interfering with Plaintiff's use of its account as permitted by the contract.

B. Plaintiff shall post a surety bond for the issuance of this Temporary Injunction in the amount of $5,000.00, or deposit $5,000.00 into the registry of the Court where it shall be held until further order of this Court, which security shall confirm to the requirements of *Fla. R. Civ. P.* 1.610(b); and

C. Plaintiff shall immediately cause a conformed copy of this Emergency Temporary Injunction to be served upon Defendant or upon counsel of record, if any, and this Emergency Temporary Injunction shall take effect upon service upon Defendant, or its counsel off record, if any, and the filing of the bond described in (B) hereof.

DONE and ORDERED in Miami-Dade County Florida, at _____ am/pm this _____ day of _____, 2020.

_____
Circuit Court Judge

4

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY
CIVIL DIVISION

ISLAND WIFI LIMITED, LLC.,
*A Foreign Limited Liability Company*
Plaintiff,

V.                                                    Case No: 2020-017369-CA-01

AT&T MOBILITY NATIONAL ACCOUNTS LLC.,
*A Foreign Limited Liability Company*
Defendant,

---

## PLAINTIFF'S AMENDED MOTION FOR INJUNCTION

COMES NOW, Plaintiff ISLAND WIFI LIMITED, LLC., by and through its undersigned

counsel, hereby files this Amended Motion for Injunctive Relief, and respectfully states as

follows:

# I. INTRODUCTION

Plaintiff Island Wi-fi Limited, LLC., is a startup company, in the business of providing wi-

fi capable mobile devices to a broad spectrum of clients and the general public. Defendant "AT&T"

is the largest telecommunications provider globally. Plaintiff and Defendant are parties to a two

year contractual agreement, commencing November 20, 2019. (Ex. A). Both of the parties

faithfully performed the contract for eight-months without issue between them. Plaintiff timely

and routinely paid the monthly bill and enjoyed the service provided by Defendant

On July 17, 2020, Defendant informed Plaintiff, that Plaintiff's account would be

terminated on August 17, 2020, due to Plaintiff's usage of the paid for lines of unlimited data.

Plaintiff has paid more than $200,000.00 in monthly bills over the short life of the contract and

invested in its own business growth.

This litigation quickly followed, and Plaintiff seeks to have this Honorable Court adjudicate the contractual rights of the parties as Defendant has unilaterally and materially altered the contract by restricting the Plaintiff's usage of its account, shortening the term of the contract and failing to perform as required by the contract. Defendant's actions are causing increasing harm to the Plaintiff's international business reputation and goodwill amongst its customers. On August 17, 2020, the threatened termination date, Defendant's counsel ensured Plaintiff's counsel via email, "[t]he status quo is being maintained until further notice" and that there was no need for Plaintiff to pursue an emergency injunction. (Ex. B). Despite the reassurance, On August 18, 2020, Defendant not only breached their own interpretation of the "status-quo" but once again shifted it in their favor by restricting the Plaintiff's from utilizing lines of service it that were previously paid for. Further the "status-quo" that should be maintained is the mutual performance of the contractual agreement, , by both parties, as it was for nine months..[1]

## A. NEGOTIATIONS AND CONTRACT FORMATION

1.    The parties initial negotiations before signing the contract lasted over 90 days as Plaintiff sought to understand the market for which its business would operate.

2.    Prior to signing the contract, Plaintiff discussed the parties contract at length with Defendant's representatives Kareem Najjar & Matthew Kutcher.

---

[1] In *Annex Indus. Park, LLc. v. Corner Land., LLC,* 206, So. 3d 739, the trial court enjoined a party accused of trespassing from any future entry upon the land of another. Corner previously gave permission to Annex. to use a portion of its land, and later withdrew said permission. *Id.* at 740.  Even after a Cease and desist Annex. continued to use Corner's property. *Id.* Corner sought a temporary injunction and the trial court granted it. *Id.*.On appeal, Florida's Third District Court of Appeal upheld the injunction and dismissed Annex.'s argument that the injunction disturbed the status quo and was therefore improper. *Id.* at 741. In doing so, the District Court ruled that "a trial court does not abuse its discretion by enjoining an alleged continuing trespass, even if the injunction disturbs, rather than preserves, the status quo. *Id.* at 740.

3.      Based upon the representations of Defendant's representatives, Kareem Najjar and Matthew Kutcher, Plaintiff's business-to-business contract was appropriate for the Plaintiff's needs.

4.      Defendant required Plaintiff to be a United States entity sign for the contracted services within the United States, and accordingly Plaintiff's entity was formed on October 30, 2019.

5.      Plaintiff is startup business in the United States and modeled its business operations from a lucrative company operated abroad. They do not have in-house counsel, or much experience with contract drafting.

6.      Defendant is a telecommunications provider believed to be valued at more than $200 billion with untold resources at its disposal, drafted the contract, and trained the representatives who advised Plaintiff.

7.      Initially Plaintiff's contract was submitted for approval, by Kutcher, under the name of the foreign entity.

8.      Plaintiff's contract was rejected due to the foreign status of that entity.

9.      Plaintiff then formed a United States L.L.C.

10.      At the time of Plaintiff receiving the final contract, Kutcher was well aware that Plaintiff's business revolved around selling wi-fi services, as the name "MyIslandWifi" implies.

11.      Plaintiff discussed its business model with Kutcher numerous times before signing the contract, and within the 30-day cancellation period after execution.

12.      During negotiations, Plaintiff specifically pointed out the clause related to reselling and was assured that it was not an issue as the clause was standard in all of Defendant's business-to-business contracts.

13.     During negotiations, Defendant's representatives informed Plaintiff that due to Plaintiff's recent incorporation date of October 30, 2019, and lack of credit a $1,000.00 deposit per-line opened on the account would be required. (Ex. B).

14.     Defendant waived the $1,000.00 deposit requirement.

15.      As of the filing of this complaint, the total deposit would be in excess of three-million dollars if AT&T had not waived this requirement.[2] (Ex. C).

16.     Plaintiff's representative specifically required that international roaming be prohibited on all lines on the account.

17.     Plaintiff signed the contract on or about November 20, 2019 and began performance shortly thereafter; the contract expires on or about November 20, 2021.

## B. THE CONTRACTUAL TERMS

18.     The terms of the contract require Plaintiff to pay per-line of service purchased from the Defendant plus any applicable activation fees, taxes, or other charges. (Ex. A).

19.     The terms require Plaintiff to pay at least $45,000.00 annually for Defendant's service under the contract's minimum revenue provision. (Ex. A.)

20.     If Plaintiff failed to consume $45,000.00 of service from Defendant annually, Plaintiff would pay the difference between any lesser amount billed and $45,000.00. (Ex. A).

21.     This means Defendant expected, required, or would otherwise penalize Plaintiff, if enough lines of service did not remain active throughout each year of the agreement, on average more than 2,000 aggregate lines based on monthly billing/counting. (Ex. A).

---

[2] The deposit requirement would have paid for the monthly charge for the entire contractual term, plus an additional 9 months.

22.     The crux of the agreement requires Defendant to provide unlimited internet for each line Plaintiff pays for, Plaintiff receives a SIM card that can be activated and inserted into a mobile device, deactivated or suspended at Plaintiff's will and reactivated if Plaintiff chooses.

23.     Plaintiff has paid its monthly bill to AT&T every month and has performed all of its obligations under the contract, including Plaintiff's most recent bill for $70,000.00.

24.     AT&T reasonably expected that Plaintiff's business would generate a large amount of lines but knew if Plaintiff failed to do so the contract contained a minimum revenue requirement of $45,000.00, for which Defendant would still profit. (Ex. A).

## C. AT&T's KNOWLEDGE OF PLAINTIFF'S OPERATIONS INTENTIONALLY WAIVED THE RIGHT TO TERMINATE THE CONTRACT

25.     Before signing the contract, Plaintiff discussed the foreign business known as MyIslandWi-fi with Defendant's representatives Kareem Najjar & Matthew Kutcher.

26.     Plaintiff's representative explained how it operated, how many lines of service it generated, its profitability, and how many new lines of service were expected on this new United States account and how the Plaintiff's business sought to model the other entity.

27.     Defendant's representative(s) assured Plaintiff and its representatives that the contractual agreement was appropriate for Plaintiff's needs, namely selling wi-fi, as the name "MyIslandWi-fi" suggests. (Ex. C").

28.     Before and after signing the contract, Plaintiff has used numerous email addresses with @MyIslandWifi.com as the domain to communicate with Defendant's representatives

29.     For execution of the contract, Defendant's representative Matthew Kutcher sent the contract to "Sales@MyIslandWifi.com."  "Sales@MyIslandWifi.com" should have been a clear indication that Plaintiff sells wi-fi. (Ex. C).

30.     After signing the contract, Plaintiff's representative sent an email directly to AT&T representative Kutcher, stating "[a]t this time we are waiting to complete orders due to the delays in the account," and requested an update on when the account would be active so Plaintiff's orders could be filled. (Ex. B).

31.     On December 10, 2019, Plaintiff spoke with Najjar about paragraph 9 of the contract between the parties, prohibited usages and reselling.

32.     Based upon that conversation, Plaintiff sought to exercise the 30-day termination clause.

33.     On December 11, 2019, Najjar emailed Kutcher to inform him of the conversation.

34.     Defendant's representative Kutcher reached Plaintiff by telephone and assured Plaintiff that "several AT&T customers use this contract for the very same reason, and if you have any questions or concerns, reach out to me directly."

35.     Defendant's representative Kutcher stated to Plaintiff that he serviced several accounts doing the same distribution as Plaintiff.

36.     Kutcher's representations induced the Plaintiff to sign the contract.

37.     Kutcher's representations induced the Plaintiff to refrain from terminating the contract.

38.     Kutcher had actual knowledge of Plaintiff's intended usage and business operations.

39.     With this knowledge, Kutcher, for the purpose of bolstering his sales record, opened Plaintiff's account, and continuously ensured Plaintiff their operations fell within the scope of the contract.

40.     Kutcher knew these statements were false when he made them and were likely to mislead consumers

41.     Cancellation did not occur, because Defendant's representative(s), specifically Matthew Kutcher, again reassured Plaintiff that the contract was appropriate for Plaintiff's needs, ensuring Kutcher would meet his quota for new lines activated. (Ex. C).

42.     Kutcher had full knowledge of the Plaintiff's needs and intended use of Defendant's services as he advised Plaintiff of the proper product.

43.     Defendant's representatives did not disclose to Plaintiff the existence of alternative products and account plans offered by AT&T, their affiliate(s), or subsidiary(ies), that permit the very business Plaintiff was engaged in.

44.     It was not until June 2020 that Plaintiff learned of the APEX[3] (AT&T Partner Exchange) program/product offered on AT&T's network.

45.     APEX would have been more appropriate for Plaintiff's business operations than the business-to-business contract supplied by the Defendant.

46.     Defendant seeks to terminate the contract, leaving Plaintiff with no alternative.

47.     Further demonstrating knowledge prior to July 17, 2020, AT&T actively assisted in resolving a dispute in May 2020 between Plaintiff and one of its customers.

48.     This dispute was causally related to Defendant's products, services, Plaintiff's accounts, and Plaintiff's use of Defendant's services.

49.     This customer claimed ownership of approximately 160 lines of service on Plaintiff's account and sought move them onto an account not owned by Plaintiff.

50.     The customer accessed Plaintiff's account without authorization and attempted to transfer 160lines.

51.     The nature of this dispute evidences the nature of the Plaintiff's business operations.

---

[3] The APEX program supports the very business that Plaintiff was engaged in, however Plaintiff's representative were never informed of its existence before the contract was executed.

52.     Defendant intervened and resolved the issue in favor of the Plaintiff.

53.     Plaintiff's account was allowed to remain open without objection.

54.     Defendant choose to willfully ignored the obvious facts of Plaintiffs business operations.

55.     No later than May 2020, Defendant knew Plaintiff sold and distributed Wi-fi services

56.     Throughout the course of performance, AT&T allowed Plaintiff to generate more lines on the account, expand its customer base, grow as a business account holder with AT&T.

57.     In doing so, Defendant waived any right it may have possessed to terminate Plaintiff's contract for the reasons stated on July 17, 2020.

58.     Defendant had direct knowledge of the exact conduct that they are now using as the basis for declaring Plaintiff is in breach of the agreement and Plaintiff's account would be terminated.

59.     Defendant made no objections to Plaintiff's use of its products when Plaintiff, fearing something was amiss, attempted to terminate the agreement in December of 2019.

60.     Instead Defendant's representative Kutcher doubled down and assured Plaintiff's representative that they "had nothing to worry about as long as Island Wi-fi paid their bill."

61.     Defendant made no objections to Plaintiff's use of its products and services even after Defendant's fraud department investigated the report made by Plaintiff's representative in May of 2020.

62.     Defendant on numerous occasions, was made aware of and accepted the Plaintiff's usage of its products and services by continuously accepting payments and providing service under the parties' contract.

63.     Defendant, with the same knowledge they currently have today, previously assented to the contract, amendments thereto, and Plaintiffs usage of AT&T services.

### D. PLAINTIFF'S SUCCESSFUL BUSINESS VENTURE

64.     Due to many market factors especially the health crisis caused by the Novel Coronavirus, Plaintiff's services have come into extreme demand. Because of this Plaintiff added a substantial amount of lines to their account in order to meet the new demand.

65.     As Plaintiff's customer list increased, so did its bill to AT&T, and as well as the amount of data services in which AT&T provided. Despite the sizeable increase in Plaintiff's lines of service, Defendant voiced no objection.

66.     Plaintiff's name "Island Wi-fi Limited" & "My Island Wi-fi" are good indicators that a reasonably prudent person would investigate, if concerned with reselling of data services.

67.     If nothing else, Plaintiff demonstrating the sister-business in the Bahamas was a clear sign of the Plaintiff's business operations within the U.S.

73. Defendant did not object to the Plaintiff's usage when it was apparent the Plaintiff was unlikely to meet its $45,000.00 minimum revenue requirement, as AT&T would have profited from the Plaintiff's expected short fall.

68. Nine months after execution, Defendant announced the intent to terminate the contract and cease service of Plaintiff's account including lines of service for which Plaintiff had already paid in advance

### E. AT&T'S ANTICIPATORY BREACH OF THE CONTACT

69.     Since the inception of the agreement and for eight (8) months thereafter, both parties adhered to their contractual obligations.

70.     Plaintiff has paid the monthly-bill and Defendant has provided contracted services

71.     Further Defendant allowed Plaintiff to control its account.

72.     Defendant has granted Plaintiff's previous requests to open new lines of service additional SIM cards, sometimes hundreds at a time.

73.     In early July 2020, Plaintiff's representative inquired into a product offered by AT&T, which may better serve the Plaintiff's needs, known as the APEX program.

74.     On or about July 17, 2020, Defendant, by email, unequivocally repudiated the contract.

75.     Coincidentally, Plaintiff expressed concern with this clause on December 11, 2019.

76.     Defendant declared its intent to terminate data service to more than 3,000 lines on Plaintiff's account, for which Plaintiff's payments are current. (Ex. C).

77.     Defendant repudiated the agreement with Plaintiff due to the volume of usage of the "unlimited internet" being used by Plaintiff. (Ex. C).

78.     This should have been disclosed to Plaintiff at the onset, no later than December 11, 2019.[4]

79.     If the current product is improper, that is solely the Defendant's fault, not the Plaintiff's wrongdoing, as Plaintiff has been completely transparent regarding usage of AT&T products.

80.     AT&T has not offered Plaintiff any reasonable compromise.

81.     Simply put, AT&T, is threatening to unlawfully breach the contract that it fraudulently induced Plaintiff into signing.

82.     This is demonstrated by the July 17, 2020, email and the August 21, 2020 restrictions placed on Plaintiff's account, despite AT&T's counsel's assurances otherwise.

83.     During the time period between July 17 and August 17, Defendant unlawfully denied Plaintiff from adding new lines of service, effectively rendering Plaintiff's business lifeless, severely diminishing its profitability, and causing Plaintiff to lose goodwill with tis consumers.

## F. DEFENDANT'S CONTINUOUS BREACH & BAD FAITH PERFORMANCE

---

[4] December 10 is when Plaintiff expressed concern over the reselling clause and expressed its desire to terminate the existing contract

84.     On Monday August 17, 2020, AT&T's, Senior Legal Counsel, Patricia Cruz sent an email to Plaintiff's counsel stating that AT&T would not be terminating Plaintiff's account as they previously stated and that counsel was reviewing the matter. (Ex. D).

85.     Plaintiff's counsel sought clarification to determine constituted "status quo." (Ex. D).

86.     On Thursday August 20, 2020, Plaintiff and AT&T's representative(s) discussed Plaintiff's desire to add more lines to the account, something he was not able to do between July 17, 2020 and August 17, 2020. Plaintiff was allowed to initiate more lines.

87.     Defendant initially added 250 lines at the request of the Plaintiff to its account and assured Plaintiff that the necessary SIM cards would arrive the next day.

88.     Plaintiff then represented to its clients that it would begin to fill some of the approximately 3,000 orders that have accumulated between July 17, 2020 and August 17, 2020.

89.     On Friday August 21, 2020, Plaintiff received 25 of the 250 promised SIM cards.

90.     On Friday August 21, 2020, without any correspondence to Plaintiff or Plaintiff's counsel, Defendant further restricted access to Plaintiff's account by preventing Plaintiff from assigning SIM cards to pre-existing-activated lines on Plaintiff's account.

91.     Plaintiff was as previously allowed to assign SIM cards at its leisure. This practice is commonly referred to as "SIM swapping" and was permitted by Defendant. Again, materially breaching the contract by failing to maintain the status-quo as Defendant's counsel stated. (Ex D).

92.     As of Friday August 21, 2020, AT&T has also denied processing Plaintiff's requests for additional SIM cards, breaching their obligations once again.

93.     On Monday August 24, 2020, Defendant again breached the contractual agreement and the "status-quo" guarantee of their counsel Patricia Cruz by closing 125 of the 250 newly added lines of service.

94.     Further,  on August 24, 2020, Plaintiff was verbally informed that AT&T granted Plaintiff ten (10) days to transfer onto the APEX product. The ten (10) days apparently started August 17, 2020, this was not communicated to Plaintiff or counsel.

95.     On Tuesday, August 25, 2020, Defendant's counsel stated that "status quo" meant restrictions on Plaintiff's ability to manage and operate its own account, including restrictions that Defendant placed after Cruz initially stated "status quo."

96.     There has been no communication between Plaintiff and APEX/AT&T regarding pricing structure, how to maneuver the account to APEX platform, to make this transfer.

97.     Even before the July 17, 2020 repudiation of the contract, AT&T has unilaterally and without notice to the Plaintiff, "involuntarily suspended" lines on Plaintiff's account, without just cause or any apparent standard for such actions. Despite suspending service to specific lines, Defendant continues to charge Plaintiff for the suspended lines of service.

98.     Plaintiff is losing both money and clients as its brand is facing undue damage and lost profits of more than $150,000.00 monthly because Defendant refuses to perform under the parties contract.

## II. MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY INJUNCTION

### A. Standard for Granting a Motion for Injunctive Relief

The "obvious purpose of a temporary injunction" is to maintain the status quo pending the outcome of litigation. *Smith v. Hous. Auth.*, 3 So.2d 880, 881 (Fla. 1941) (en banc) (bold and underlining added for emphasis). In order to obtain a temporary injunction a Plaintiff must satisfy a four-part test under Florida law by demonstrating: "[l] a substantial likelihood of success on the merits; a [2] lack of an adequate remedy at law; [3] irreparable harm absent the entry of an injunction; and

[4] that injunctive relief will serve the public interest." *Liberty Counsel v. Fla.Bar Bd. of Governors*, 12 So.3d 183, 186 (Fla. 2009)(quoting *Reform Party of Fla. v. Black*, 885 So.2d 303, 305 (Fla. 2004).

The Plaintiff here meets the four-prong test and granting a temporary injunction will preserve the status quo as Defendant has already promised to do. An injunction will permit Plaintiff to avoid dissolution, service clients on vessels, find an alternative carrier, or alter the contract with AT&T. No harm will be imposed on Defendant if the court grants this Motion for Emergency Relief, as the Defendant (working under a multi-national corporate conglomerate) already agreed to maintain the status quo – then failed to do so in less than a week of making that guarantee.

### B. Plaintiff is Likely to Succeed on the Merits - Clear Legal Right

It is well settled law that in order to prevail on a claim for breach of contract, a litigant must demonstrate: (a) the existence of a contract, which is demonstrated by the parties performance of the written agreement, (b) a breach of the contract, which is demonstrated by AT&T's refusal to allow Plaintiff to activate new lines on its account and subsequent restrictions placed after agreeing to maintain the "status-quo" otherwise known as performing under the contract, (c) damages resulting from the breach, which are evident by the fact that Plaintiff will suffer a loss of revenue, demolition of its international brand and harm to owner-Tripp's personal reputation,[5] and (d) the party claiming a breach by the other, must demonstrate they have performed or are legally excused from performing all of their own contractual obligations.[6] An anticipatory breach occurs when one party, before the time to perform, demonstrates a refusal to perform by their words or

---

[5] *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).
[6] *Old Republic Ins. co. v. Von Onweller Constr. Co.*, 239 So.2d 503, 505 (Fla. 2d DCA 1970).

actions.   The nonbreaching party is excused from future performance & must demonstrate the ability to perform its contractual obligations.[7]

### i.  Plaintiff's Claim for Breach of Contract

1.  If Plaintiff were to take this action to trial, the evidence discussed above would clearly demonstrate that:

 (i) AT&T assented to the Plaintiff's intended business operations before entering into the contractual agreement with Plaintiff, (ii) AT&T knew and ratified the Plaintiff's actual business operations no later than May of 2020 and continued to perform the contract with Plaintiff., (iii) AT&T continued to service Plaintiffs account, with actual knowledge of the conduct AT&T now uses as the basis for termination the contract – waiving their right to cancel the contract for said conduct, (iv) the Defendant acted in bad faith by alleging Plaintiff was in breach of the contract thus grounds for termination of service, upon Plaintiff's inquiry to switch to the APEX program, (v) Caused Plaintiff damages by refusing to allow new lines of service from July 17- August 17, resulting in a back log of nearly 3,000 unfilled orders. (vi) the Defendant waived any right to claim breach, by having knowledge of the actions that Defendant now asserts as basis for breach and termination of the contract - performed their obligations and allowed Plaintiff to perform, without objection, (vii) Defendant fraudulently induced Plaintiff into entering into the contractual agreement by withholding material information regarding the contract.

Plaintiff's claim for breach of contract is rooted in the doctrine of anticipatory repudiation, Defendant failed to give adequate assurances or signaled intent to breach the contract. There is no doubt that the parties have a binding contract and that the parties have performed under said contract for several months. Documentation of emails, and affidavit of Plaintiff's executive

---

[7] *Id.*

demonstrates that the parties performed the contract and that AT&T had actual knowledge of the business operations of Plaintiff. Defendant upon receipt of a proposal from Plaintiff, claimed a violation of the agreement and unequivocally announced its intent to prematurely terminate the contract. Plaintiff's use of Defendant's data services was known to Defendant from the inception of the agreement and all times thereafter.. As such, Defendant has legally waived this right. Defendant encouraged and ratified the Plaintiff's business model several times over the first eight months of the contract, demonstrating Defendant's intent to waive the right to cancel. Consequently, Defendant, at this late stage, has no legal right to terminate the contract for conduct it was aware of and encouraged. The doctrine of waiver prevents Defendant from terminating the agreement or would operate as affirmative defenses if Defendant countersued Plaintiff.

### ii. Defendant's Action Demonstrates that the Waiver of a Known Right was Intentional

"The elements of waiver are: (l) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.[8]  Waiver may be implied by conduct, but that conduct must make out a clear case.[9] The burden of proving the affirmative defense of estoppel and waiver rests upon the party invoking it.[10] Mere delay is insufficient to support a defense of waiver or estoppel.[11]

### iii. AT&T had Actual and Constructive Knowledge of Paragraph 9

**a. The Defendant drafted the contract containing Paragraph 9.**

---

[8] *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. Pd 1098, 1104 (Fla. 5th DCA 2004). Citing *Zurstrassen v. Stonier*, 786 So.2d 65, 70 (Fla. 4th DCA 2001).
[9] *Goodwin*, at 1104. Citing *Fireman's Fund Ins. Co. v. Vogel*, 195 So.2d 20, 24 (Fla 2d DCA 1967).
[10] *Goodwin*, at 1104. *Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So.2d 997, 998 (Fla.4th DCA 1981).
[11] *Mercede*, at 392; Citing *Air Prods. & Chem., Inc. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989)(applying Florida Law in holding no clear waiver shown after five-year delay).

Here, at the time the contract was executed, the Defendant was aware of Paragraph 9 that prohibits the resell service or program components. In fact, the clause was questioned by the Plaintiff.  As a result, Defendant's representatives reassured the Plaintiff that is was merely a form contract.   On this reassurance, the Plaintiff executed the contract. Moreover, throughout the contractual relationship, AT&T has always had the right for which they assert is the basis to terminate the Plaintiffs account over a year before its expiration. This right is found within the Defendant's services terms which it provides and unilaterally changes from time to time. AT&T was fully aware of its own contractual rights as written by its own lawyers as the drafters of the contract at the time paragraph 9 was drafted, the contract executed, and later waived. Accordingly, not only did the right exist but Defendant had actual knowledge of it.

### b. The Defendant's Statements and Conduct Evidence an Intentional Waiver

A party waives a breach of contract when it continues to abide by the contract after learning of a breach. *Plaza Builders, Inc. v. Regis*, 502 So. 2d 918, 922 (Fla. 2d DCA 1986) (finding a waiver when a party became aware of a breach of contract and it continued to deal with the other party after learning that the party was unable to acquire the required license).

In December of 2019, Plaintiff further inquired into whether the contract was suitable for its business. Defendant provided reassurances that Paragraph 9 was of no consequence and its business model was acceptable.  In  May of 2020, when Plaintiff reported fraud on its account, Defendant made no objection to the obvious use of services and Plaintiff's business operation.

Notably, the Sales@MyIslandWifi.com email address and the business-to-business contract showed circumstances and nature of Plaintiff's business. This was evident before the expiration of the 30-day cancellation period of the contract.  Further, AT&T knew the Plaintiff sold wi-fi, AT&T or at least their duly authorized representatives permitted such conduct.

Accordingly, after repeatedly reassuring the Plaintiff, knowing of the Plaintiff's business model, and waiting eight (8) months to object to the business model, it is clear that the Defendant waived any objection to the Plaintiff's business model several times over.

### C. Plaintiff will Face Irreparable Harm if the Injunction is Not Granted

Florida courts have found an injured party has suffered irreparable harm when they demonstrate: 1-suffered monetary damages, 2-will continue to suffer monetary damages, 3-injury to businesses goodwill and business reputation. *Tiffany Sands, Inc. v. Mezhibovsky*, 463 So. 2d 349, 351(Fla. 3d DCA 1985), citing, *Puga v. Suave Shoe Corp.*, 374 So.2d 552 (Fla. 3d DCA 1979).

In the instant case, Plaintiff is currently suffering financial harm because Defendant no longer allows them to open lines of service, or even make use of the lines already paid for. Plaintiff will certainly suffer future financial harm, and that amount is not readily ascertainable. In a few short month's Plaintiffs business grew exponentially, as demonstrated by the monthly bills. The parties have over a year left on their contractual term, and Plaintiff is entitled to operate until November of 2021. Plaintiff has already sustained injury to its goodwill amongst its customers, many whom Plaintiff also serves abroad. Plaintiff has lost numerous orders and customers have begun to complain about the inability to rely on Plaintiff for their data service's needs.

### D. Plaintiff Lacks an Adequate Remedy at Law.

A party lacks an adequate remedy at law where damages are unavailable or are "so speculative as not to be susceptible of proof." *So. Colonization Co. v. Derfler*, 75 So. 790, 794 (Fla. 1917); see also *Thompson v. Planning Comm 'n*, 464 So.2d 1231, 1237 (Fla. 1st DCA 1985) (where damages are speculative, the remedy is inadequate).

The Plaintiff solely relies on AT&T for its services and operates under this sole contract. Plaintiff's business will cease to exist by October 1, 2020 if the injunction not be granted. This cannot be remedied with a monetary judgment or later ordering specific performance.

On the other hand, the Defendant a multinational conglomerate that can withstand any negative impact of the injunction for (90) and likely suffer no harm. In fact, the Defendant will profit from the Plaintiff's contract.

Plaintiff's international brand, albeit less than three years in the making, has grown at a significant rate and at a time where economic uncertainty is on the rise globally. If Defendant is permitted to cancel Plaintiff's account or continue the unfair tactics exhibited since the filing and serving of this suit, the harm to Plaintiff will be permanent. The Island Wi-fi brand globally is being forever impacted and the liability Plaintiff may face is untold, should any harm come to any clients due to the loss of crucial internet service at sea. In their written opinion *of Liza Danielle, Inc. v. Jamko, Inc.*, Florida's Third District Court of Appeals adopts the following statement:

> Lack of an adequate remedy at law is a prerequisite for equitable relief, and furthermore, "an injunction will not lie where there is a choice between the ordinary processes of law and the injunction, the former being sufficient to furnish the full relief to which the complaining party is entitled." 29 Fla.Jur.2d, Injunctions 17. On the other hand, however, it has been said that "in order to preclude pursuit of equitable remedies an available legal remedy must be plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice." 29 Fla. Jur.2d, Injunctions 18.

408 So. 2d 735, 738 (1982). Considering the above, it seems quite deserving in this matter that AT&T be enjoined from the egregious conduct it has exhibited. AT&T is a large corporation with vast financial resources, certainly enough resources to litigate its disputes. It is AT&T who has the adequate remedy should the claim be true that Plaintiff is in breach, instead AT&T chooses an unlawful approach and submits false guarantees. To deny the Plaintiff's injunction would condone

the party who has an adequate remedy at law, financial resources to pursue it, but chooses to ignore that avenue and opt for a less judicious approach.

## E. Public Policy Consideration Favors an Injunction

Courts across the United States, including our Supreme Court have held close to the notion that "a freely negotiated private agreement unaffected by fraud, undue influence, or overweening bargaining power should be given full effect." *Manrique v. Fabbri*, 493 so. 2d 437, 439 (Fla. 1986). Citing *The Bremen v. Zapata Off-Shore Co.*, (407 U.S. 1, 1972).

If this injunction is not granted, many of the clients of the Plaintiff will be stuck at sea without the instantaneous weather updates and tracking they relied on with the wi-fi service.  It can be dangerous for such clients to navigate on their vessels when they planned on using wi-1fi for such services. This is especially alarming given that it is hurricane season.  A ninety (90) injunction will not only serve to save a business but it may actually save lives and allow clients to avoid peril.

Specifically, Plaintiff's clients may be forced to endure hazardous conditions at sea. This is not conjecture, but reality, as Defendant originally planned to terminate service on August 17, 2020. Hurricane Laura made it path through the Gulf of Mexico, where Plaintiff's customers frequent, just days after AT&T would have shut down their internet capabilities, had it not been for the Plaintiff initiating this litigation. If AT&T shuts down the account, Plaintiffs clients will be placed in jeopardy and lives will be endangered

AT&T certainly was not overcome in their bargaining power in this agreement by a company of less than 20 employees, only a few days old at the time of contracting.  In balancing the hardships of the parties, it is clear that the Defendants breach weighs heavier on the Plaintiffs than it does on the Defendants.  Defendant is an international company. Its offices in will remain

open and active, and there is no reason to assume that Defendant will need to close their doors if they abide by the contract.  In fact, the contract will positively affect the Defendant's sales and profits.

Consequently, the parties' agreement should be given its full effect. The only way to do that, is for this Honorable Court to grant this Emergency Petition for Plaintiff immediately, as the Plaintiff is experiencing irreparable harm. If the injunction is issued, Plaintiff will continue making all payments and complying with all contractual obligations owed. Further Plaintiff is aware and capable of posting any reasonable bond ordered by this Honorable Court.

## **CONCLUSION**

Plaintiff has demonstrated, through this sworn petition, sworn complaint and accompanying affidavit that the facts of this case and evidence provided:

A.      Irreparable harm would occur if an injunction is not granted,

B.      Plaintiff has a substantial likelihood of success on the merits,

C.      Plaintiff lacks an adequate remedy at law, and

D.      Consideration of the Public Interest supports the injunction.

**WHEREFORE** Plaintiff ISLAND WIFI LIMITED LLC., respectfully requests this Honorable Court enter an Order Granting this Petition for Injunctive Relief, specifically enjoining the Defendant AT&T MOBILITY NATIONAL ACCOUNTS LLC., and all its affiliated entities from: disconnecting, discontinuing, or in any manner interrupting the service of Plaintiff's account including Plaintiff's use of the account and accompanying portal, for a period of at least ninety 90 days, or until such time deemed necessary by this Court, that the Court may hear the parties and determine to lift or extend the injunction, an award of reasonable attorney's fees, court costs and any further relief this Honorable Court Deems just and proper.

EXHIBIT A

**AT&T reserves the right to withdraw this Agreement, if this Agreement is not executed by the Customer before: 02/28/2020**



**Location Account ID: 10000002562**

### AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT
### VERSION 13-A

| Island Wifi Limited | | | 800-570-0316 |
|---|---|---|---|
| Customer Legal Name ("Customer") | | D/B/A | Main Telephone Number |
| 41 SE 5th St Suite 2005 | Miami | FL | 33131 |
| Street Address | City | State | ZIP Code |
| LeAnne Rozelle | | 800-570-0316 | |
| Primary Contact Name and Email Address | | Primary Contact Telephone Number | |
| Check one: ☐ Corporation | ☐ Partnership | ☒ Limited Liability Corporation/Partnership   ☐ Other | |
| State of Formation: | <u>LA</u> | **Effective Date:** _____<br>(To be completed by AT&T only) | |

**Agreement:** This AT&T Corporate Digital Advantage Agreement between Customer, on behalf of itself and as agent for its Affiliates, and AT&T Mobility National Accounts LLC ("AT&T"), on behalf of itself and as agent for the Carriers, consists of (a) this Cover Page, (b) the attached AT&T Corporate Digital Advantage Program Description (the "Program Description"), (c) the General Terms and Conditions in effect on the Effective Date and found at the Program Website ("General Terms and Conditions"), and (d) all AT&T materials incorporated by reference in the foregoing, such as applicable Attachments found at the Program Website and Sales Information, and the AT&T Acceptable Use Policy found at www.att.com/legal/terms.aup.html (collectively, the "Agreement").

**Program Website:**      **www.att.com/cda**

**Term:** The Agreement is for an initial term beginning on the Effective Date and continuing for a period of:
☒ Two years    ☐ Three years    ☐ Four years    ☐ Five years

At the end of this initial term, the Agreement will automatically renew for successive one (1) year terms unless either party gives the other party notice of its intent not to renew at least ninety (90) days prior to the end of the then current term.

---

**Initial MAC:**                                                                                                              $45,000

---

**By signing below, the parties agree to be bound by the terms and conditions of the Agreement.**

| **Customer**<br>(by its authorized representative) | **AT&T**<br>(by its authorized representative) |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

**AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A**
**PROGRAM DESCRIPTION**

**1.   Service.**  AT&T, through Carriers, will provide Service to Customer, its Affiliates and their respective Employees.  Employees may receive Service under the Agreement as CRUs or IRUs.

**2.   AT&T Corporate Digital Advantage Program Eligibility Requirement.**

**2.1   Minimum Revenue Requirement.**  Customer must generate at least $45,000 in Service Revenue per Term Year.  If Customer fails to achieve this revenue requirement in any Term Year, Customer will pay AT&T the difference between $45,000 and the Service Revenue amount that Customer actually paid in such Term Year.  In the event Customer fails to comply with this eligibility requirement, Customer is no longer eligible for the Service Discount or any other program components, and AT&T may immediately discontinue provisioning all such program components in addition to pursuing any other remedies available under the Agreement.

**3.   Service Discount and MAC Contribution.**

**3.1   Generally.**  Subject to the restrictions set forth in this Section, AT&T will provide Customer with the Service Discount specified in Table 3.1 below based on Customer's MAC.  All Qualified Charges incurred by Customer, its Affiliates and their respective CRUs in AT&T Markets contribute towards the MAC.  **AT&T may restrict certain Plans or certain other discount programs from either contributing to Customer's MAC or qualifying for the Service Discount or both.  AT&T will advise Customer if such restrictions apply.**  AT&T will only apply the Service Discount to the Monthly Service Charge of eligible Voice Service and Wireless Data Service Plans.  It may take several billing cycles for the Service Discount to be applied.

**Table 3.1**
**MSC Service Discount**

| MAC | MSC Service Discount for CRUs | MSC Service Discount for IRUs |
|---|---|---|
| $45,000 and higher | 20% | 18% |

**3.2   MAC Modification.**  Customer's initial MAC is set forth on the Cover Page.  Customer may modify its MAC for the subsequent Term Year.  Any such modification is subject to AT&T's consent, which will not be unreasonably withheld or delayed, and the parties will memorialize the modification in a signed writing.  Customer must notify AT&T of its desire to modify the MAC within thirty (30) days after each Term Year; however, the authorized modification will become effective as soon thereafter as reasonably practicable.  In connection with any such MAC modification, AT&T may (a) modify Customer's Service Discount; and/or (b) permit or restrict Customer's access to certain other program components.  Customer's MAC modification will not affect the Reconciliation Obligation for the prior Term Year (see §3.3 of the Program Description).

**3.3   Service Discount Reconciliation.**  If Customer fails to achieve the MAC, as modified, Customer will pay AT&T the difference between the amount of the Service Discount received by Customer, and/or End Users, and the amount of the Service Discount for which Customer would have qualified considering Service Revenue actually received by AT&T during that Term Year (the "Reconciliation Obligation").  In the event Customer owes the Reconciliation Obligation, AT&T may reduce Customer's Service Discount percentage by an amount sufficient to offset the Reconciliation Obligation.  The amount and duration of this Service Discount reduction is at AT&T's sole discretion, provided that AT&T will not offset more than the total amount of the Reconciliation Obligation.

**3.4   Ramp Year.**  If Customer has a MAC of $200,000 or higher, then, during the first Term Year only, Customer will be deemed to have achieved its MAC for that first Term Year if AT&T receives Service Revenue in an amount equal to 75% of the MAC on or before the first anniversary of the Effective Date.  This §3.4 applies only for purposes of determining whether Customer has achieved its MAC during the first Term Year and does not apply to or otherwise affect Customer's obligations under §2 of the Program Description or any other obligations under the Agreement.

**4.   Sponsorship Program.**  Customer's Employees may elect to participate in the Sponsorship Program as IRUs.  Employees must be validated in order to become IRUs, and any Employees not so validated will not be IRUs under the Agreement and will not receive corresponding program benefits.

**4.1   Sponsorship Program Activation Processes and Procedures.**  Each IRU participating in the Sponsorship Program: (a) must enter into, and be individually responsible for complying with an IRU Service Agreement including, without limitation, the corresponding obligations to comply with all of the terms and conditions of the chosen Plan and to pay all charges incurred under the IRU Service Agreement; and (b) must follow the activation, validation, migration, upgrade and related policies, procedures and processes established by AT&T from time to time, including without limitation paying any applicable enrollment fees.

**4.2   Sponsorship Program Features.**  Under the Sponsorship Program: (a) IRUs may choose from select Plans available to Customer within each AT&T Market (provided they qualify for the chosen Plan); (b) IRUs will receive the Service Discount in accordance with §3 of the Program Description; (c) Qualified Charges incurred by IRUs will contribute to Customer's MAC in accordance with §3 of the Program Description; and (d) IRUs and their usage will contribute to Customer's eligibility requirements set forth in §2 of the Program Description.

**4.3   Marketing Assistance.**  Customer will assist AT&T in obtaining Employees' participation in the Sponsorship Program as follows:

• Posting and maintaining a hyperlink from Customer's intranet site for Employee-related benefits to the att.com landing page established for Customer's IRUs;

**AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A**
**PROGRAM DESCRIPTION**

• Posting AT&T-provided Sponsorship Program flyers or digital signage in break room(s) and/or other Employee common area(s) of Customer's main campus at least once per calendar quarter;

• Permitting AT&T sales representatives to participate in two (2) "onsite events" per year at the Customer's main campus, the date and time of which shall be mutually agreed upon by the parties; and

• Any other mutually agreed upon marketing efforts, which shall be documented in a writing signed by both parties.

**5.   Financial Responsibility.** Customer must pay for all charges incurred under the Agreement, regardless of whether such charges were incurred by Customer, its Affiliates or their respective CRUs. Customer is not liable for any charges incurred by IRUs under this Agreement or any IRU Service Agreement.

**6.   Invoicing Options.** With respect to Service, Customer will have the invoicing options set forth in this §6.

**6.1     Consolidated Invoicing.** Under consolidated invoicing, AT&T will provide an online invoice to Customer each month that consolidates all CRUs' Service charges for the preceding monthly billing cycle, except as may otherwise be noted in applicable online or printed terms and conditions of an AT&T offer, product, service, or Plan. This invoicing method is only available through Premier. Consolidated invoicing is not offered in conjunction with Corporate Responsibility User invoicing. Customer must promptly notify AT&T of any Numbers to be added or deleted from Customer's online invoice.

**6.2     Corporate Responsibility User Invoicing.** Under Corporate Responsibility User invoicing, AT&T will provide invoices to Customer's CRUs each month that set forth such CRUs' Service charges for the preceding monthly billing cycle. Corporate Responsibility User invoicing is not offered in conjunction with consolidated invoicing.

**7.   Cancellation Fee.** In the event AT&T offers and Customer elects to purchase Equipment with a service commitment, the service commitment begins either on the date (a) the Equipment is activated with a new CRU line of Service or (b) an existing CRU line under the Agreement is upgraded to the Equipment (with or without a migration to a different Plan). For each CRU that is terminated from Service more than 30 days after activation but prior to the expiration of the applicable service commitment, Customer agrees to pay AT&T with respect to each device identifier or Number assigned to such CRU, in addition to all other amounts owed, a Cancellation Fee in the amount specified below ("Cancellation Fee"). The Cancellation Fee for certain specified Equipment (e.g., smartphones) will be $325 minus $10 for each full month toward the service commitment that the CRU completes. (For a complete list of the specified Equipment, check www.att.com/equipmentETF.) Otherwise, the Cancellation Fee will be $150 minus $4 for each full month toward the service commitment that the CRU completes. The Cancellation Fee is not a penalty, but rather a charge to compensate AT&T for Customer's failure to satisfy the service commitment. For the avoidance of doubt, Customer will not pay any Cancellation Fee(s) under one of AT&T's device installment plan pricing options described in the applicable online Attachment found at the Program Website. Customer acknowledges and agrees that porting a CRU's Number to a non-AT&T service provider before the end of the applicable service commitment constitutes a termination subject to this Cancellation Fee. Customer may terminate a CRU's Service within the first 30 days after activation without incurring a Cancellation Fee, but equipment restocking or other fees may apply. Customer should refer to AT&T's returns policy at www.wireless.att.com/cell-phone-service/legal/return-policy.jsp, or such other site as AT&T may designate from time to time, for additional details.

**8.   Customer's Affiliates.** Customer agrees that any of its Affiliates receiving Service under the Agreement meet, and will continue to meet throughout the term of the Agreement, the definition of "Affiliate" set forth in the General Terms and Conditions.

**9.   Resale and Other Prohibited Uses.** Customer, its Affiliates (if applicable) and their respective CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third parties whether directly or indirectly including, without limitation, through machine to machine transmissions.

**10. Definitions.** In addition to terms defined elsewhere, these terms have the following meanings in the Agreement:

**10.1    "CRU" and "Corporate Responsibility User"** mean an Employee receiving Service under Customer's account.

**10.2    "Effective Date"** means the effective date of this Agreement.

**10.3    "Employees"** means Customer's or its Affiliate's current, validated personnel receiving Federal W-2 or K-1 tax treatment.

**10.4    "End Users"** means CRUs and IRUs, collectively.

**10.5    "IRU" and "Individual Responsibility User"** mean an Employee receiving Service under an individual account in accordance with the Sponsorship Program.

**10.6    "IRU Service Agreement"** means a separate wireless service agreement between an IRU and AT&T for Service, Equipment and related matters.

**10.7    "MAC"** means Customer's minimum annual commitment of Service Revenue.

**10.8    "Monthly Service Charge"** means the set fee charged monthly for use of the Service available with a particular Plan (i.e., the monthly "plan charge", not the monthly per device "access charge", if any).

**10.9    "Non-Qualified Charges"** refers to the following charges: (a) charges for long distance service, (b) all charges for local landline interconnect, toll services and other charges arising from or related to wireless operators providing long distance service, (c) monthly access charges related to AT&T's abbreviated dialing code product, (d) all charges for Equipment, (e) roaming charges

## AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
### PROGRAM DESCRIPTION

if not using AT&T's wireless network, (f) charges for other goods and services that Customer, a CRU and/or an IRU authorizes to be charged through the wireless bill; (g) shipping and handling charges; (h) all Taxes; and (i) all other charges not described as "Qualified Charges" herein.

**10.10** **"Qualified Charges"** refers to the following undiscounted AT&T Mobile Services charges: (a) one-time charges for Service activation and conversion, (b) the Monthly Service Charge, (c) home wireless usage charges, (d) roaming charges incurred by Numbers provisioned from AT&T Markets while roaming in other AT&T Markets and using AT&T's wireless network, (e) charges for detail billing, (f) charges for tethering if using AT&T's wireless network, (g) charges for additional wireless service features such as voice mail if using AT&T's wireless network, but excluding enhanced features such as directory assistance or fee-based information services and (h) monthly recurring access charges for qualified Supplemental Services identified at www.att.com/abs-addtl-terms from time to time.

**10.11** **"Service Discount"** means a monthly discount on eligible AT&T Mobile Services that is based on Customer's MAC and applied to an eligible End User's Monthly Service Charge as described in this Program Description.

**10.12** **"Service Revenue"** means revenue from Qualified Charges received by AT&T.

**10.13** **"Term Year"** means any year of the term of the Agreement, including any renewal year.

**11. OTHER PROGRAM COMPONENTS.** Provided Customer is in compliance with the Agreement and maintains its MAC in the amount of $45,000 or higher, AT&T will make available to Customer the additional custom offers described in this Section 11 (including subsections) during the applicable Offer Period and only with respect to CRU lines of service for which Customer has met the corresponding eligibility requirements.

### 11.1. Waiver of Select Fees

| Custom Offer | Offer Period | Eligibility Requirements |
|---|---|---|
| Waiver of Activation Fee (i.e., start of Service fee) | Initial term and renewal term(s) | Activate a new CRU line of Service on an available Voice Service Plan and/or Wireless Data Service Plan during the Offer Period. |
| Waiver of Equipment Shipping Fee | Initial term and renewal term(s) | Purchase new Equipment for a new or existing CRU line of Service during the Offer Period. (Shipping carrier will be determined by AT&T.) |

**11.2. Accessory Discounts.** AT&T will make available Accessory Discounts as described below. Accessory Discounts are applicable only to select phone and tablet accessories identified as discount-eligible at point of sale, which are determined solely by AT&T and may vary from time to time. Accessory Discounts may not be combined with any other promotional accessory pricing or offers.

| Accessory Discount for CRUs | Accessory Discount for IRUs |
|---|---|
| 25% | 25% |

### 11.3 Custom Equipment Pricing

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| iPhone® XR (64GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $299.99 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® S10 (128GB) | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $599.99 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| Samsung Galaxy® A10E | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | $24.00 | Initial term and renewal term(s) | During the Offer Period:<br>• Purchase the Qualified Device from AT&T with an Equipment Installment Plan for a new or upgrade-eligible existing CRU line of service; and<br>• Activate such new CRU line of Service on, or migrate such existing CRU line of service to, the Qualified Plan. |
| * Offer subject to Equipment availability. | | | | |

AT&T CORPORATE DIGITAL ADVANTAGE AGREEMENT – VERSION 13-A
PROGRAM DESCRIPTION

| Qualified Device* | Qualified Plan | Equipment Price** | Offer Period | Eligibility Requirements*** |
|---|---|---|---|---|
| ** Price does not include applicable taxes and may not be combined with other Equipment-related discounts or other offers. | | | | |

### 11.4. Additional Plans

AT&T will make available to Customer the Custom Plans described below (each a "Custom Plan"). Each Custom Plan is subject to additional plan-specific pricing and terms set forth in the corresponding Sales Information, as modified by AT&T from time to time and which is incorporated herein by reference.

| Custom Plan | Offer Period | Eligibility Requirements | Sales Information* |
|---|---|---|---|
| AT&T Business Select Exclusive Plans | Initial term and renewal term(s) | New or existing CRU line with an eligible smartphone, feature phone or data-only Equipment (i.e., tablet, LaptopConnect/aircard, or mobile hotspot device) | See Sales Information found at www.att.com/bizselectexclusive |

* Incorporated by reference into this Agreement.

### 11.5. AT&T Digital Concierge Credit.

| AT&T Digital Concierge Credit Amount | Qualified Service | Offer Period | Eligibility Requirements |
|---|---|---|---|
| $20.00 | For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher | First 120 days after the Effective Date. | During the Offer Period:<br>• For each new CRU Service activated by the AT&T Digital Concierge Service with a Monthly Service Charge of $20.00 or higher during the Offer Period; and<br>• Activate it with a new CRU line of service in accordance with the corresponding Qualified Service; and<br>• Continue to receive in accordance with the corresponding Qualified Service at the time the AT&T Digital Concierge Credit is applied. ** |
| ** Each AT&T Digital Concierge Credit will appear on the applicable invoice as a "bottom of the bill" credit applied after application of discounts, taxes, surcharges and fees. AT&T Digital Concierge Credit shall be inclusive of credits associated with surcharges and fees assessed on the Service. It will take up to three (3) billing cycles after the 120 day Offer Period for each AT&T Digital Concierge Credit to appear. | | | |

### 11.6. Activation Credits

| Activation Credit Amount | Qualified Equipment | Qualified Plan* | Offer Period | Eligibility Requirements |
|---|---|---|---|---|
| $100.00 | Smartphone | AT&T Business Select Exclusive Plans for Smartphones - see Section 11.4 (Additional Plans) | First 120 days after the Effective Date | During the Offer Period:<br>• Purchase the Qualified Equipment from AT&T with an Equipment Installment Plan or other available smartphone installment plan installment agreement; and<br>• Activate it with a new CRU line of service on the corresponding Qualified Plan; and<br>• Each Qualified Activation must continue to be on the Qualified Plan at the time the Activation Credit is applied.** |
| * Plan pricing and terms are set forth in the applicable Sales Information, which is incorporated by reference into the Agreement.<br>** Each Activation Credit will appear on the applicable invoice on the bottom of the bill after application of discounts, taxes, surcharges and fees. It will take up to three (3) billing cycles after activation for the Activation Credit to appear. | | | | |

**12. Incorporation of Agreement.** The terms, conditions and defined terms set forth in all documents comprising the Agreement including, without limitation, the Cover Page, this Program Description, the General Terms and Conditions, and other applicable online terms and conditions, apply throughout all such documents.

EXHIBIT B



Jacob Spragg <jacob@spragglawfirm.com>

## SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>                          Mon, Aug 17, 2020 at 12:36 PM
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Please accept this e-mail as confirmation that no action will be taken on the account while Litigation counsel reviews the dispute.  Hence, there is no need for an emergency hearing on your motion for injunctive relief.

Also, I understand other employees are receiving subpoenas via e-mail.  Do not contact any AT&T employee directly regarding this matter, as they are represented parties.  Please only communicate with me until further notice.  If you have sent any other emails to any other employees since Friday, please forward those to me.

Thank you for your attention.

**Patricia Simone Cruz**

Assistant Vice President - Senior Legal Counsel - Litigation

**AT&T**

600 N.W. 79th Avenue, Room 684, Miami, FL 33126

Office: 786.792.5470 | Cell: 786.452.5962 | pc515g@att.com

MOBILIZING **YOUR** WORLD

This message may contain attorney-client privileged communications and/or attorney work product. This email and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this email is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this email is strictly prohibited.

[Quoted text hidden]
[Quoted text hidden]

> [Quoted text hidden]
> [Quoted text hidden]
>
> Thank you,
>
> --

8/24/2020                    Spragg Law Firm Mail - SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

[Quoted text hidden]

[Quoted text hidden]

8/24/2020                    Spragg Law Firm Mail - SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.



Jacob Spragg <jacob@spragglawfirm.com>

## SERVICE OF COURT DOCUMENT - Island Wifi Limited LLC v. AT&T Mobility Services LLC.

**CRUZ, PATRICIA S (Legal)** <pc515g@att.com>                                     Mon, Aug 17, 2020 at 2:01 PM
To: "Legal Solutions (BLUE LINE Law Intake)" <intake@tbllf.com>
Cc: "Jacob@SpraggLawFirm.com" <Jacob@spragglawfirm.com>

Kevin - I would like to clarify your statement: "we agree that an emergency order needs to be filed or heard at this time."
Maybe there was a typo in your email, but AT&T does _not_ agree that an emergency order needs to be entered or that an
emergency motion needs to be heard at this time.  The emergency motion sought an order to maintain the status quo.
The status quo is being maintained until further notice.  I am in the process of reviewing the dispute.  As soon as I have a
chance to consult with my clients, I will get back to you regarding AT&T's position regarding termination.  In the meantime,
I do agree a stay of the litigation is appropriate.  Please send a draft agreed order staying litigation for my review.  Thank
you.

[Quoted text hidden]

Exhibit C

 Gmail

J Spragg <jacobspragg8@gmail.com>

## Fwd: Island WIFI Limited - Account 287295933298

**leo tripp** <leo.tripp@myislandwifi.com>
To: JacobSpragg8@gmail.com

Mon, Aug 3, 2020 at 6:42 PM

---------- Forwarded message ---------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri, Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>



RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale prohibition in the AT&T Service Agreement. Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third-parties whether directly or indirectly, including, without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete the message from*

your computer.  Any other uses, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited."

*Leo Tripp*

CEO of Island Wifi Ltd.  dba "My Island Wifi"
(318) 218-9447 Direct Cell / WhatsApp
Leo.Tripp@MyIslandWiFi.com
www.MyIslandWiFi.com

EXHIBIT D

 **Gmail**

J Spragg <jacobspragg8@gmail.com>

## Fwd: Island WIFI Limited - Account 287295933298

**leo tripp** <leo.tripp@myislandwifi.com>
To: JacobSpragg8@gmail.com

Mon, Aug 3, 2020 at 6:42 PM

---------- Forwarded message ---------
From: **WHITE, LARRY** <lw2346@att.com>
Date: Fri, Jul 17, 2020 at 3:37 PM
Subject: Island WIFI Limited - Account 287295933298
To: leo.tripp@myislandwifi.com <leo.tripp@myislandwifi.com>



RE: 287295933298

Dear Mr. Tripp,

As discussed, based on your current usage AT&T has determined you are reselling service in violation of the resale prohibition in the AT&T Service Agreement.  Specifically, Section 9 reads:

> **Resale and Other Prohibited Uses.** Customer and its CRUs are not permitted to resell, reproduce, retransmit, or disseminate Service or any other program components to third-parties whether directly or indirectly, including, without limitation, through machine-to-machine transmissions.

If you have not taken actions to move reselling activity away from AT&T, the accounts will be canceled on 8/17/2020.

Larry White
Global Fraud Management Organization
Senior Fraud Case Manager

Work: 908-506-6027

WHP: 732-310-6921
lw2346@att.com

Web: www.att.com/cyberaware

*"This e-mail and any files transmitted with it are AT&T property, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed.  If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete the message from*

your computer.  Any other uses, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited."

*Leo Tripp*

CEO of Island Wifi Ltd.  dba "My Island Wifi"
(318) 218-9447 Direct Cell / WhatsApp
Leo.Tripp@MyIslandWiFi.com
www.MyIslandWiFi.com

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-017369-CA-01
SECTION: CA24
JUDGE: Antonio Arzola

**ISLAND WIFI LIMITED LLC**
Plaintiff(s)

vs.

**AT&T MOBILITY NATIONAL ACCOUNTS LLC.**
Defendant(s)

_____/

**ORDER ON PLAINTIFF'S EMERGENCY MOTION FOR ENTRY OF TEMPROARY [SIC] INJUNCTION**

THIS MATTER came before the Court pursuant to Plaintiff Island Wifi Limited, LLC's Emergency Motion for Entry of Temproary [*sic*] Injunction. Upon review of the motion, after conducting a hearing, and being otherwise fully advised, THE COURT HEREBY ORDERS AS FOLLOWS:

Plaintiff's motion is DENIED WITHOUT PREJUDICE. The Motion was merely one paragraph and referred the Court to the complaint. The Court finds such a motion to be legally insufficient. Plaintiff may re-file a motion for temporary injunction that includes a memorandum of law and, after filing the same, Defendant AT&T Mobility National Accounts LLC shall have seven days to file any response. The parties' individual briefings shall not exceed 20 pages.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>4th day of September, 2020</u>.

<u>2020-017369-CA-01 09-04-2020 11:33 AM</u>
Hon. Antonio Arzola

**CIRCUIT COURT JUDGE**
Electronically Signed

<div style="border:1px solid red;">

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

</div>

**Electronically Served:**
Derek E Leon, dleon@leoncosgrove.com
Derek E Leon, eperez@leoncosgrove.com
Jacob Spragg, jacob@spragglawfirm.com
Jordi C. Martinez-Cid, jmartinez-cid@leoncosgrove.com
Jordi C. Martinez-Cid, lburns@leoncosgrove.com
Kevin Drummond, Intake@tbllf.com
Kevin Drummond, Kevin@tbllf.com
Krystal Vasquez, kvasquez@leoncosgrove.com

**Physically Served:**

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 2020-017369-CA-01

ISLAND WIFI LIMITED, LLC., a Foreign
Limited Liability Company,

     Plaintiff,

vs.

AT&T MOBILITY NATIONAL ACCOUNTS
LLC., a Foreign Limited Liability Company,

     Defendant,

_____/

## NOTICE OF APPEARANCE AND DESIGNATION OF E-MAIL ADDRESSES

Please take notice that the law firm of León Cosgrove LLP appears in this case as counsel for AT&T Mobility National Accounts LLC. All parties are requested to forward copies of all correspondence and pleadings to the undersigned counsel at the address listed below. In addition, all pleadings and papers in this action shall be served by e-mail under Florida Judicial Administration 2.516 to the following:

| | Primary e-mail address | Secondary e-mail address |
|---|---|---|
| Derek E. León | dleon@leoncosgrove.com | eperez@leoncosgrove.com |
| Jordi C. Martínez-Cid | jmartinez-cid@leoncosgrove.com | lburns@leoncosgrove.com |

CASE NO. 2020-017369-CA-01

Dated: September 2, 2020

Respectfully submitted,

*s/ Jordi C. Martínez-Cid*_____
Derek E. León
  Florida Bar No. 625507
Jordi C. Martínez-Cid
  Florida Bar No. 100566
Email: dleon@leoncosgrove.com
Email: jmartinez-cid@leoncosgrove.com
Email: eperez@leoncosgrove.com
Email: lburns@leoncosgrove.com

**LEÓN COSGROVE, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975

*Counsel for AT&T Mobility*
*National Accounts, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2020, a true and correct copy of the foregoing was

served via the Florida Courts E-Filing Portal and/or U.S. Mail on the following:

Kevin Drummond
BLUE LINE LAW FIRM, PLLC
1645 Palm Beach Lakes Blvd., Suite 1200
West Palm Beach, FL 33401
Email: intake@tbllf.com

*Counsel for Plaintiff*

*/s/Jordi C. Martínez-Cid*_____
Jordi C. Martínez-Cid

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO.: 2020-017369-CA-01**

**SECTION:** CA24

**ISLAND WIFI LIMITED LLC**
**Plaintiff(s),**

**vs.**

**AT&T MOBILITY NATIONAL ACCOUNTS LLC.**
**Defendant(s)**

_____/

<u>**NOTICE OF SPECIAL SET HEARING**</u>
**Status Conference**

    **YOU ARE HEREBY NOTIFIED** that, a Special Set hearing on the above cause is scheduled for ___**15 min**___ on ___**09-03-2020 at 10:30 AM**___ in Room Virtual courtroom.

**Due to COVID-19, this courthouse is closed for in-person appearance. Virtual Court is held remotely on the Zoom platform. You will receive an email from the Court with the information you need to connect to your event by video or phone if you are on the E-Filing Portal service list. You may also register for text notification via link below.** https://cmap.jud11.flcourts.org/ebench/textNotificationsRegistration.jsp

<u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above notice was delivered to the parties below on ___**09-01-2020**___.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355, Email: ADA@jud11.flcourts.org at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.**

Copies Furnished to:
Electronically Served

Jacob Spragg, jacob@spragglawfirm.com
Kevin Drummond, Intake@tbllf.com
Kevin Drummond, Kevin@tbllf.com
Jordi Martinez-Cid, jmartinez-cid@leoncosgrove.com